**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL LEHRMAN and LINNEA SAGE, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>   v.<br><br>LOVO, INC.,<br><br>               Defendant. | No.<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiffs Paul Lehrman and Linnea Sage ("Plaintiffs"), on behalf of themselves and all others similarly situated, for their Complaint against Defendant Lovo, Inc. ("LOVO"), state as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of Plaintiffs and similarly situated persons whose voices and/or identities were stolen and used by LOVO – to create millions of voice-over productions – without permission or proper compensation, in violation of numerous state right of privacy laws, and the federal Lanham Act. LOVO is a technology company with proprietary software driven by artificial intelligence (AI) that allows LOVO's clients to create and edit voice-over narrations adapted from real actors. To be clear, the product that customers purchase from LOVO is stolen property. They are voices stolen by LOVO and marketed by LOVO under false pretenses: LOVO represents that it has the legal right to market these voices, but it does not.

**THE PARTIES**

2.      Plaintiff Paul Lehrman is a resident of New York and is a voice-over actor.

3.      Plaintiff Linnea Sage is a resident of New York and is a voice-over actor.

4.      Defendant Lovo, Inc. is a Delaware-incorporated corporation with a principal address of 2150 Shattuck Avenue, Berkeley, California 94704.

**JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States; and under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.      This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in New York County.

7.      In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

8.      In addition, under 28 U.S.C. § 1332(d)(2), this Court shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant (28 U.S.C. § 1332(d)(2)(A)).

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions that give rise to the claims alleged herein

occurred in New York County, the principal injuries stemming from the violations alleged herein occurred in the State of New York, and this Court has personal jurisdiction over Defendant.

## BACKGROUND

10.     The voice-over industry is estimated to generate more than $2 billion annually in the United States, and more than $4 billion annually worldwide.

11.     Voice-overs, commonly known as narrations, are integral to various industries, spanning entertainment, advertising, marketing, education, and other corporate sectors. They serve as indispensable tools across a wide array of mediums, including film and television, commercials, animation, audiobooks, e-learning, corporate presentations, marketing presentations, educational videos, interactive voice response (IVR) systems, podcasting, video games, documentaries, virtual assistants, public announcements, dubbing, radio imaging, audio dramas, museum exhibits, phone systems, language learning, medical narration, corporate training modules, websites, sales pitches, and digital content. They are even used in venture capital funding pitches.

12.     Traditionally, actors are hired to read scripts, which may be recorded in outside studios or with the actor's own equipment. The recordings are then edited, changes or re-recordings produced, and a final recording is laid into the show or presentation.

13.     The actors are paid a negotiated amount for the use of their voices, and typically for the time spent recording the audio requested. The negotiated amount is a function of the actor's name, brand value, where, and in what medium the voice-over will be used, and for how long it will be used. Payments typically include upfront fees,

royalties, residuals, or some combination of these payments. And there are other potential fees required under Screen Actors Guild – American Federation of Television and Radio Artists (SAG-AFTRA) contracts.

14.     Actors like Plaintiffs get paid anywhere from $150 for a short recording for a local television tag, to $2,000 for a one-time sales presentation, to $6,000 minimum for a 13-week run of a TV commercial, or more depending on the project.[1] Established actors can typically make much more via residuals, and through daily fees which can exceed $1,000 per day and can involve several weeks of work.

15.     Failure to pay the actor a negotiated and agreed-upon price for their professional services – and often recognizable voice – is a violation of multiple statutes and common law.

16.     Defendant LOVO, by its own admission, is attempting to disrupt and "revolutionize" this traditional model. LOVO sells a text-to-speech subscription service that allows its clients – typically companies – to generate voice-over narrations at a fraction of the cost of the traditional model. LOVO does this by allowing subscribing customers to upload a script into its AI-driven software known as "Generator" or "Genny," and generate a professional-quality voice-over based on certain criteria. For example, LOVO customers can choose between – and designate their preference for – male or female voices, regional accents, and older or younger-sounding voices.

---

[1] *See, e.g.*, Global Voice Acting Academy, GVAA Rate Guide, https://globalvoiceacademy.com/gvaa-rate-guide-2/.

17.     As of January 2023, LOVO had created over 7 million voice-overs.[2] In a podcast, LOVO's chief executive officer and co-founder Tom Lee explained how LOVO's synthetic speech platform works:

> [I]magine … you have a real human voice, and we take that, and clone that, and make it available as an option for you to turn any text that you have into that voice. So, you can make that voice say anything that you want, even if that person has never actually said that before in their life.

18.     In that same 2023 podcast, Mr. Lee then stated that LOVO "only need[s] a person to read 50 sentences. … We can capture the tone, the character, the style, the phonemes, and if you have an accent, we can even capture that as well."

19.     LOVO also promotes its service using barely-disguised images and names of celebrities and states on its website, "Clone any voice." Only deep in its website does LOVO tell customers, "Mind you, you cannot use this cloned voice for imitation of celebrities, so only use this tool for personal entertainment purposes!"

20.     LOVO purports to compensate voice actors. That may be true in some cases. But Plaintiffs and other members of the class have received no revenue from the continued unauthorized use of their voices by LOVO and LOVO clients.

21.     The benefit to the business subscriber of using LOVO's service is financial: they do not have to pay the actor the studio session, any residuals, royalties, or fees – beyond the monthly subscription cost paid to LOVO.

22.     Implicit in LOVO's offerings to its customers is that each voice-over actor has agreed to LOVO's terms and conditions for customers to be able to access that

---

[2] *Category Visionaries*, Podcast, "Tom Lee, Co-Founder of LOVO AI: $7 Million Raised to Build the Future of AI Voiceovers" (Jan. 2023).

actor's voice. But for Plaintiffs and other members of the class who have not agreed to LOVO's terms, the continued unauthorized use of Plaintiffs' voices is theft of service and misappropriation.

23.     Plaintiffs and many members of the class are members of SAG-AFTRA.

24.     On its website, LOVO represents to potential clients that it has agreements with actors allowing LOVO to utilize those actors' voices and compensating them appropriately for that use. That may be true with respect to some actors, but it is emphatically not true with respect to Plaintiffs: LOVO had no permission to use Plaintiffs' voices for training its AI Generator, to promote the LOVO service, or to market voices based on Plaintiffs' voices. And LOVO never compensated Plaintiffs for any of LOVO's unauthorized uses of Plaintiffs' voices.

25.     Upon information and belief, LOVO has not entered into any agreement with SAG-AFTRA pertaining to the employment of its members for voice-over services. Those agreements are designed to protect the rights of SAG-AFTRA members – like Plaintiffs Sage and Lehrman –who are required by SAG-AFTRA's Global Rule 1 to eschew jobs that are not covered by the union's contract. By bypassing or ignoring the terms of agreements between SAG-AFTRA and producers and/or companies that are signatories to SAG-AFTRA agreements, LOVO endangers Plaintiffs' livelihood. Using Plaintiffs' voices without their consent may put Plaintiffs in involuntary breach of their union obligations and contracts.

26.     LOVO represents to its customers that LOVO is granting to the customer full commercial rights for all content generated using its platform to users who subscribe to any of its paid plans (Basic, Pro, Pro+, and Enterprise). Yet LOVO does not

legally own or control the rights it is purporting to give these customers – rights which remain with the actors whose voices have been illegally cloned or otherwise misappropriated.

27.     Indeed, any cost-avoidance completely depends upon the actor agreeing to participate in LOVO's scheme. Plaintiffs did not agree to LOVO's terms and did not grant LOVO any right to market their voices. In fact, Plaintiffs specifically rejected all entreaties to participate in any AI-driven voice-related software. Moreover, LOVO affirmatively misrepresented how Plaintiffs' voices would be used. And yet, LOVO used its proprietary software to appropriate, adapt, generate, steal, and market Plaintiffs' voices.

## DEFENDANT'S MISAPPROPRIATION OF PLAINTIFFS' VOICES

### Plaintiff Lehrman

28.     In May 2020 Mr. Lehrman was contacted via the Fiverr website to provide voice-over narrative services.

29.     Fiverr.com is an online marketplace that connects freelancers with clients looking for digital and creative services.

30.     Using the Fiverr platform, Mr. Lehrman communicated about the inquiry with someone who can now only be identified as "User25199087" (because the account has since been deleted).

31.     As Mr. Lehrman was preparing to upload the voice files requested by the hiring company, on May 12, 2020, he asked User25199087, "In addition can you please explain how the voiceovers will be used?"

32.     At 9:24 PM on May 12, 2020, User25199087 sent Mr. Lehrman a message: "We are researching speech synthesis with different accents and voices. Your voiceover will be used for academic research purposes only."

33.     Mr. Lehrman wrote back to User25199087, "Great. Still working through the scripts. Please guarantee that these scripts will not be used for anything other than your specific research project. My curiosity is getting the best of me. What is the goal of the research project?"

34.     User25199087 wrote back to Mr. Lehrman, "The scripts will not be used for anything else - and I can't yet tell you the goal, as it's a confidential work in process sorry haha."

35.     Mr. Lehrman responded to User25199087, "That's okay. Will my voice be repurposed and used in a different order?"

36.     To which User25199087 wrote to Mr. Lehrman, "The script and your finished file will be used for research purposes only."

37.     Mr. Lehrman delivered the requested voice files via Fiverr and was paid $1,200.

38.     In 2020, at the time of the online communications between Mr. Lehrman and User25199087, neither Mr. Lehrman, most other class plaintiffs, nor the general public had any idea what "speech synthesis" was. That Mr. Lehrman's voice was being used "for academic research purposes only" was a reasonable explanation. At no time did User25199087 ever accurately represent that Mr. Lehrman's voice would be used for anything other than "academic research purposes" – certainly not for commercial purposes.

39.     Several years later, Mr. Lehrman learned that User25199087 was an employee of Defendant LOVO, and the company that reached out to and hired Mr. Lehrman was LOVO.

40.     On March 28, 2022, Mr. Lehrman was approached by Fiverr and asked if he would like to add an AI software option to his Fiverr profile. Mr. Lehrman was told by the Fiverr executive that the AI software option would integrate software to his profile and allow customers to hear what Mr. Lehrman's voice could sound like if he were to read a script.

41.     Mr. Lehrman declined the invitation to add that AI/software to his Fiverr profile.

42.     Mr. Lehrman demonstrated to Fiverr that a user could easily produce commercial audio without consent or compensation as well as create violent, pornographic, or any unauthorized audio material without consent from the voice actor.

43.     On or about April 6, 2022, Plaintiffs learned that iNTECH, a YouTube channel (now called Military News) with more than 336,000 subscribers, had created and was promoting videos about Russian military equipment that used Plaintiff Lehrman's AI-generated voice. To be clear: Mr. Lehrman never recorded the YouTube videos; they were generated by a then-unidentified AI software without Mr. Lehrman's participation or approval.

44.     Concerned about the unauthorized replication of his voice on the YouTube channel, Mr. Lehrman contacted the Fiverr executive who had approached him on March 28, 2022, seeking help to identify the AI software used. The Fiverr executive

committed to consulting with Fiverr's legal team as well as the AI company he had partnered with for the AI profile software that had been offered, which Mr. Lehrman had previously declined. The Fiverr executive identified this company as LOVO, a name Mr. Lehrman was unfamiliar with at the time.

45.     Upon information and belief, iNTECH used LOVO's software to misappropriate and utilize Mr. Lehrman's voice – without his permission or compensation.

46.     Then, on or about June 13, 2023, Mr. Lehrman heard his voice being used on a podcast episode of "Deadline Strike Talk." Ironically, the episode was about the dangers of AI technologies.

47.     Upon information and belief, the Deadline Strike Talk podcast that used Mr. Lehrman's voice was created by LOVO software. Mr. Lehrman never gave permission to LOVO or to the Deadline Strike Talk podcast to use his voice, nor was he ever compensated for that unauthorized use.

48.     It was not until August 30, 2023 that Mr. Lehrman learned that the Fiverr client that requested his voice-over recording for research purposes in 2020 was a LOVO employee. And that admission was only made by LOVO's counsel after Plaintiff's counsel sent a cease-and-desist letter to LOVO's counsel.

## Plaintiff Sage

49.     On October 29, 2019, Plaintiff Sage was offered a job on the Fiverr website to produce test scripts for radio ads.

50.     Before accepting the job offer, Ms. Sage asked what the voice recording would be used for.

- 10 -

51.    Ms. Sage received a message from "tomlsg" at an anonymous company offering the job stating, "These are test scripts for radio ads. They will not be disclosed externally, and will only be consumed internally, so will not require rights of any sort."

52.    Ms. Sage accepted the job and was paid $400.

53.    Upon information and belief, "tomlsg" was LOVO co-founder Tom Lee.

54.    Some years later, in June of 2023, Ms. Sage discovered that LOVO had been using, manipulating, and editing her voice in promotional materials for Defendant LOVO for many years, including but not limited to, in a five-minute investor presentation at the Berkeley SkyDeck Demo Day Spring 2020 event, which was also posted to YouTube (despite previous assurance that the use of Ms. Sage's voice would not be public). This event was used to help raise money for LOVO.[3]

---

[3] The examples of Ms. Sage's actual voice and the LOVO-generated voice used by LOVO can be heard starting at approximately 2:13 of the presentation. It can be accessed at https://www.pollockcohen.com/media/SoundFiles/Lovo2020PitchatSkyDeck.mp4.



55.     Upon information and belief, LOVO has raised millions of dollars in venture capital using Ms. Sage's voice in unauthorized and uncompensated presentations that showcase the LOVO technology.

56.     Plaintiff Sage never authorized LOVO to use her voice for public use, nor was she aware of or ever compensated for its use.

**DEFENDANT'S ONGOING AND IMPROPER USE OF PLAINTIFF LEHRMAN'S VOICE**

57.     In June of 2023, Mr. Lehrman began investigating whether his voice had been used by LOVO or anyone else.

58.     LOVO used Mr. Lehrman's voice to promote its Genny service without Mr. Lehrman's permission and without compensating him.[4]

---

[4] This use of Plaintiff Lehrman's voice as Kyle Snow can be heard at https://www.pollockcohen.com/media/SoundFiles/GennyAdvertismentUsingPaulsVoice.mp4.



59.     Mr. Lehrman learned that LOVO had been marketing his misappropriated voice as part of its subscription service under the stage name "Kyle Snow." The Kyle Snow voice was, unquestionably, Mr. Lehrman's voice.

60.     To be clear, LOVO never said "Kyle Snow" was Mr. Lehrman. Instead, LOVO did something even more insidious: it created a fake character (Kyle Snow) and animated it with Mr. Lehrman's voice. LOVO stole Mr. Lehrman's voice – his protected property – and marketed and sold it as if it were its own. Mr. Lehrman was never compensated for that use.

61.     Mr. Lehrman also found that LOVO had published an article on its website entitled "5 Best Practices For Perfect Audio Advertising" – promoting LOVO's services – that featured Mr. Lehrman voice, and attributing that voice to "Kyle".[5]

---

[5] https://www.pollockcohen.com/docs/5-Best-Practices-For-Perfect-Audio-Advertising-_-LOVO-AI.pdf



62.     LOVO also promoted Mr. Lehrman's voice as Kyle Snow and said it was one of "The 5 Best Male Voices For Text To Speech." The LOVO promotional piece continued:

> With his upbeat tone and slightly faster talking speed, Kyle Snow has the perfect voice for conveying enthusiasm and youthfulness. This makes him an ideal male voice generator text-to-speech option for all kinds of content, from audiobooks and narrations to commercials and social media.

> His upbeat tone becomes even more enthusiastic and compelling if you speed up his voice while his tone remains cheerful and enthusiastic but takes on a clearer and more pronounced quality when slowed down. This makes Kyle's decelerated voice an excellent choice for explainers and e-learning.



63.     Mr. Lehrman later learned that from 2021 to September 2023, his voice

was the default voice for the software.



64.     Mr. Lehrman never authorized LOVO to use or manipulate his voice for LOVO's service or any other use, nor did he authorize LOVO to connect his voice to the stage name "Kyle Snow." Mr. Lehrman was never made aware of nor compensated for Defendant's unauthorized usage of his voice.

65.     LOVO's scheme not only unlawfully appropriated, used, sold, and marketed Mr. Lehrman's voice, but it interfered with his ability to earn a living. LOVO knew that its scheme was in violation of the agreement that the Screen Actors Guild had with various producers and other signatories, and it threatened Mr. Lehrman's (and other Plaintiffs') relationship with SAG-AFTRA and those producers/signatories.

### DEFENDANT'S ONGOING AND IMPROPER USE OF PLAINTIFF SAGE'S VOICE

66.     Plaintiff Sage subsequently learned that her voice was marketed by LOVO as part of its subscription business. LOVO promoted the availability of Ms. Sage's voice under the name "Sally Coleman."

67.     To be clear, LOVO never explicitly stated that "Sally Coleman" was Ms. Sage. Instead, LOVO did something even more insidious: it created a fake character, "Sally Coleman," and unlawfully animated it with Ms. Sage's voice. LOVO stole Ms. Sage's voice – her protected property – and marketed it as if it were its own property without her consent, infringing on Ms. Sage's rights.

68.     Upon information and belief, LOVO also used Ms. Sage's voice on its website to demonstrate what the software was capable of and to promote its business.

69.     Ms. Sage never permitted LOVO to use her voice as part of its subscription business.

70.     Ms. Sage was never compensated for LOVO's improper use of her voice.

### DEFENDANT'S UNAUTHORIZED USE OF PLAINTIFFS' VOICES CONTINUES

71.     LOVO claims that its Genny voices were created using thousands of other voices. The voice of "Kyle Snow" was undoubtedly the voice of Plaintiff Lehrman. The voice of "Sally Coleman" was undoubtedly the voice of Plaintiff Sage. Upon information and belief, the voices of other LOVO voice options are undoubtedly the voices of other class Plaintiffs who neither gave their authorization to use their voice – for either teaching Genny, use by LOVO, or sale by LOVO as part of its service – nor were properly compensated.

72.     On August 18, 2023 and September 27, 2023, attorneys for Mr. Lehrman and Ms. Sage contacted counsel for LOVO. Plaintiffs' counsel demanded that LOVO cease and desist from marketing, promoting, and offering Mr. Lehrman and Ms. Sage's voices.

73.     Counsel for LOVO responded, "Kyle Snow or Sally Coleman are not popular and sales are negligible."

74.     Defendant's statements are untrue and belied by its own advertising: Defendant listed Kyle Snow as one of its "*The 5 Best Male Voices For Text to Speech.*"

75.     Defendant wrote a glowing review of Ms. Sage's voice on Fiverr, and stated regarding Ms. Sage's voice that, "Stellar is an understatement. We would recommend her to anyone."



76.     Defendant's counsel informed Plaintiffs that their voices would be removed from the LOVO service.

77.     Upon information and belief, that is not true. On August 30, 2023 LOVO's attorneys stated that Ms. Sage's and Mr. Lehrman's voices were removed. However, Ms. Sage's and Mr. Lehrman's voice were still available to new customers through the end of September 2023.  And upon information and belief, Mr. Lehrman's and Ms. Sage's voices are still available to any LOVO customer who previously downloaded the voices for use in a project prior to the removal request.

78.     Moreover, even though Plaintiffs' counsel directed Defendant to preserve

all documents related to this matter in the cease-and-desist letter, LOVO deleted

messages that were part of the Fiverr correspondence between Ms. Sage and the LOVO

representative.

### DEFENDANT RECOGNIZES THE IMPROPER USAGE OF PLAINTIFFS' VOICES

79.     Ironically, LOVO itself recognizes the threat of improper usage of

AI-generated voices. In 2019, co-founder Lee wrote in an article for *Medium*:

> Some people are alarmed by the possibility of their voices being used
> unbeknownst to them, or in malicious, illegal ways. Others are
> concerned they are going to take away the jobs. While they are right
> to be concerned, it shouldn't be a divisive confrontation. Just like
> how we must be wary of our images, names, affiliations, and
> identities are used by ourselves or others, we must ensure that our
> laws and ethics develop in step with the technology to create a safe
> environment.[6]

80.     The founders of LOVO even created another company, VoiceVerse, which

sold voice NFTs (non-fungible tokens). The founders stated on a pitch website about

their "[v]ision":

> A person's voice is uniquely linked to their identity. Once you hear
> that person's voice, it immediately reminds you of them, and
> memories you had with them. Voice is personal. Voice brings out
> emotion. Voice is unique. Voice is a powerful aspect of one's identity.[7]

---

[6] *Medium*, "Voice Conversion: Definition, Technology, Usage & Concerns," Orbis AI Inc.
(Sept. 13, 2019), https://medium.com/@tom_44446/voice-conversion-definition-
technology-usage-concerns-8b8f103a343b

[7] VoiceVerse Docs, "Vision," docs.voiceverse.com/whitepaper/english/vision. Separately,
VoiceVerse has already been found to have stolen technology from another company.
*See* Ule Lopez, WCCF Tech, "Voiceverse NFT Service Reportedly Uses Stolen
Technology from 15ai," (Jan. 16, 2022), https://wccftech.com/voiceverse-nft-service-uses-
stolen-technology-from-15ai/.

**DEFENDANT'S IMPROPER USE OF CELEBRITY NAMES AND LIKENESSES AND OTHER VOICES**

81.     Defendant not only improperly appropriates the voices of the named Plaintiffs who are "working actors" but not "celebrities"; Defendant also borrows the name and likeness of some of the nation's most well-known celebrities, including Barack Obama (crudely represented as "Barack Yo Mama"), Conan O'Brien ("Cocoon O'Brien"), and Elton John ("Elton John Cena"), to promote its services and show the capabilities of the LOVO product.



82.     Defendant boasts that its Genny tool allows users to "[c]lone any voice and create high-quality custom voice content," and illustrates that capability with the barely disguised names and images above.

83.    LOVO even used celebrity-cloned voices in its pitch to potential investors:[8]



84.    LOVO boasts that it offers 600 voice options.

### CLASS ACTION ALLEGATIONS

85.    This action is brought by the Plaintiffs individually and on behalf of a

class (the "Class") pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of

Civil Procedure.

86.    Plaintiffs seek certification of the following Class and Subclasses:

> All persons whose voices were used by LOVO without permission or
> proper compensation for the purpose of creating or refining its AI
> text-to-speech generator; or whose AI-replicated voice was used,
> licensed, or sold without authorization or appropriate compensation;
> or whose name or stage name was used by LOVO to market its
> services without authorization or proper compensation.

---

[8] The Elton John clone begins at approximately 2:27,
https://www.pollockcohen.com/media/SoundFiles/Lovo2020PitchatSkyDeck.mp4.

87.     Excluded from the proposed Class are Defendant and its employees, officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and the judicial officers and their immediate family members and associated court staff assigned to this case, as well as all persons who make a timely election to be excluded from the proposed class.

88.     Plaintiffs reserve the right to amend or modify the class definition, including as to subclasses and particular issue classes.

89.     **Numerosity.** Fed. R. Civ. P. 23(a)(1). The Class consists of many hundreds and perhaps thousands of actors whose voices were used by LOVO without authorization or proper compensation. LOVO has bragged that its proprietary algorithm and machine-learning software, which it refers to as "Generator" or "Genny," was trained using data from thousands of voices and thousands of hours of recordings. Those actors were not appropriately compensated for the use of their voices for training an AI program. Some of those voices, such as those of Ms. Sage and Mr. Lehrman, were not augmented by any other voices.

90.     **Typicality.** Fed. R. Civ. P. 23(a)(3). The claims asserted by the Plaintiffs are typical of the claims of the Class. At all relevant times, Defendant acquired voices for Genny either by appropriating actors' voices without their knowledge, or by deceiving actors as to the true nature of the "academic research" project they were signing up for when they agreed to provide voice recordings. Class members' voices were used either to train the AI program, or as unaltered options for LOVO customers to use.

91.     **Adequacy of representation.** Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of other Class members. Plaintiffs have retained counsel competent and experienced in class actions and consumer protection litigation, who are competent to serve as Class Counsel. Plaintiffs and their counsel will fairly and adequately protect the interest of the class members.

92.     **Ascertainability.** The identities and of Class members can be readily ascertained from business records maintained by Defendant and/or self-authentication. The precise number of class members can be ascertained from Defendant's records. Plaintiffs anticipate providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

93.     **Commonality and predominance.** Fed. R. Civ. P. 23(a)(2); 23(b)(3). This action is appropriate as a class action because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include but are not limited to, the following:

   a)   Whether Defendant appropriated Plaintiffs' voices for use in its AI Generator without the express permission of the Plaintiffs in violation of New York Civil Rights Law § 51, which states:

        Any person whose name, portrait, picture or *voice* is used within this state for advertising purposes or for the purposes of trade without the consent first obtained[.]" (emphasis added).

   b)   Whether Defendant appropriated Plaintiffs' professional identities to promote its Genny subscription service without the express permission of Plaintiffs in violation of New York Civil Rights Law § 51.

   c)   Whether Defendant violated New York General Business Law ("GBL") §§ 349 and/or 350 by promoting Plaintiffs' voices and/or likenesses which they did not have the lawful right to promote.

- 24 -

d)  Whether Defendant violated Lanham Act § 43(a), 15 U.S.C. § 1125(a), by engaging in conduct that falsely represents Plaintiffs as consenting to the use of the LOVO Genny tool and allowing their voices to be included in the LOVO voice library.

94.  **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)  given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class member, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendant has committed against them;

b)  the prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for Defendant and burden the courts;

c)  when Defendant's liability has been adjudicated, the Court can determine claims of all Class members;

d)  this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense;

e)  without a class action, many Class members would continue to suffer injury while Defendant retains the substantial proceeds of its wrongful conduct; and

f)  this action does not present any undue difficulties that would impede its management by the Court as a class action.

95.  Plaintiffs request that the Court afford Class members with notice and the right to opt out of any Class certified in this action.

## FIRST CAUSE OF ACTION

### Violation of New York Civil Rights Law Sections 50, 51

96.  Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

97. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the New York Civil Rights Law Sections 50, 51.

98. New York Civil Rights Law Section 51 imposes liability on a party for misappropriating an actor's voice "for advertising purposes or for the purposes of trade without ... written consent[.]"

99. Plaintiffs are persons under the law.

100. Defendant's actions as set forth herein used Plaintiffs' voices without Plaintiffs' consent in violation of New York Civil Rights Law Sections 50, 51.

101. Plaintiffs have been injured by Defendant's misappropriation in that they did not receive appropriate compensation for the use of their voices; and their voices and brands were harmed by the inferior voice quality generated by Defendant's Genny text-to-speech tool.

## SECOND CAUSE OF ACTION

### Deceptive Acts and Practices in Violation of the New York Deceptive Practices Act, N.Y. GBL § 349

102. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

103. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the New York Deceptive Practices Act. N.Y. GBL § 349.

104. N.Y. GBL § 349 imposes liability on anyone who engages in "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York.

105.    Plaintiffs are "persons" under N.Y. GBL § 349(h).

106.    Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under N.Y. GBL § 349(a).

107.    Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs. Defendant misrepresented to Plaintiffs what their voices would be used for. LOVO told Plaintiffs that their voices would be used only for academic research purposes.

108.    Defendant engaged in practices that were directed at consumers who wanted to utilize the services of established voice-over actors or authorized AI-created voices, and they thought they could do so affordably and legally. That was deceptive: LOVO did not have the right to use Plaintiffs' voices and it significantly harmed Plaintiffs – not only by misappropriating their voices and their right to publicity and failing to properly compensate Plaintiffs, but by depriving them of control of their own brand. Defendant led consumers to believe that LOVO either had the rights to use and offer actors' voices; or that the voices offered were completely AI-generated and not merely clones of real actors' – Plaintiffs' – voices. The consumers included individuals, sole practitioners, and small businesses. They thought they were getting a more affordable but legal deal – and thought they were getting authorized, affordable access to established actors.

109.    In the course of business, Defendant made deceptive affirmative misrepresentations and omissions to consumers by publishing and disseminating misleading information that the Plaintiffs – or their recognizable voices – were

affiliated with LOVO and had given their consent to be included in LOVO's product offerings.

110.    These misrepresentations and omissions alleged herein were materially misleading.

111.    The acts and practices alleged herein are deceptive acts and practices covered under N.Y. GBL § 349 and have caused Plaintiffs and class members significant ascertainable monetary and non-monetary injuries. Among other injuries, Defendant's deceptive acts and practices have caused significant monetary damages, along with damages to Plaintiffs' individual brands.

112.    Defendant willfully and knowingly violated N.Y. GBL § 349. It knew that Plaintiffs had not given their consent for the use of their voices.

**THIRD CAUSE OF ACTION**

**False advertising in violation of the
New York False Advertising Act, N.Y. GBL § 350**

113.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

114.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the New York False Advertising Act, N.Y. GBL § 350.

115.    N.Y. GBL § 350 imposes liability on anyone who uses false advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in New York. "False" includes "advertising, including labeling of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to

which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity[.]" N.Y. GBL § 350(a).

116.    Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under N.Y. GBL § 350.

117.    Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs. The actions and practices alleged herein were directed at consumers who wished to utilize the services of established voice-over actors – or purely AI-generated voices – and thought they were getting those services in an authorized and affordable way.

118.    This false and deceptive advertising harmed Plaintiffs by diverting legitimate away from them, and significantly harmed Plaintiffs – not only by misappropriating their voices and their right to publicity and failing to appropriately compensate Plaintiffs – but by depriving them of control of their own brand.

119.    A cause of action based upon false advertising is appropriate because the Defendant utilized false advertising to mislead consumers into believing that Plaintiffs' voices were available at a bargain price and without oversight of their brand.

120.    The false advertising alleged herein was materially misleading.

121.    The acts and practices alleged herein constitute false advertising covered under N.Y. GBL § 350 and have caused millions of dollars in significant monetary damages to Plaintiffs by diverting legitimate work from them and depreciating their brands.

122.    Defendant willfully and knowingly violated N.Y. GBL § 350.

**FOURTH CAUSE OF ACTION**

**Unfair Competition and False Affiliation in
Violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)**

123.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

124.    Defendant's conduct as set forth herein significantly impacts interstate commerce and commerce within this district.

125.    Section 43 of the Lanham Act provides liability as to

Any person ... who uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities ... .

126.    As described more fully herein, Defendant has engaged in such conduct in the promotion of its Genny voice-over product.

127.    This conduct has caused, and is likely to cause, mistake and deception as to the affiliation, connection, or association of Plaintiffs and the other Class members, with LOVO.

128.    Through this conduct, Defendant also misrepresents the nature and characteristics of its catalog of available voices.

129.    This course of conduct includes, but is not limited to, the following:

a)  confusing, or likely confusing, potential customers about the existence of any business affiliation between Plaintiffs and Class

members with LOVO, and the ability to directly purchase Plaintiffs' services with the LOVO Genny subscription;

b) misrepresenting that Plaintiffs and the Class members have a consensual business partnership with LOVO and are part of its catalog of available voices;

c) misrepresenting that customers may use LOVO to directly purchase Plaintiffs' services;

d) failing to inform LOVO customers that Plaintiffs and the Class members have not consented to offer their professional services through LOVO;

e) failing to inform LOVO customers that the LOVO subscription service cannot be used in place of other payment methods to pay for services provided by Plaintiffs and the Class members;

f) harming the reputations of Plaintiffs and the Class members by falsely affiliating them with LOVO;

g) harming the reputations of Plaintiffs and the Class members by refusing to completely remove them from the LOVO website after they have requested disaffiliation; and

h) stealing potential customers from Plaintiffs and the Class members by diverting them to purchase services from the LOVO subscription service, rather than directly transact with Plaintiffs and the Class members.

130. The false and misleading statements and omissions described herein are material because they are intended to have an impact on whether consumers or businesses become LOVO customers and on whether those consumers or businesses choose to join the LOVO subscription service.

131. The false and misleading statements and omissions described herein actually deceive or have the tendency to deceive potential customers of Plaintiffs and class members.

132. Defendant's conduct, as described herein, constitutes a violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

133.   As a direct and proximate result of Defendant's violations and false and misleading statements and omissions described herein, pursuant to 15 U.S.C. § 1117, Plaintiffs and the class members have been, or are likely to be, damaged. Plaintiffs and the Class are therefore entitled to recover from Defendant all profits, gains, and advantages obtained stemming from this improper conduct.

134.   Pursuant to 15 U.S.C. § 1117, Plaintiffs are further entitled to recover the costs of this action. Defendant's conduct was knowing, characterized by malicious intent, and explicitly designed to deceive the general public to reap profits unjustly at the expense of Plaintiffs and the Class, entitling Plaintiffs to a statutory multiplier of actual damages, additional damages, and reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### False Advertising in Violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)

135.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

136.   Defendant's conduct as set forth herein significantly impacts interstate commerce and commerce within this District.

137.   As described more fully herein, Defendant has engaged in a course of conduct with respect to the advertising of its LOVO directory of available actors that contains false and/or misleading statements of fact, or omissions of essential facts, including those about Plaintiffs and class members, who did not consent to partner with LOVO.

138.   These false and/or misleading statements, or omissions of material facts, include, but are not limited to, the following:

a) confusing, or likely confusing, potential customers of Plaintiffs and the Class members as to Plaintiffs' and the Class members' affiliation with LOVO and the ability to use the LOVO service in place of traditional access to these actors;

b) misrepresenting that Plaintiffs and the Class members have partnered with LOVO and that their voices are available through the LOVO subscription service;

c) misrepresenting that the goods and services offered by Plaintiffs and the Class members may be paid for directly through the LOVO subscription service;

d) failing to inform LOVO customers that Plaintiffs and the Class members are in no way affiliated with the LOVO subscription service;

e) failing to inform LOVO customers that the LOVO subscription service cannot be used to pay for the professional services of the Plaintiffs and the Class members;

f) misrepresenting the number of actors accessible through the LOVO subscription service to convince customers and other actors to participate in the LOVO subscription service;

g) harming the reputations of Plaintiffs and the Class members by falsely affiliating them with LOVO;

h) harming the reputations of Plaintiffs and the Class members by refusing to remove actors' voices from the LOVO website who have requested disaffiliation; and

i) stealing potential customers from Plaintiffs and the Class members by diverting them to purchase a misleading LOVO subscription rather than directly transact with Plaintiffs and the Class members.

139.    The false and misleading statements and omissions described herein are material and are intended to have an impact on whether consumers purchase the LOVO subscription service.

140.    The false and misleading statements and omissions described herein actually deceive or have the tendency to deceive potential customers of Plaintiffs and the Class members.

141. Defendant's conduct as described herein constitutes a violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a).

142. As a direct and proximate result of Defendant's violation and false and misleading statements and omissions described herein, pursuant to 15 U.S.C. § 1117, Plaintiffs and the Class have been or are likely to be damaged. Plaintiffs and the Class are likewise entitled to recover from Defendant all profits, gains, and advantages obtained during the execution of this improper conduct.

143. Pursuant to 15 U.S.C. § 1117, Plaintiffs are further entitled to recover the costs of this action. Defendant's conduct was knowing, characterized by malicious intent, and explicitly designed to deceive the general public to unjustly reap profits at the expense of Plaintiffs and the Class, entitling Plaintiffs to a statutory multiplier of actual damages, additional damages, and reasonable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

144. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

145. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for unjust enrichment.

146. Defendant appropriated Plaintiff's voices without Plaintiffs' permission and then marketed AI-generated versions of Plaintiffs' voices as part of Defendant's business, receiving millions of dollars in revenue – without ever properly compensating Plaintiffs.

147. Defendant also used Plaintiffs' voices – without permission or compensation – to raise millions of dollars in venture capital.

- 34 -

## SEVENTH CAUSE OF ACTION

### Tortious Interference with Advantageous Business Relationship

148.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

149.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for tortious interference.

150.    Defendant interfered in the business relationships Plaintiffs had with SAG-AFTRA – specifically the requirement to abide by union rules – and with those producers (including but not limited to studios, networks, corporations, and others engaged in voice-over production) who were signatories to SAG-AFTRA agreements and contracts.

151.    LOVO was aware of these SAG-AFTRA agreements and contracts with Plaintiffs and other voice-over actors.

152.    LOVO acted with malice and utilized improper and illegal means to utilize Plaintiffs' voices without their permission, consent, or actual compensation to build its Generator and market its service.

153.    This improper and illegal allocation of Plaintiffs' voices caused Plaintiffs harm with both SAG-AFTRA and the producers/signatories, threatening Plaintiffs' relationship with SAG-AFTRA and the producers/signatories, threatening their membership in SAG-AFTRA, depriving them of work and income, and devaluing their personal brands and reputations.

## EIGHTH CAUSE OF ACTION

### Fraud

154.    LOVO committed fraud by materially misrepresenting to Plaintiffs Lehrman and Sage, and other members of the Class, what would be the ultimate uses for their voice-over recordings.

155.    Moreover, LOVO omitted to tell Plaintiffs that their voice recordings would be used for promotion of LOVO's services and as available voice options on the LOVO website.

156.    Defendant knew what the use would be of the voice recordings, including that it would be used for promotion of LOVO and as options for the LOVO website.

157.    Defendant intended to defraud Plaintiffs and the Class.

158.    Plaintiffs reasonably relied on these material misrepresentations; indeed, Plaintiffs confirmed that the voice recordings would only be used for academic, and not public, purposes.

159.    Plaintiffs were damaged by these misrepresentations. Plaintiffs and the Class have not been fully compensated for the use of their voices by LOVO and have suffered from the degradation of their services. They would not have given permission for their voices to be used had they known the truth.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, request relief and judgment against Defendant as follows:

A.    certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.      awarding Plaintiffs and the Class compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C.      awarding Plaintiffs and the Class appropriate relief, including actual and statutory damages;

D.      awarding Plaintiffs and the Class punitive damages;

E.      awarding Plaintiffs and the Class civil penalties;

F.      granting Plaintiffs and the Class declaratory and equitable relief, including restitution and disgorgement;

G.      enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

H.      awarding Plaintiffs and the Class the costs of prosecuting this action, including expert witness fees;

I.      awarding Plaintiffs and the Class reasonable attorneys' fees and costs as allowable by law;

J.      awarding pre-judgment and post-judgment interest; and

K.      granting any other relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: New York, New York
        May 16, 2024

                                        Respectfully submitted,

                                        By:     /s/ *Steve Cohen*
                                                Steve Cohen
                                                Anna Menkova
                                                **POLLOCK COHEN LLP**
                                                111 Broadway, Suite 1804
                                                New York, NY 10006
                                                Tel: (212) 337-5361
                                                SCohen@pollockcohen.com

                                                *Attorneys for Plaintiffs and*
                                                *the Proposed Class*