UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL LEHRMAN, *et al.*, | |
| Plaintiffs, | 24-CV-3770 (JPO) |
| -v- | OPINION AND ORDER |
| LOVO, INC., | |
| Defendant. | |

J. PAUL OETKEN, District Judge:

Plaintiffs Paul Lehrman and Linnea Sage bring this putative class action against

Defendant Lovo, Inc. ("Lovo") alleging that Lovo used artificial intelligence ("AI") to synthesize

and sell unauthorized "clones" of their voices. Plaintiffs assert claims for violations of New

York civil rights and consumer protection laws, the Lanham Act, and the Copyright Act, along

with common-law contract, fraud, conversion, unjust enrichment, and unfair competition claims.

Before the Court now is Lovo's motion to dismiss all claims.

This case involves a number of difficult questions, some of first impression. It also

carries potentially weighty consequences not only for voice actors, but also for the burgeoning

AI industry, other holders and users of intellectual property, and ordinary citizens who may fear

the loss of dominion over their own identities.

Ultimately the Court concludes that, for the most part, Plaintiffs have not stated

cognizable claims under federal trademark and copyright law. However, that does not mean they

are without a remedy. Rather, claims for misappropriation of a voice, like the ones here, may be

properly asserted under Sections 50 and 51 of the New York Civil Rights Law, which, unlike

copyright and trademark law, are tailored to balance the unique interests at stake. Plaintiffs also

adequately state claims under state consumer protection law and for ordinary breach of contract.

For those and the further reasons that follow, Lovo's motion to dismiss is granted in part and denied in part.

## I.    Background

### A.    Factual Background

The following facts are taken from the operative complaint and are presumed true for purposes of this opinion.  *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). Plaintiffs Paul Lehrman and Linnea Sage are voice-over actors living and working in New York. (ECF No. 22 ("AC") ¶¶ 6-7.)  They are hired to read scripts, creating recordings that their clients then edit, potentially revise, and ultimately incorporate into other forms of media.  (*Id.* ¶ 17.) They are paid "a negotiated amount for the use of their voices, and typically for the time spent recording the requested audio," which usually includes "upfront fees, royalties, residuals, or some combination of [those] payments."  (*Id.* ¶ 18.)  Pay per project can vary from hundreds to thousands of dollars.  (*Id.* ¶ 19.)  Lehrman's work has been featured in the television shows *Blue Bloods*, *New Amsterdam*, and *The Resident*, and in several movies.  (*Id.* ¶ 41.)  Sage's work has been featured in advertisements for major brands, in a Marvel video game, on mobile apps and podcasts, on international television, and more.  (*Id.* ¶ 42.)

Defendant Lovo "sells a text-to-speech subscription service that allows its clients to generate voice-over narrations at a fraction of the cost of the traditional model," and it bills itself as "revolution[izing]" the industry.  (*Id.* ¶ 21.)  Lovo produces its audio using "AI-driven software known as 'Generator' or 'Genny'," which it claims was "created using '1000s of voices.'"  (*Id.* ¶ 21-22.)  Genny is capable of creating a voice "clone," which "refers to a virtual copy of a real person's voice.  Rather than using machine learning to synthesize an original AI voice, voice cloning technology replicates an existing human voice."  (*Id.* ¶ 23 (quoting Carol Moh, *Synthetic Voice and Voice Cloning*, Lovo (July 17, 2023), lovo.ai/post/synthetic-voice-and-

voice-cloning (last visited June 18, 2025)).)  Lovo has advertised its voice cloning service by emphasizing how similar its cloned voices are to the originals from which they are derived.  (*Id.* ¶ 24.)  In one marketing video, Lovo told viewers "you will hear five speakers whose voices have been cloned to near perfection.  Their tone, accent, and even mannerisms are fully learned by our AI voice system."  (*Id.*)[1]  One of Lovo's co-founders described a cloned voice as a replacement for "a real human voice," allowing users of Lovo's platform to "make that voice say anything that you want, even if that person has never actually said that before in their life."  (*Id.* ¶ 26).

Lovo cautions its customers not to "use [a] cloned voice for imitation of celebrities, . . . only . . . for personal entertainment purposes!"  (*Id.* ¶ 28.)  However, Lovo also advertises the commercial use of its platform to "Save $$ and time on voiceovers."  (*Id.* ¶ 32.)  Whatever its users' true intentions, "Lovo represents to its customers that Lovo is granting full commercial rights for all content generated using its platform to users who subscribe to any of its paid plans," which cover "any monetized, business-related uses such as videos, audio books, advertising, promotion, web page blogging, [and] product integration."  (*Id.* ¶ 36 (quoting *Terms of Service*, Lovo (Sept. 26, 2024), https://lovo.ai/tos (last visited June 18, 2025)).)

Lovo originally solicited Lehrman and Sage for the projects relevant to this action on an "online marketplace" for freelance services called Fiverr.com ("Fiverr").  (*Id.* ¶¶ 44-45.)  In May 2020 an anonymous Fiverr user, "User25199087," who was "later identified by Lovo's counsel as a Lovo employee," contacted Lehrman and hired him to "provide voice recordings for 'research purposes'."  (*Id.* ¶ 45.)  The employee assured Lehrman that the company would use the recordings for "research purposes only," and that such research would be only "internal" and

---

[1] According to Sage, her voice was one of the clones featured in this video.  (AC ¶ 24.)

"academic" in nature.  (*Id.* ¶¶ 47, 49.)  Lehrman wrote back, asking User25199087 to "guarantee that these scripts will not be used for anything other than your specific research project," to which User25199087 replied:  "The scripts will not be used for anything else . . . ."  (*Id.* ¶¶ 50-51.)  Lehrman also asked User25199087 to confirm that the script would not be "repurposed and used in a different order," which User25199087 also confirmed.  (*Id.* ¶¶ 52-53.)  Lehrman did not deliver the scripts until after having these exchanges.  (*Id.* ¶ 54.)  Lehrman later filed for and received copyright registrations for the recordings, but did not receive a decision on his registration until over a month after filing the instant lawsuit.  (*Compare id.* ¶ 56 *with* ECF No. 1.)  Lehrman alleges that, had he known how the recordings would be used, "he would not have agreed to provide the audio files to User25199087 or to Lovo."  (AC ¶ 58.)  Lehrman was paid $1,200 for his work.  (*Id.* ¶ 55.)

Sage's story is similar.  A Fiverr user with the screenname "tomlsg" first solicited Sage on October 29, 2019.  (*Id.* ¶ 76.)  Plaintiffs allege that tomlsg was in fact Lovo co-founder Tom Lee, though they do not allege that Sage knew his identity at the time of their initial interaction. (*Id.* ¶ 82.)  Before providing any recordings, Sage asked what they would be used for, and tomlsg replied:  "These are test scripts for radio ads.  They will not be disclosed externally, and will only be consumed internally, so will not require rights of any sort."  (*Id.* ¶¶ 77-78.)  Sage asked tomlsg to confirm that the recordings would not be used "in broadcast," and tomlsg again repeated the previous statement.  (*Id.* ¶¶ 78-79.)  Sage then delivered the recordings and Lovo paid her $400 for her work.  (*Id.* ¶¶ 80-81.)  As with Lehrman, Sage later registered the recordings with the United States Copyright Office, but did not do so until after filing the instant action.  (*Compare id.* ¶ 83 *with* ECF No. 1.)

Lehrman and Sage allege that they first learned that their voices had been used in unanticipated ways when they listened to an episode of the *Deadline Strike Talk* podcast narrated in part by an artificial voice produced by Lovo's software.  (AC ¶¶ 63-68.)  The podcast was produced in cooperation with the Massachusetts Institute of Technology, which confirmed that the narration in question had been generated using "a paid subscription to Lovo."  (*Id.* ¶ 66.) Plaintiffs allege that the voice used in the podcast was "identical to Mr. Lehrman's voice."  (*Id.* ¶ 68.)  Plaintiffs also allege that "[n]umerous people who heard the podcast," including "friends" and "professional colleagues" "told Mr. Lehrman or Ms. Sage" that the "voice on the podcast was virtually identical to Mr. Lehrman's voice," and that "the cloned voice would undoubtedly be mistaken for Mr. Lehrman's actual voice."  (*Id.* ¶ 70.)  Plaintiffs also allege, and provide several declarations purporting to confirm, that professionals "experience[d] [in] discerning and conveying small differences in voice tone, quality, timbre, and delivery" believe that "Lovo's cloned voice is a replica of Mr. Lehrman's real voice."  (*Id.* ¶ 74.)

After hearing what appeared to be Lehrman's voice on *Deadline Strike Talk*, Plaintiffs sought to learn more about Lovo.  (*Id.* ¶¶ 85-146.)  Lehrman found that Lovo "had been marketing [the clone of his voice] as part of its subscription service under the stage name 'Kyle Snow'" (*id.* ¶ 108), and that it was this "Kyle Snow" voice that he had heard on the podcast (*id.* ¶ 72.  Lovo incorporated the Kyle Snow voice into advertisements on its website and YouTube (*id.* ¶¶ 105-06), as well as in promotional articles posted to its website (*id.* ¶¶ 123-24).  For example, on June 21, 2023, Lovo allegedly published a "promotional piece" advertising the Kyle Snow voice as "an ideal male voice generator . . . for all kinds of content" due to his "upbeat tone and slightly faster talking speed."  (*Id.* ¶ 124.)  Lovo published another article on July 10, 2023 titled "5 Best Practices For Perfect Audio Advertising," which also featured the Kyle Snow

voice.  (*Id.* ¶ 123.)  Based on YouTube videos posted prior to the filing of this action, Plaintiffs

allege that the Kyle Snow voice was "the default voice for [Lovo's] software," and estimate that,

as a result, it may have been utilized in thousands of projects made with the software.  (*Id.*

¶¶ 125-26.)  The Kyle Snow voice was also used in multiple Lovo-produced tutorials posted to

Lovo's website.  (*Id.* ¶ 132.)  Lovo also allegedly used Lehrman's recordings to "train its Genny

generator" more broadly.  (*Id.* ¶ 109.)

Sage discovered that Lovo had created a clone of her voice named "Sally Coleman" that

was available to Lovo's subscribers.  (*Id.* ¶¶ 93, 135-36.)  Lovo also marketed its product using

"side-by-side" comparisons of Sage's original audio recordings—the ones she provided via

Fiverr—and the "cloned version of her voice."  (*Id.* ¶ 86.)  For example, Lovo incorporated such

a side-by-side comparison into a presentation at "the Berkeley SkyDeck Demo Day Spring

2020" event in a pitch to "raise money from investors."  (*Id.* ¶ 87.)  Lovo then "posted the

presentation publicly on YouTube."  (*Id.*)  Plaintiffs allege that the side-by-side comparison of

Sage's real and cloned voices was still available on Lovo's website as of the filing of the

Amended Complaint.  (*Id.* ¶ 91.)

According to Plaintiffs, the Kyle Snow and Sally Coleman voices are not synthetic

creations, composites, or amalgams, built from a multiplicity of input voices, but direct copies of

their specific voices.  (*Id.* ¶ 23.)  In support, Plaintiffs point to public statements Lovo and its

executives have made describing Lovo's software.  (*Id.* ¶¶ 23, 94-95.)  In such statements, Lovo

has claimed that its product "reproduce[s]" actors' voices in a way that is "practically

indistinguishable from the 'real' voice (*id.* ¶ 94 (quoting Anthony Kimery, *Lovo Launches AI*

*'voice-over' platform that creates realistic human voices*, Biometric Update (Apr. 21, 2020),

https://www.biometricupdate.com/202004/lovo-launches-ai-voice-over-platform-that-creates-

realistic-human-voices (last visited June 18, 2025))) and, allegedly, that its software is capable of "clon[ing] to perfection" the voices of specific speakers (*id.* ¶ 95 (emphasis in amended complaint omitted)).

On August 18, 2023, counsel for Plaintiffs sent a cease-and-desist letter to Lovo.  In response, Lovo wrote that the "fictitious characters" Kyle Snow and Sally Coleman had been created using the voice recordings obtained from Lehrman and Sage through Fiverr in 2020 and 2019.  (*Id.* ¶ 111.)  Lovo claimed that its usage was "fully permissioned" and "not unauthorized." (*Id.* ¶ 112.)  Lovo also wrote that "Kyle Snow and Sally Coleman are not popular and sales are negligible" (*id.* ¶ 118), but that "Lovo unilaterally removed the characters" from its platform (*id.* ¶¶ 129, 119).  Plaintiffs dispute this, alleging that the both the Kyle Snow and Sally Coleman voices continued to be available on Lovo's software and in Lovo's marketing materials to this day.  (*Id.* ¶¶ 130, 141-46.)

In addition to individual claims, Plaintiffs propose a "Voice Actor Class" comprising

> [a]ll persons whose voices were used by Lovo without permission or proper compensation for the purpose of creating or refining its AI text-to-speech generator; or whose AI-replicated voice was used, licensed, or sold without authorization or appropriate compensation; or whose name or stage name was used by Lovo to market its services without authorization or proper compensation.

(*Id.* ¶ 153.)  They also propose a "Consumer Class" comprising

> all consumers who purchased the Lovo software and used the Lehrman, Sage, or other Voice Actor Class voices that were stolen, cloned, used, and sold by Lovo.

(*Id.* ¶ 154.)  Plaintiffs assert their first, second, third, sixth, seventh, eighth, tenth, and sixteenth causes of action both individually and on behalf of the Voice Actor Class.  (*Id.* at 44, 47, 49, 55, 57, 60, 61, 69.)  Plaintiffs assert their fourth, fifth, and ninth causes of action both individually and on behalf of the Consumer Class.  (*Id.* at 52, 53, 60.)  Plaintiffs assert their eleventh through fifteenth causes of action only individually.  (*Id.* at 61-69.)

### B.    Procedural Background

Plaintiffs filed the original complaint in this action on May 16, 2024.  (ECF No. 1.)  After an initial pretrial conference on August 12, 2024, Plaintiffs filed an amended complaint on September 25, 2024.  (AC.)  Lovo then filed a motion to dismiss on November 25, 2024 (ECF No. 27), along with a supporting memorandum of law (ECF No. 28 ("Mem.")) and an attorney declaration (ECF No. 29).  Plaintiffs opposed the motion to dismiss on January 10, 2025 (ECF No. 33 ("Opp.")), and Lovo replied in support of the motion on January 31, 2025 (ECF No. 39 ("Reply")).  On January 21, 2025, the Court granted a partial stay of discovery pending its resolution of Lovo's motion to dismiss.  (ECF No. 37.)

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This means that a complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.* at 678, the Court must draw "all inferences in the light most favorable to the non-moving party . . . ."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Determining whether a complaint states a plausible claim is ultimately a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

## III.    Discussion

### A.    Breach of Contract

Because at least some of the non-contract claims in this action depend on the existence of valid and enforceable contracts, the Court addresses Plaintiffs' contract claims first. "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d. Cir. 2004) (quotation marks omitted). While a plaintiff must allege "the essential terms of the parties' purported contract in nonconclusory language, including the specific provisions of the contract upon which liability is predicated," *Accurate Grading Quality Assurance, Inc. v. Khothari*, No. 12-CV-9130, 2014 WL 5073576, at *9 (S.D.N.Y. Sept. 30, 2014) (quotation marks omitted), it need not "attach a copy of the contract or plead its terms verbatim," *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, No. 91-CV-1816, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993), nor is it "necessary for each element to be pleaded individually," *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008).

Despite Lovo's protestations to the contrary (Mem. at 40-41), Plaintiffs have met their burden here. Plaintiffs allege that they received offers to buy their voice recordings from Lovo's agents (FAC ¶¶ 45, 76, 81); that Plaintiffs agreed to accept those offers if and only if the agents agreed to use the recordings in particular, circumscribed ways (*id.* ¶¶ 48-54, 77-80); that the agents accepted the proposed conditions (*id.* ¶¶ 49, 51, 53, 78-79); that Plaintiffs delivered the recordings (*id.* ¶¶ 54, 80); and that Lovo paid for the recordings (*id.* ¶¶ 55, 81). These exchanges plausibly show offer and acceptance, the parties' mutual intent to be bound, the terms of the transfer, assent, and consideration.

Lovo also argues that the putative contracts cannot be performed within one year and are therefore invalid under the New York Statute of Frauds. (Mem. at 41 (quoting N.Y. Gen. Oblig.

Law § 5-701).)  Such contracts are "void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent."  N.Y. Gen. Oblig. Law § 5-701(a).  "[T]o satisfy the Statute of Frauds, a purported contract 'must contain expressly or by reasonable implication all the material terms of the agreement.'"  *Del Toro v. Novus Equities, LLC*, No. 20-CV-1002, 2024 WL 1533285, at *3 (S.D.N.Y. Apr. 9, 2024) (quoting *Alkholi v. Macklowe*, 858 F. App'x 388, 391 (2d Cir. 2021) (summary order)) (emphasis omitted); *accord Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 619 N.Y.S.2d 260, 262 (1994).  "A term is essential, and must thus appear in the memorandum, if it seriously affects the rights and obligations of the parties."  *Id.* (cleaned up).  The Statute of Frauds expressly allows electronic communications to constitute a binding contract.  N.Y. Gen. Oblig. Law § 5-701(b)(3)(a).  Furthermore, "the tangible written text produced by . . . [a] process by which electronic signals are transmitted . . . shall constitute a writing and any symbol executed or adopted by a party with the present intention to authenticate a writing shall constitute a signing."  *Id.* § 5-701(b)(4).

An affirmative defense, the Statute of Frauds may be raised under Rule 12(b)(6) "only if the defense appears on the face of the complaint."  *Sabilia v. Richmond*, No. 11-CV-739, 2012 WL 213656, at *7 (S.D.N.Y. Jan. 24, 2012); *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir.1998).  "[D]efendants retain the burden of proof on this issue."  *Levy v. Aaron Faber, Inc.*, 148 F.R.D. 114, 118 (S.D.N.Y. 1993).

Plaintiffs respond that the Statute of Frauds does not apply because the pertinent contracts governed the delivery, not the ongoing use, of their voice recordings.  (*See* Opp. at 39.) But the provisions of the contracts that Plaintiffs allege Lovo breached are essentially indefinite restrictions on use, and have nothing to do with delivery.  And Plaintiffs do not identify any

temporal limitation, such as a termination option that might be exercised within one year.  *Cf.*

*BPP Wealth, Inc. v. Weiser Cap. Mgmt., LLC*, 623 F. App'x 7, 12-13 (2d Cir. 2015) (summary

order).  The contracts are therefore barred unless they satisfy the Statute of Frauds.  *Cf. Meyers v.*

*Waverly Fabrics, Div. of Schumacher & Co.*, 65 N.Y.2d 75, 79 (1985).

However, Lovo has failed to carry its burden of showing that the contracts here violate

the Statute of Frauds.  According to the operative complaint, Plaintiffs were contacted "via the

Fiverr website" (AC ¶¶ 45-46, 76, 78), which the Court understands to mean that the relevant

communications with Lovo took the form of online chat messages.  (*See also id.* ¶¶ 49 ("[Lovo]

sent Mr. Lehrman a message"), 76 ("Sage received a message on the Fiverr platform").)  Lovo

argues that these communications are insufficient because they do not "mention all material

terms."  (Mem. at 42.)  But they do describe the nature of the recordings that Lovo purchased,

the purchase prices, and Plaintiffs' requested restrictions on use.  (*Id.* ¶¶ 45-55, 76-81.)  That

encompasses "substantially the whole agreement"—the transfer of certain voice recordings for

money, subject to specific restrictions on use—"so that one reading [them] can understand from

it what the agreement is."  *Cf. Truman v. Brown*, 434 F. Supp. 3d 100, 114 (S.D.N.Y. 2020)

(quoting *Kobre v. Instrument Sys. Corp.*, 387 N.Y.S.2d 617, 618-19 (1st Dep't 1976)).

Lovo also argues that the communications are insufficient because they "do not even

allegedly identify all parties."  (Mem. at 42.)  The chat messages do identify Lehrman and Sage,

as they were sent from Plaintiffs' accounts and Lovo does not allege that Plaintiffs used aliases.

As for identifying Lovo, the communications allegedly involved two Lovo representatives—"a

Lovo employee" using the screenname "User25199087" (AC ¶ 45), and "LOVO co-founder,

Tom Lee," using the screenname "tomlsg" (*id.* ¶ 82).  That Lovo's agents did not use their real

names is immaterial.  The Statute of Frauds allows a party to be bound by a writing signed by its

11

"lawful agent," N.Y. Gen. Oblig. Law § 5-701(a), and allows "any symbol" to constitute a

signature as long as the signing party had a present intent to be bound, *id.* § 5-701(b)(4); *see also*

*Mizel Roth IRA on behalf of Consol. Asset Funding 3 LP v. Unified Cap. Partners 3 LLC*, No.

19-CV-10712, 2022 WL 3359759, at *5 (S.D.N.Y. Aug. 15, 2022) ("When faced with the

question of whether a particular moniker constitutes a valid signature . . . courts emphasize

substance over form, focusing on the intent of the would-be signer.").[2]  No party here disputes

the authenticity of the Fiverr messages or that they were sent by Lovo's agents.  And no party

indicated at the time that material terms were missing, or that the parties' agreements were

subject to later modification.  *Cf. Maxgain LLC v. Rai*, 201 N.Y.S.3d 383, 384 (1st Dep't 2023).

Invalidating the parties' contracts because Lovo's agents did not separately affix their full, legal

names to the messages would be "a needless formality that does not reflect" contemporary

business conventions.  *Cf. Phila. Ins. Indem. Co. v. Kendall*, 151 N.Y.S.3d 392, 396 (1st Dep't

2021) (holding, in a different context, that "if an attorney hits 'send' with the intent of relaying a

settlement offer or acceptance, and their email account is identified in some way as their own,

then it is unnecessary for them to type their own signature"); *Go N.Y. Tours, Inc. v. Tour Cent.*

*Park Inc.*, 189 N.Y.S.3d 175, 176 (2023) ("The email correspondence is sufficient to embody a

settlement agreement since it was authentic and sets forth all material terms."); *Guice v. PPC*

---

[2] The "any symbol" language applicable to general contracts can also be contrasted with the more specific requirements applicable to contracts for "goods . . . sold at public auction." *See* N.Y. Gen. Oblig. Law § 5-701(a)(6) (requiring that a written memorandum include "the name of the purchaser[] and the name of the person on whose account the sale was made").  For auction contracts, "[t]he General Obligations Law states clearly that the memorandum must include names.  It makes no provision for an alternative to a name, including some other mode of identification designed by an auction house to facilitate the auction process, such as . . . numeric identifiers." *William J. Jenack Est. Appraisers & Auctioneers, Inc. v. Rabizadeh*, 22 N.Y.3d 470, 477 (2013).  The fact that the Statute of Frauds expressly requires names for only some types of contracts reinforces the conclusion that names are not required for the contracts at issue here.

*Residential, LLC*, 182 N.Y.S.3d 94, 95 (2023) (same); *see also In re O'Connor*, 630 B.R. 384, 387-88 (Bankr. W.D.N.Y. 2021) (applying the reasoning from *Philadelphia* to the Statute of Frauds).[3] Accordingly, because Lovo's messages were sent from accounts that are identified with persons we now know to be agents of Lovo, Lovo is bound by those messages.

Moreover, even if the Fiverr messages alone were insufficient, "[t]he Statute of Frauds may be satisfied by separate connected writings, not all of which must be signed." *Strain v. Strain*, 644 N.Y.S.2d 317, 318 (2d Dep't 1996); *accord Parlux Fragrances, LLC v. S. Carter Enters., LLC*, 164 N.Y.S.3d 108, 121 (1st Dep't 2022); *Del Toro*, 2024 WL 1533285, at *3. While an iterative series of "motley communications," standing alone, may not constitute an "integrated agreement bearing definite terms," *cf. Truman*, 434 F. Supp. 3d at 114, here the parties also agreed to Fiverr's "Terms of Service" in order to use the platform (*see* Mem. at 42-43; Opp. at 42; *see also* ECF No. 29-4 ("2019 TOS"); ECF No. 29-5 ("2020 TOS")).[4] Those contracts supply further detail about the parties' dealings on Fiverr, and plausibly supplement any material terms missing from the Fiverr chats. To the extent that the parties identified themselves more fully in agreeing to the Terms and Conditions, the Terms and Conditions may also supplement the lack of identifying information in the parties' Fiverr chats.

---

[3] Although it appears that neither the First Department nor any other New York appellate court has extended *Philadelphia* to the Statute-of-Frauds context, the Court can discern no reason why the result should differ. Both N.Y. C.P.L.R. § 2104 and N.Y. Gen. Oblig. Law § 5-701 require a writing that identifies all material terms and is subscribed. The First Department's reasoning in allowing unsigned emails under § 2104 applies equally to § 5-701, absent contrary authority from the New York Court of Appeals or the Second Circuit.

[4] It would be odd for Lovo to argue now that the parties are not bound by the Fiverr Terms of Service, as those terms provide the only plausible basis for Lovo's rights to use Plaintiffs' voice recordings as they did. If Lovo were correct that neither the Fiverr messages nor Fiverr's Terms of Service were binding, then Lovo would essentially have stolen Plaintiffs' recordings outright. In any event, Lovo does invoke its rights under Fiverr's Terms of Service in its memorandum of law, and has therefore waived its right to object to those writings under the Statute of Frauds. *See* N.Y. Gen. Oblig. Law § 5-701(b)(3)(c).

In sum, Plaintiffs have plausibly identified a series of written communications subscribed to by the relevant parties and identifying the material terms of their transactions with Lovo. Whether these documents are ultimately sufficient to satisfy the Statute of Frauds is a fact question not resolvable on a motion to dismiss. *Cf. Strain*, 644 N.Y.S.2d at 318 (denying summary judgment). Lovo's motion is therefore denied as to Plaintiffs' contract claims.

### B.    Lanham Act

Plaintiffs next assert claims for "Unfair Competition and False Affiliation," and for "False Advertising," pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (AC ¶¶ 231-51.) Section 43(a) "creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014); *see also Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991) (characterizing the former as "product infringement" and the latter as "false advertising"); 4 McCarthy on Trademarks and Unfair Competition § 27:9 (5th ed. 2025) (hereinafter 4 McCarthy) (describing § 43(a) as "the foremost federal vehicle for the assertion of two major and distinct types of 'unfair competition': (1) infringement of even unregistered marks, names and trade dress, and (2) 'false advertising.'"). [5] "The claims are distinct and require and require separate consideration." *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 259 (2d Cir. 2002); *accord* 4 McCarthy § 27:9.50 ("A plaintiff cannot disguise a § 43(a)(1)(a) trademark infringement claim as a false

---

[5] To the extent that Plaintiffs intend to assert "unfair competition" in a more general sense, they cannot. Section 43(a)(1)(A) "does not have boundless application as a remedy for unfair trade practices" and is not "a federal codification of the overall law of unfair competition." *Dastar*, 539 U.S. at 29 (quotation marks omitted).

advertising § 43(a)(1)(b) claim," because "[t]he two claims are separate and distinct and have different elements needed to assert a prima facie case.").

### 1.    Unfair Competition and False Affiliation

Plaintiffs' so-labeled "unfair competition and false affiliation" claims fall into the first bucket—false association—and the Court construes them as brought pursuant to Section 43(a)(1)(A).[6] "To succeed on a section 43(a)(1)(A) claim, a plaintiff must prove (1) that the mark or dress is distinctive as to the source of the good or service at issue, and (2) that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007). This cause of action is broad and has been interpreted to cover conduct including infringement of an unregistered mark, trade dress infringement, passing off, reverse passing off, and false designation of geographic origin—"all of which simply describe different methods of trademark infringement." *Red Rock Sourcing LLC v. JGX LLC*, No. 21-CV-1054, 2024 WL 1243325, at *22 n.10 (S.D.N.Y. Mar. 22, 2024).

The parties primarily dispute whether Plaintiffs have identified a protectable mark. (Mem. at 31-32; Opp. at 26-27.) At the outset, the Court observes that "mark" in this context means, as it must, something more than an ordinary trademark. While it is settled precedent that a Section 43(a)(1)(A) claim requires "wrongful use of another's distinctive mark or other device," *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196-97 (2d Cir. 2001), *overruled in part on other grounds by Lexmark*, 572 U.S. at 118,[7] courts in this Circuit and

---

[6] 4 McCarthy § 27:9.50 (explaining that "false association," "unfair competition," and "unregistered trademark infringement" claims under Section 43(a)(1)(a) are all the same).

[7] *See also ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007) ("To succeed on a section 43(a)(1)(A) claim, a plaintiff must prove . . . that the mark or dress is distinctive . . . ."); *Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc.*, 128 F.4th 112, 121 (2d Cir. 2025) (same); *Virgin Enters. Ltd. v. Nawab*, 335 U.S. 141, 146 (2d Cir. 2003) (requiring, for infringement claims, a "mark [that] is entitled to protection"); *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414

F.3d 400, 406-07 (2d Cir. 2005) ("In order to prevail on a trademark infringement claim for . . . unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a plaintiff must establish that . . . it has a valid mark that is entitled to protection."); *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 257 (2d Cir. 2021) (approving of the distinctive-mark requirement in the context of a false endorsement claim under Section 43(a)(1)(A)); *Gibson v. SCE Grp., Inc.*, No. 22-916, 2023 WL 4229913, at \*2 (2d Cir. June 28, 2023) (summary order) (approving of the *ITC* and *Electra* definitions of false association and explaining that "[t]o the extent that this approach to the false endorsement claim diverges from our caselaw involving false advertising, that result is consistent with the fact that the two types of claims are distinct").

One possible gray area for this requirement concerns so-called "reverse passing off" or "reverse palming off" cases, which can arise "when 'A sells B's product under A's name.'" *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 131 (2d Cir. 2004) (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994)). According to the most recent binding case in the Second Circuit, "a reverse palming off claim requires allegations: '(1) that the product at issue originated with the plaintiff; (2) that the origin of the product was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.'" *Id.* (quoting *Softel, Inc. v. Dragon Med. & Sci. Commc'ns*, 118 F.3d 955, 970 (2d Cir. 1997)) (brackets omitted). Read literally, nothing in this list of elements requires the existence of a trademark, trade dress, or other device. The court in *Societe Des Hotels* also held that the plaintiff "was not required to plead 'secondary meaning'." *Id.* at 131.

*Societe Des Hotels* was, however, decided shortly after the Supreme Court sharply curtailed the scope of reverse passing off cases in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27-28 & n.1 (2003), and does not refer to *Dastar* at all. Although nominally about the definition of "origin" in Section 43(a), *Dastar* effectively limited the ability to bring "reverse passing off" cases that would not otherwise be cognizable as unregistered infringement cases. *Id.* at 36-37; *see also Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 580 (7th Cir. 2005) ("*Dastar* added that the injury must be a *trademark* loss—which is to say, it must come from a misrepresentation of the goods' origin.").

Not only does *Societe Des Hotels* fail to mention *Dastar*, but it also relies primarily on older cases that imposed reverse passing off liability in violation of the rule established in *Dastar*. *See, e.g.*, *Softel*, 118 F.3d at 955. And, notably, *Societe Des Hotels* has never again been cited by the Second Circuit in the context of Section 43(a)(1)(A), but only Section 43(a)(1)(B) (false advertising). Thus, at least some commentators have suggested that the statements of law in *Societe Des Hotels* concerning Section 43(a)(1)(A) are "no longer good law." *See* 4 Callmann on Unfair Comp., Tr. & Mono. § 22:33 (4th ed. 2024); *cf. Portkey Techs. Pte Ltd. v. Venkateswaran*, No. 23-CV-5074, 2024 WL 3487735, at \*10 (S.D.N.Y. July 19, 2024) (declining to impose liability based on alleged "reverse passing off" of intellectual property). Alternatively, some lower courts have interpreted *Societe Des Hotels* narrowly, applying it only to situations where a defendant states a "direct falsity," and have found that indirect-falsity cases "sound in copyright and must be resolved according to that statute." *See, e.g., Park v. Skidmore, Owings & Merrill LLP*, No. 17-CV-4473, 2019 WL 9228987, at \*10 (S.D.N.Y. Sept. 30, 2019).

others have long approved of claims involving mark-like devices such as a celebrity's "image," "likeness," "persona," or "identity." *Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, No. 10-CV-2333, 2011 WL 1327137, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *ETW Corp. v. Jierh Pub., Inc.*, 332 F.3d 915, 925 (6th Cir. 2003) and *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992)). The question here is whether a voice, in this context, is sufficiently like these devices to merit protection.

The Court begins with what can be loosely categorized as celebrity endorsement cases. Such cases prototypically take one of two forms. First, they may involve the unauthorized use of a celebrity's likeness on merchandise, implying that the celebrity approves of the merchandise or is affiliated with the seller. *See, e.g.*, *Bruce Lee Enters.* 2011 WL 1327137 at *5 (use of Bruce Lee's image on t-shirts); *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 205 (S.D.N.Y. 2015) (use of Marilyn Monroe's image on apparel and glassware); *Jackson v. Odenat*, 9 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (use of Curtiss Jackson's (a.k.a. "50 Cent's") image on the masthead of a website). Second, they may involve the explicit use of a celebrity's likeness in advertising or to promote goods or services. *See, e.g.*, *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 618 (S.D.N.Y. 1985) (use of a Woody Allen lookalike in advertisements); *Bondar v. LASplash Cosms.*, No. 12-CV-1417, 2012 WL 6150859, at *2 (S.D.N.Y. Dec. 11, 2012) (use of a famous model's image in advertisements); *Kuhn v. Corbis Corp.*, No. 10-CV-9127, 2012 WL 13388758, at *3 (S.D.N.Y. Jan. 17, 2012) (same).[8] Some plaintiffs have prevailed even

---

In any event, whether there exist exceptions to the requirement that Section 43(a)(1)(A) claims concern a valid mark, Plaintiffs do not argue that such an exception applies here.

[8] Although they involve advertising, these cases are distinct from "false advertising" cases, which require that the advertisement "misrepresents the nature, characteristics, qualities, or geographic origin of" goods or services, 15 U.S.C. § 1125(a)(1)(B), rather than merely causing confusing as to "sponsorship" or "approval," *id.* § 1125(a)(1)(A).

when they are not "celebrities" in the traditional sense.  *See, e.g., Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, No. 04-CV-6107, 2006 WL 2289847, at *3, 11 (S.D.N.Y. Aug. 8, 2006) (use of a European royal family's name by a "distant cousin" to promote his business activities).  It is also true that, at least in other circuits, such claims have successfully been based on the unauthorized use of voice recordings, not just images.  *See, e.g., Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1012 (3d Cir. 2008) (use of altered recordings of a famous sports broadcaster in a documentary about the making of a football video game).

Some courts have observed that "the true gravamen of [such a] claim is infringement on their right of publicity," but have nonetheless concluded that "that observation has no legal traction" because "[t]he cause of action for false endorsement under the Lanham Act is well-accepted in this and other circuits."  *Mayes v. Summit Ent. Corp.*, No. 16-CV-06533, 2018 WL 566314, at *2 (E.D.N.Y. Jan. 18, 2018) (Tiscione, Mag. J.), *report and recommendation adopted in relevant part*, 287 F. Supp. 3d 200 (E.D.N.Y. 2018).  And the Second Circuit recently approved of celebrity endorsement claims in *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 258 (2d Cir. 2021), and *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 117 (2d Cir. 2023), though in both cases the court affirmed dismissal of the claims for failure to show a likelihood of confusion.

From these cases, the general principle emerges that there can exist a "trademark-like interest in [one's] image, likeness, persona, and identity."  *Jackson*, 9 F. Supp. 3d at 355.  Given this, the Court can discern no basis for categorically excluding voices, as opposed to images, from such protection.  The Lanham Act does not limit celebrity endorsement claims to those based on "images" or "pictures."  Rather, the relevant statutory language is "name, symbol, or device," which "courts broadly interpret . . . to include other indicia of identity, such as a

person's voice." *Facenda*, 542 F.3d at 1014. Lovo states in conclusory fashion that "a voice alone is not something [that] can be protected under the Lanham Act," that "there is nothing to protect," and that there is "nothing which may have been used without consent and which could create any confusion." (Mem. at 32.) But Plaintiffs have at least plausibly alleged that voices can sometimes serve a role similar to that of a persona or likeness. And Lovo offers no reason to disbelieve the long-recognized reality that "[t]he human voice is one of the most palpable ways identity is manifested." *See Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988).

Lovo next argues that Plaintiffs' voices cannot be protected because "Plaintiffs are not celebrities." (Reply at 13.) But Section 43(a)(1)(A) "does not require celebrity, only a likelihood of consumer confusion." *Bondar*, 2012 WL 6150859 at *7. While it is true that "the misappropriation of a completely anonymous face could not form the basis for a false endorsement claim, because consumers would not infer that an unknown [individual] was 'endorsing' a product," Plaintiffs have at least alleged that they are more than "completely anonymous" or "unknown" here. *Id.* Rather, they have pleaded that they are well-known and sought-after voice actors whose voices are their recognizable calling cards. At least at this stage, that suffices to plausibly establish "a level of consumer recognition short of celebrity—as the term is usually understood—capable of causing consumer confusion." *Id.* (emphasis added).

The more pertinent question than the two above is whether "what [each Plaintiff] seeks to protect from imitation—[his or] her voice—functions as a trademark or trade name entitling it to protection." *Booth v. Colgate-Palmolive Co.*, 362 F. Supp. 343, 348 (S.D.N.Y. 1973).[9] The Lanham Act defines a mark as "any word, name, symbol, or device" that one uses "to identify

---

[9] Admittedly, Lovo does not develop this point, though Lovo does cite and rely on cases in which use as a mark was a central concern, like *Booth*.

and distinguish," or "indicate the source of," one's goods or services.  15 U.S.C. § 1127.[10]  "The

first part of that definition, identifying the kind of things covered, is broad," but is cabined by the

second part, which "describes every [mark's] 'primary' function: 'to identify . . . origin or

ownership'."  *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146 (2023).  This

"source-identifying" function of marks ensures that "trademark rights 'play well with the First

Amendment'," *id.* at 159 (quoting *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894 (9th Cir. 2002)),

and helps ensure that trademark law does not accidentally mutate into "a species of perpetual

patent and copyright," *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37

(2003).  "The principal purpose of federal trademark law is to 'secure the public's interest in

protection against deceit as to the sources of its purchases, and the businessman's right to enjoy

business earned through investment in the good will and reputation attached to a trade name.'"

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir.

2012) (quoting *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 57 (2d Cir.1995)).

"[T]rademark law is not intended to 'protect innovation by giving the innovator a monopoly'

over a useful product feature."  *Id.* (quoting *Fabrication Enters.*, 64 F.3d at 59 n.4).  Because

marks can take essentially any form, courts must therefore be careful to ensure that they receive

protection only when used as contemplated by the statute—that is, as *marks*.

The celebrity endorsement cases sit uneasily with this distinction between source-

identifying marks and the products they identify, as celebrities' personas are also their products.

A celebrity is, in a sense, one who has monetized his or her own identity.  *See White v. Samsung

Elecs. Am., Inc.*, 971 F.2d 1395, 1399 (9th Cir. 1992) (discussing, in the context of publicity

---

[10] Precisely speaking, the Act defines "trademark" and "service mark," along with two
more specialized forms of marks, and then defines "mark" as any of those four subtypes.  *See* 15
U.S.C. § 1127.

rights, "celebrity identity value" as something that one can "exploit . . . for profit," and which "[t]he law protects").  And that identity, along with the names and likenesses that signify it, are what the celebrity endorsement cases protect.  In this sense, one might understand those cases as representing an exception to the general rule that a mark's "primary significance . . . is to identify the source of the product *rather than the product itself*."  *Cf. Christian Louboutin*, 696 F.3d at 226 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11 (1982)) (emphasis added).  "Marks rooted in something distinct from oneself are quite different from those in which the signifying mark and the signified object merge, as is the case when what is signified is a particular person, rather than some external and distinct object or company."  Jennifer E. Rothman, *Navigating the Identity Thicket: Trademark's Lost Theory of Personality, the Right of Publicity, and Preemption*, 135 Harv. L. Rev. 1271, 1298 (2022); *cf. Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1434 (3d Cir. 1994) ("[A] product configuration differs fundamentally from a product's trademark, insofar as it is not a symbol according to which one can relate the signifier (the trademark, or perhaps the packaging) to the signified (the product).").

Given their distinct nature, these personal marks are treated differently from other marks in various ways.  For one, personal marks generally cannot be registered, and the law is highly skeptical of efforts to restrict individuals from using their own identities in trade.  *See Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 989 (7th Cir. 2004); *see also 815 Tonawanda Street Corp. v. Fay's Drug Co., Inc.*, 842 F.2d 643, 649 (2d Cir. 1988) (noting "the common law's general solicitude of and willingness to protect the individual's right to use his own name in business").  The law also imposes some limits on the ability to transfer attributes of one's identity—such as personal skill as an artisan—when one transfers trademark rights in one's name or likeness.  *See* 2 McCarthy on Trademarks and Unfair Competition § 18:35 (5th ed.) (hereinafter 2 McCarthy).

And, as relevant here, Section 43(a)(1)(A) protects those who use their identities as marks from the unauthorized appropriation by competitors. While such specialized rules do serve the ordinary trademark purposes of preventing consumer confusion and protecting merchants' right to profit from their goodwill and reputations, they are also bound up in a set of unique "autonomy and dignity interests of the individuals whose personalities are intertwined with such marks," and "implicate fundamental rights" in a way that ordinary trademarks do not. *See* Rothman, *supra*, at 1273, 1276.

Unlike the celebrity endorsement cases, though, Plaintiffs here use their voices in ways that are clearly separable from their identities and personalities. Their clients pay them to produce recordings of themselves narrating scripts, which the clients then own and use to produce content, as authorized by their contracts with Plaintiffs. (*See* AC ¶¶ 17-18.) As professional voice actors, Plaintiffs are not paid only for their "fame," *cf. White*, 971 F.2d at 1399, but also "a negotiated and agreed-upon price for their professional services" (AC ¶ 20), based at least in part on concrete vocal attributes like "tone, quality, timbre, and delivery" (*id.* ¶ 103). Plaintiffs' putative marks—their voices—therefore serve dual functions as both "one of the most palpable ways identity is manifested," *cf. Midler*, 849 F.2d at 463, and as ordinary services in the voice-over market. As one of Plaintiffs' own declarants put it, the involuntary use of an actor's voice "waters down *the actor's product*" by "mak[ing] the voice ubiquitous." ((*See* ECF No. 22-1 at 6, ¶ 11 (emphasis added).) The Court is therefore hesitant to apply the exceptional logic of the celebrity endorsement cases here, even if false endorsement or "business affiliation" is one of the forms of confusion that Plaintiffs allege. (*Cf.* AC ¶¶ 237(a)-(b).) Rather, Plaintiffs voices are protectable only to the extent that they function primarily as *source identifiers* rather than as *products themselves*.

22

In this sense, Plaintiff's claims more closely resemble run-of-the-mill claims for "trade dress" infringement, where the protectable "mark" is "essentially a product's total image and overall appearance." *See Knitwaves*, 71 F.3d at 1005.[11]  Those cases are difficult because trademark terminology "is unsuited for application to the product itself." *Id*. at 1007-08 (quoting *Duraco Prods.*, 40 F.3d at 1440-41).  Accordingly, plaintiffs in such cases must articulate "a precise expression of the character and scope of the claimed trade dress" to receive protection. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 117 (2d Cir. 2001) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co*., 113 F.3d 373, 381 (2d Cir. 1997)).  In all trade dress cases, plaintiffs must show that their claimed mark "meet[s] the first requirement of an action under § 43(a) of the Lanham Act—that [it] be used as a mark to identify or distinguish the source." *Knitwaves*, 71 F.3d at 1006.  Where product design is at issue, courts exercise "particular caution" given the fact that "'almost invariably, even the most unusual of product designs such as a cocktail shaker shaped like a penguin[ ]is intended not to identify the source' of the product, 'but to render the product itself more useful or more appealing.'" *Yurman Design*, 262 F.3d at 114-15 (quoting *Samara Bros*., 529 U.S. at 213).  Thus, a plaintiff can obtain trade dress protection for a design only by demonstrating secondary, or acquired, meaning. *Samara Bros.*, 529 U.S. at 216.

---

[11] *Knitwaves* involved product design and was based on an interpretation of the Supreme Court's ruling in *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992), that trade dress protection may be based on "inherent distinctiveness."  The Supreme Court in *Samara Bros.*, 529 U.S. at 215, then held that product design trade dress always requires secondary meaning to qualify for Section 43(a) protection, abrogating that aspect of *Knitwaves*'s holding.  The underlying logic of *Knitwaves*—that at a minimum, trade dress protection requires that a mark's primary function be source-identifying—still applies, and is arguably bolstered rather than undermined by the subsequent decision in *Samara Bros.*

Whichever approach is applied, Plaintiffs have failed to show that their voices, as used in this context, are protectable under Section 43(a)(1)(A).  Plaintiffs have not explicitly pleaded secondary meaning, nor the factors typically considered in establishing it.  *Cf. Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992) (listing factors such as "advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use").  And beyond a few conclusory references to the recognizability of their voices (*see* AC ¶¶ 20, 189, 204) and the fact that "Plaintiffs' work has been sought out by large companies" (*id.* ¶ 40), Plaintiffs have not alleged that their voices are primarily significant as brands rather than as services to which brands might be attached.

To be clear, Plaintiffs are not out of luck here because they are not famous enough.  To the contrary, even extremely famous celebrities are barred from asserting Section 43(a)(1) claims based on the use of their likenesses as products rather than as source-identifying marks.  Take, for example, *Pirone v. MacMillan, Inc.*, a Second Circuit case involving the name and likeness of Babe Ruth, "one of the greatest baseball players of all time," who the court acknowledged "hardly need[ed] an introduction."  894 F.2d 579, 580 (2d Cir. 1990).  After Ruth's death, MacMillan published a commemorative baseball-themed calendar including three photos of Ruth.  *Id.* at 581.  Ruth's daughters, meanwhile, had registered Ruth's name as a trademark for "paper articles, namely, playing cards, writing paper and envelopes," and sued MacMillan for both infringement of the registered mark in Ruth's name, and for infringement of an unregistered mark in his likeness pursuant to Section 43(a).[12]  *Id.*  The court rejected both claims.  First, the court explained that the registered trademark of Ruth's name did not confer rights in all images

---

[12] The case was brought before Congress split 43(a)(1) into subparts (A) and (B), but clearly sounded in false endorsement, not false advertising.  *See Pirone*, 894 F.2d at 584.

ever taken of Ruth. *Id.* at 583. "[A] photograph of a human being, unlike a portrait of a fanciful cartoon character, is not inherently 'distinctive' in the trademark sense of tending to indicate origin," and even if the plaintiff could establish acquired distinctiveness in some circumstances, it could not be "said that every photograph of Ruth serves this origin-indicating function." *Id.* Second, the court reasoned that "[w]hatever rights [the plaintiff] may have in the mark 'Babe Ruth,' MacMillan's use of Ruth's name and photographs can infringe those rights only if that use was a 'trademark use,' that is, one indicating source or origin." *Id.* But the images of Ruth were used "in the primary sense—to identify a great baseball player," rather than as "identifying the business of selling those products." *Id.* at 584. "While the secondary use may be protected, the use of these words in their primary, descriptive sense may not be." *Id.* Finally, with respect to the plaintiff's Section 43(a) claim specifically, the court applied similar reasoning: "While these pictures of Ruth are in a sense symbols, they in no way indicate origin or represent sponsorship." *Id.* Rather, "the photographs . . . indicate the contents of the calendar, not its source." *Id.*[13] The fact that Ruth's likeness was universally recognizable was irrelevant.

In *Pirone*, the Second Circuit approvingly cited *Estate of Presley v. Russen*, 513 F. Supp 1339 (D.N.J. 1981), which involved Elvis Presley, another celebrity who needs no introduction. There, as in *Pirone*, the court rejected the Presley Estate's attempt to assert common-law trademark claims based on the singer's "likeness and image." *Id.* at 1363-64. The court instead found that the Estate had established only that "a picture or illustration of Elvis Presley dressed in one of his characteristic jumpsuits and holding a microphone in a singing pose is likely to be found to function as a service mark." *Id.* at 1364. This "Elvis Pose" mark had "acquired

---

[13] The Court then explained that there was no likelihood of confusion. *Pirone*, 594 F.2d at 584-85.

secondary meaning through its use in advertising and promoting" and was therefore, unlike Elvis's general image and likeness, distinct from his "entertainment services." *Id.* at 1365.

"The distinction drawn by the Second Circuit in *Pirone* is between situations where the words are used to identify a business or in their 'primary, descriptive sense.'" *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 315 (S.D.N.Y. 2019). That distinction applies here as well: Plaintiffs' voices may be protectable to the extent that they are being used primarily to identify the source of particular sound recordings, but are not protectable to the extent that they primarily function as *content* in those sound recordings (like Ruth's photo was *content* in the calendar, rather than a brand identifier). Whether Plaintiffs' voices are also recognizable is immaterial.

Plaintiffs might object that their voices, as indicia of identity, merit trademark protection even if they function primarily as services. But that logic conflicts with trademark law's typically restrictive approach to the protection of other indicia of identity, such as names. *See* 2 McCarthy § 13:1. To understand the rationale for this restrictive approach, consider a hypothetical: A new voice actor enters the industry whose voice happens to sound highly similar to either Lehrman's or Sage's. Under Plaintiffs' theory, it is difficult to imagine why they could not bring a Section 43(a)(1)(A) claim against the new actor. The Lanham Act contains no knowledge or intent requirement. *See Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018) (citing *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004)). And while Lovo's synthetic clones are allegedly indistinguishable from Plaintiffs' real voices, such one-to-one mimicry is not required to establish a likelihood of confusion. *Cf. Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (treating "similarity between the two marks" as only one of eight relevant factors).

Moreover, unregistered trademark rights, even in a name or likeness, can be assigned. 2 McCarthy, § 18:32. This could have unsettling consequences. For example, in one recent case, the Cousteau Society successfully asserted Section 43(a)(1)(A) claims against Jacques Cousteau's granddaughter to prevent her from using, among other purported marks, her grandfather's name and likeness in her own business, as Cousteau had assigned all of his intellectual property rights to the Society prior to his death. *See The Cousteau Soc'y, Inc. v. Cousteau*, 498 F. Supp. 3d 287, 298, 312 (D. Conn. 2020). In another case, a district court ordered a social-media influencer to turn over control of her social media accounts to a company to which she had previously sold trademark rights in her name. *JLM Couture, Inc. v. Gutman*, No. 20-CV-10575, 2021 WL 827749, at *1 (S.D.N.Y. Mar. 4, 2021). While that case involved registered trademarks and was partly vacated on appeal, *see JLM Couture, Inc. v. Gutman*, 24 F.4th 785, 799 (2d Cir. 2022), it illustrates the risks associated with granting entities exclusive, perpetual, and transferable rights in identity attributes. While such rights are appropriate in some circumstances, they must be carefully limited.

To allow any artist, actor, or other creative tradesperson to sue their doppelgangers for trademark infringement, as Plaintiffs' theory would allow, would "create[e] a cause of action for, in effect, plagiarism," and would be incompatible with the careful ways that courts have circumscribed the Lanham Act to avoid unduly burdening competition and free expression. *Dastar*, 539 U.S. at 36. In the celebrity cases, courts have sometimes allowed suits to proceed against lookalikes or their employers. *See, e.g.*, *Allen*, 610 F. Supp. at 618. But the crux of such cases is that the defendants are appropriating the identity and the goodwill of the famous plaintiffs—that is, pretending to *be* Woody Allen—rather than merely engaging in the same trade while happening to look like the famous plaintiffs. The celebrity cases are also limited in that

they protect only identities themselves from appropriation, not ordinary goods or services. In cases like *Allen*, the burdens on competition and free expression are minimal, while the benefits from preventing confusion are substantial. Here, the risks and benefits are flipped. To allow Plaintiffs to protect the downstream uses of their voices merely because Plaintiffs originated them would disrupt the "carefully crafted bargain" struck by patent and copyright law and "misuse" the Lanham Act to "to reward [artisans] for their innovating in creating a particular [work or] device." *Cf. Dastar*, 539 U.S. at 33-34.

Because Plaintiffs have failed to identify a protectable mark, the Court need not consider whether Plaintiffs have pleaded a likelihood of confusion. Lovo's motion to dismiss is thus granted as to Plaintiffs' claims under Section 43(a)(1)(A).

### 2.    False Advertising

Plaintiffs also bring false advertising claims under Section 43(a)(1)(B) of the Lanham Act, which prohibits any person from, "in commercial advertising or promotion, misrepresent[ing] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. 1125(a)(1)(B). "To state a false advertising claim under Section 43(a), a plaintiff must . . . plausibly allege the falsity of the challenged statement[,] . . . materiality, i.e., that the false or misleading representation involved an inherent or material quality of the product[,] . . . that the defendant placed the false or misleading statement in interstate commerce, and that the plaintiff has been injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 56 (2d Cir. 2022) (quotation marks omitted). Falsity "may be based on at least one of two theories: 'that the challenged advertisement is literally false, *i.e.*, false on its face,' or 'that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers.'" *Tiffany (NJ) Inc. v.*

*eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)).  "When an advertisement is shown to be literally or facially false, consumer deception is presumed," but " a district court must rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message." *Time Warner Cable*, 497 F.3d at 153 (cleaned up).  Unlike Plaintiffs' false association claims, false advertising claims do not require Plaintiffs to plead the existence of, or their right to assert, a valid mark.  4 McCarthy §§ 27:24 (listing the elements of a § 43(a)(1)(B) claim), 27:50 ("Some plaintiffs have attempted to either avoid or embellish a § 43(a)(1)(A) trademark infringement and unfair competition allegation by asserting the same facts as a claim of false advertising under § 43(a)(1)(B). This is attempted to avoid having to prove the validity of a trademark.").

Plaintiffs articulate two bases for falsity here.  First, Plaintiffs argue that Lovo marketed their voices under the names "Kyle Snow" and "Sally Coleman," which they allege is literally false.  (Opp. at 33.)  Second, Plaintiffs point to a list of statements made on Lovo's website and on YouTube (*id.*) that allegedly suggest the existence of a business relationship between Plaintiffs and Lovo (AC ¶ 246).

Regarding Lovo's marketing of the Snow and Coleman artificial voices, Plaintiffs have not adequately pleaded falsity.  To the contrary, Plaintiffs point to numerous examples of Lovo marketing the voices as what they truly are—synthetic "clones" of real actors' voices.  (*See, e.g.*, *id.* ¶¶ 23-24, 26, 28, 90-93, 95, 150-51, 178 & n.33.)  Plaintiffs do not allege that Lovo claimed to be selling Plaintiffs' actual voices.  Plaintiffs do allege that Lovo falsely stated that the cloned voices "came with all commercial rights."  (*Id.* ¶ 227.)  But even if Plaintiffs are correct Lovo

lacked the "commercial rights" that it promised to sell,[14] such misrepresentations do not concern

"the nature, characteristics, qualities, or geographic origin" of Plaintiffs' cloned voices.  *See*

*Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 308 (S.D.N.Y. 2011) (quoting 15 U.S.C.

§ 1125(a)(1)(B)).  Courts in this Circuit and others have held, following the underlying logic of

*Dastar*, 539 U.S. at 32-38, that the language of Section 43(a)(1)(B) excludes claims based on "a

false assertion of license" along with "a false claim of authorship."  *Agence France Presse* 769

F. Supp. 2d at 307-8; *see also Invista S.a.r.l. v. E.I. Du Pont De Nemours & Co.*, No. 08-CV-

7270, 2008 WL 4865208, at *3 (S.D.N.Y. Nov. 3, 2008) (rejecting claim that

"misrepresentations of [the defendant's] freedom to use the [plaintiff's] technology constitute

false advertising"); *Patterson v. Diggs*, No. 18-CV-3142, 2019 WL 3996493, at *7 (S.D.N.Y.

Aug. 23, 2019) (holding that "representations giving the clear but false impression that Plaintiff

licensed or otherwise authorized Defendants to reproduce, display, sell, and distribute Plaintiff's

work" did not constitute Lanham Act false advertising (cleaned up)); *Sybersound Recs., Inc. v.

UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008) (rejecting the argument that "the licensing

status of each work is part of the nature, characteristics, or qualities of the . . . products").  *But

see Trackman, Inc. v. GSP Golf AB*, No. 23-CV-598, 2024 WL 4276497, at *16-18 (S.D.N.Y.

Sept. 24, 2024) (allowing false advertising claim based on the defendant's misrepresentation that

it had obtained trademark licenses "from the owners of branded golf courses," where the licenses

"could be characterized as endorsements from these iconic courses" and thus constituted indicia

"that trademarked courses available for play on SGT were genuine and sanctioned by the courses

themselves").  In addition to being inconsistent with the statutory text, permitting false

---

[14] As explained below, *see infra* Sections III.D and III.E, Plaintiffs have adequately
alleged that Lovo lacked "all commercial rights" insofar as Plaintiffs have stated claims under
the New York Civil Rights Law for misappropriation of their voices.

advertising claims based on licensing status would allow plaintiffs to circumvent the strictures of *Dastar* by "shoe-horning a claim into section 43(a)(1)(B) rather than 43(a)(1)(A)." *Agence France Presse*, 769 F. Supp. 2d at 308.  Thus, because Lovo's claim that it held the requisite "commercial rights" concerns the licensing status of the cloned voices, rather than their material attributes or geographic origins, it is not false advertising for purposes of the Lanham Act.

Similarly, Plaintiffs allegations that Lovo "confus[ed] potential customers . . . as to [Plaintiffs'] affiliation with Lovo and the ability to use the Lovo service in place of traditional access to these actors," and that Lovo "misrepresent[ed] that [Plaintiffs] have partnered with Lovo" are not actionable as false advertising.  (AC ¶ 246(a)-(b).)  Such claims are indistinguishable from the false affiliation claims that the Court dismissed above, *see supra* Section III.B.1, and Plaintiffs cannot avoid the requirement of a protectable mark by "disguis[ing] a § 43(a)(1)(A) trademark infringement and unfair competition claim as a false advertising § 43(a)(1)(B) claim."  4 McCarthy § 27:50 (capitalization altered).

Plaintiffs have also failed to identify any message in any Lovo advertisement that is "impliedly false" in the sense that it "leaves 'an impression on the listener or viewer that conflicts with reality.'"  *Int'l Code Council*, 43 F.4th at 57 (quoting *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016)).  In the false advertising context, this may be accomplished by pleading actual consumer confusion.  *Id.* at 58 n.5.  But here, Plaintiffs do not allege that any consumers would be or were confused by Lovo's advertising, as opposed to being confused by the similarity of the synthetic voices to Plaintiffs' voices when heard in the wild.  (*Cf.* ECF No. 22-1.)  In fact, Plaintiffs actually allege that Lovo's advertising was clear on the *lack* of connection between Plaintiffs and Lovo's voice clones. Lovo marketed its service as a disruptive alternative to traditional voice-over services (AC ¶ 21),

and Plaintiffs admit that "[t]he benefit to a subscriber of using Lovo's service is financial: they do not have to pay the actor for the studio session, any residuals, royalties, or fees," and "do not need to seek the consent of the actor." (*Id.* ¶ 30; *see also id.* ¶ 32 ("[T]he LOVO website boasts that customers can 'Save $$ and time on voiceovers'.").) Plaintiffs' other supposed falsehoods are not interpretable as statements of fact and therefore cannot ground a false advertising claim. (*See id.* ¶¶ 246(h) ("harming the reputations of [Plaintiffs] . . . by refusing to remove their voices from the Lovo website [after they] requested disaffiliation"), 246(i) ("stealing potential customers . . . by diverting the customers to purchase a . . . Lovo subscription").)

The last identifiable allegation of falsity in the Amended Complaint is that Lovo "misrepresented the number of actors accessible through the Lovo subscription service." (*Id.* ¶ 246(f).) However, Plaintiffs have not pleaded facts supporting this allegation. Rather, Plaintiffs state that Lovo "claimed that its Generator was created using '1000s of voices'" (*id.* ¶ 22) but do not dispute the truth of this observation. Plaintiffs do not allege that Genny was actually trained with or offers fewer than thousands of synthetic voices, only that Lovo used some voices without permission. (*Id.*)

Finally, even if Plaintiffs have identified some misleading aspects of some of Lovo's marketing, they have not adequately pleaded actual injury. Where "the defendant and plaintiffs are competitors in the same market," materiality and injury usually blend together, as "the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff's." *Church & Dwight*, 843 F.3d at 70-71. While Plaintiffs have alleged that they risk losing sales to Lovo, they have not alleged that such losses are related to actionable false

claims in Lovo's advertising.[15]  Rather, Plaintiffs themselves allege that the lost sales are due to

the fact that artificial voices can be procured at lower cost and without a voice actor's consent.

Put differently, Lovo's services are more desirable to some customers because they are cheaper

and more accessible.  While Plaintiffs might have a different cause of action for such competitive

harm, it does not sound in Lanham Act false advertising.

Because Plaintiffs have pleaded neither falsity nor injury, their false advertising claims

under Section 43(a)(1)(B) of the Lanham Act are dismissed.

### C.    Copyright

Plaintiffs assert four species of copyright claims.  First, Sage asserts a direct infringement

claim based on Lovo's use of her actual voice recording in an investor presentation, pitches to

investors, at a conference, and in Lovo's external marketing materials.  (AC ¶¶ 289-91.)  Second,

Plaintiffs assert direct infringement claims based on Lovo's use of Plaintiffs' voice recordings to

train Genny.  (*Id.* ¶ 302.)  Third, Plaintiffs assert direct infringement claims based on Lovo's use

of Genny to output "clones of their voices."  (*Id.*)  Finally, Plaintiffs assert contributory

infringement claims based on the theory that Lovo made clones of their voices available for

third-party use.  (*Id.* ¶ 310.)

#### 1.    Registration

As an initial matter, Lovo argues that Plaintiffs cannot assert any copyright claims

because they failed to register the underlying copyrights prior to commencing this action.  (Mem.

at 43 (citing 17 U.S.C. § 411(a)).)  Lovo cites *Fourth Estate Public Benefit Corporation v. Wall-*

---

[15] The one exception to this is Lovo's allegedly false claim that it was selling fully
licensed products.  *See supra* note 14.  But, as explained above, while Plaintiffs have a legitimate
argument that this falsehood allowed Lovo to cannibalize their customers, misrepresentations
about licensing are not actionable under the Lanham Act.

*Street.com, LLC*, for the proposition that copyright registration is akin to "an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." 586 U.S. 296, 301 (2019).

Here, however, Plaintiffs did not "institut[e]" a "civil action for infringement of the copyright" before registering their copyrights, *cf.* 17 U.S.C. § 411(a), as the original complaint in this action did not include any copyright claims (ECF No. 1). Rather, Plaintiffs waited until Lehrman's and Sage's copyrights were registered, all by the end of August 2024, to bring their copyright claims in an amended complaint filed on September 25, 2024. (AC at 65-69.)[16]

The Court sees no reason to dismiss a validly filed Lanham Act and state-law action that was later amended to include copyright claims after the copyrights had been registered. While some district courts have interpreted *Fourth Estate* to require dismissal of copyright claims without prejudice when they were first filed before registration, *see e.g.*, *Zonis v. Grubman*, No. 20-CV-7181, 2022 WL 597447, at *2 (S.D.N.Y. Feb. 28, 2022); *Malibu Media, LLC v. Doe*, No. 18-CV-10956, 2019 WL 1454317, at *4 (S.D.N.Y. Apr. 2, 2019), the Court is unaware of any case law requiring dismissal in a situation like the one here.

### 2. Statute of Limitations

Lovo next argues that Plaintiffs cannot pursue claims based on alleged infringement that occurred more than three years before they filed suit—that is, before May 16, 2021—based on the Copyright Act's statute of limitations. (Mem. at 44 (citing *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2d Cir. 2014); 17 U.S.C. §507(b)).) In response, Plaintiffs argue that "the claim accrues when the holder discovers or should have discovered the infringement."

---

[16] Oddly, Plaintiffs do not point this out, arguing only that dismissal for failure to register before filing would be a waste of judicial resources. (*See* Opp. at 33.)

(Opp. at 43 (citing *Psihoyos*, 748 F.3d at 125).)  Plaintiffs are correct that "the discovery rule determines when an infringement claim accrues under the Copyright Act," *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 148 (2d Cir. 2024), including for purposes of assessing damages, *Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 374 (2024).  Because Plaintiffs allege that they actually discovered Lovo's alleged infringement "on July 11, 2023, when they heard the June 20, 2023 episode of the 'Deadline Strike Talk' podcast" (Opp. at 33), the only remaining question is whether Plaintiffs should have discovered the infringement sooner.

Here, there is no indication that Plaintiffs failed to exercise due diligence.  To the contrary, Lovo did not initially identify itself to Plaintiffs (*see, e.g.*, AC ¶¶ 45, 76) and allegedly concealed from Plaintiffs the true intended uses of their recordings (*see, e.g.*, *id.* ¶¶ 47, 58, 78, 79).  Plaintiffs also allege that "neither [of them] had any idea what 'speech synthesis' was" or "had [any] reason not to believe [Lovo's] assurance" that their voices would be used for limited, non-public purposes.  (*Id.* ¶ 57.)  And Plaintiffs' quick action to stop Lovo's use of their recordings further supports the inference that they were exercising due diligence given the circumstances.  (*Id.* ¶ 111.)  Any inferences to the contrary would "require[] consideration of facts outside the complaint, and therefore could not be made on [Lovo's] motion to dismiss."  *Cf. Michael Grecco Prods.*, 112 F.4th at 153.  Accordingly, Plaintiffs' copyright claims are timely.

### 3.    License

Lovo next argues that Fiverr's Terms of Service granted Lovo a license to use Plaintiffs' recordings as it did.  (Mem. at 42-43.)  "Dismissal of a claim for copyright infringement is proper where a contract underlying the suit clearly and unambiguously demonstrates the existence of the defendant's license to exploit the plaintiff's copyrights and where plaintiff has not shown any limitation on that license."  *Ariel (UK) Ltd. v. Reuters Grp. PLC*, No. 05-CV-

9646, 2006 WL 3161467, at *5 (S.D.N.Y. Oct. 31, 2006), *aff'd*, 277 F. App'x 43 (2d Cir. 2008) (summary order).  Such a defense "may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."  *Id.* (quoting *Pani*, 152 F.3d at 74).  Where a license agreement is not incorporated into the complaint but is nonetheless "integral" to it, "the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."  *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *see also Marvullo v. Gruner & Jahr*, 105 F. Supp. 2d 225, 233-34 (S.D.N.Y. 2000) (treating an alleged copyright license agreement as integral for purposes of resolving a motion to dismiss).

Lovo points to Fiverr's Terms of Service (Mem. at 43), which provide that "when the work is delivered, and subject to payment, the Buyer is granted all intellectual property rights, including but not limited to, copyrights for the work delivered from the Seller, and the Seller waives any and all moral rights therein."  (2019 TOS at 14; 2020 TOS at 13.)  The Terms of Service also state that "delivered work shall be considered work-for-hire," and that "[i]n the event the delivered work does not meet the requirements of work-for-hire . . . the Seller expressly agrees to assign to Buyer the copyright in the delivered work."  (2019 TOS at 14; 2020 TOS at 13.)  However, the next paragraph contains additional specifications for "Voice Over Gigs" that are inconsistent with a transfer of unrestricted copyrights.  For example, while copyright ownership in a sound recording confers the exclusive right to reproduce it, including for commercial purposes, Fiverr's Terms of Service state that buyers of voice-over recordings are only "purchasing basic rights, . . . allowing them to use the work forever and for any purpose except for commercials, radio, television and internet commercial spots."  (2019 TOS at 14;

2020 TOS at 13.)  Buyers need to purchase higher-tier packages of either "Commercial Rights,"

in order to "promote a product and/or service," or "Full Broadcast Rights," in order to use the

recordings "in radio, television and internet commercials."  (2019 TOS at 14-15; 2020 TOS at

13.)  Lovo concedes that it did not purchase these extra packages.  (Opp. at 42; Reply at 19-20.)

It is thus at least plausible to read the Terms of Service as creating a default rule that

buyers receive full copyright from sellers, but overriding that default in the voice-over context,

and providing instead that buyers of voice-overs receive only limited licenses.  (*Cf.* Opp. at 33.)

Plaintiffs have therefore adequately alleged that no copyright transfer occurred,[17] and that Lovo

thus lacked the right to, for example, use Sage's recordings to promote its service to potential

investors.  (*Cf.* 87-92.)

Moreover, Plaintiffs have adequately alleged that the chat messages they exchanged with

Lovo impose additional restrictions beyond the default rules contained in Fiverr's Terms of

Service.  While the interaction of these contract terms will ultimately depend on facts not alleged

in the complaint, such as whether the parties accepted Fiverr's Terms of Service before, after, or

at the same time as their chats with Lovo, the Court must harmonize inconsistent contract terms

where possible.  *Cf. Div. 5, LLC v. Fora Fin. Advance LLC*, No. 24-CV-6870, 2025 WL

1548807, at *3 (S.D.N.Y. May 30, 2025).  Here, the chats can plausibly be read as evincing the

---

[17] If this were not the case, the Court would need to resolve the additional question of whether an electronically signed "Terms of Service" document suffices as a signed writing required by the Copyright Act to transfer a copyright.  *Cf.* 17 U.S.C. § 204.  In general, "[t]he rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so."  *Weinstein Co. v. Smokewood Ent. Grp., LLC*, 664 F. Supp. 2d 332, 340 (S.D.N.Y. 2009) (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir.1990)).  At least one circuit—the First—has suggested, but not held, that so-called "clickwrap" agreements might not satisfy the requirements of § 204.  *See Small Just. LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 320 & ns. 4-8 (1st Cir. 2017).  It appears that no other circuit, including the Second, has addressed this question.

parties' intent that Lovo would be able to use Plaintiffs' voice recordings only in narrowly circumscribed ways. *See supra* Section III.A.

### 4.    Infringement

To demonstrate copyright infringement, a plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). To show copying, the plaintiff must "first show that his work was actually copied," and then "he must establish substantial similarity" between the allegedly infringing work and protected expression in his work. *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (quotation marks omitted).

"The word 'copying' is shorthand for the infringing of any of the copyright owner's . . . exclusive rights described in [17 U.S.C.] § 106." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (quotation marks omitted). The copyrights at issue in this case are sound recordings. (*See* Mem. at 28; Opp. at 32.) Thus, the relevant exclusive rights are "to duplicate the sound recording in the form of phonorecords or copies that directly or indirectly recapture the actual sounds fixed in the recording," 17 U.S.C. § 114(b), "to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality," *id.*, "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending," *id.* § 106(3), and "to perform the copyrighted work publicly by means of a digital audio transmission," *id.* § 106(6). The rights of duplication and derivation, with respect to sound recordings, "do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording." *Id.* § 114(b).

To determine similarity, courts ask whether "an average lay observer would recognize the alleged copy as having been appropriated." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 100 (2d Cir. 1999). However, not all elements of a registered work are protectable, as copyright "extends only to those components of a work that are original to the author." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001). When a work "contain[s] both protectible and unprotectible elements," courts "must attempt to extract the unprotectible elements from . . . consideration and ask whether the *protectible elements*, *standing alone*, are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995) *abrogated on other grounds by Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205 (2000).

### a.    Direct Reproduction

The direct infringement analysis regarding the reproduction of Sage's original recording is straightforward. Plaintiffs allege that Lovo reproduced "a part of one [of Sage's] actual copyrighted recordings . . . in 2020 presentations and in videos on Lovo's YouTube channel." (Mem. at 42 (quoting AC ¶¶ 24, 286-91, 88-92).) Lovo appears to concede that, at least in the 2020 presentations, part of Sage's actual recording was used, and Lovo is aware of the precise segment of the recording on which Sage's allegations are based. (*Id*. at 47 (specifying the length of the clip and the number of words).)[18] Such usage is clearly aimed at promoting Lovo's products and services, and is therefore not covered by the license contained in Fiverr's Terms of Service. *Cf. supra* Section III.B.3.

While the presentation incorporating Sage's original recording was first used in early 2020, more than three years before Sage's infringement claims accrued, *see supra* Section

---

[18] Confusingly, Lovo tries to fault Sage for failing to specify "which of the copyrighted recordings were allegedly infringed." (Mem. at 46.) Clearly Sage has carried her burden here, as she has identified the exact section of the presentation that was allegedly copied.

III.B.2, the Supreme Court recently confirmed that such claims are timely as long as they are brought within three years of discovery. *See Warner Chappell Music*, 601 U.S. at 370-74 (assuming the applicability of the discovery rule, the Copyright Act allows damages stemming from "infringing acts occurring more than three years before [a plaintiff] filed suit"). Lovo does not allege that Sage had any way of knowing how it had used her voice recordings prior to hearing Lovo's voice clones for the first time on the *Deadline Strike Talk* podcast. Sage has therefore adequately alleged infringement based on Lovo's use of her original recordings, and Lovo's motion to dismiss such claims is denied.

### b.    AI Training

Lehrman and Sage next allege direct infringement based on Lovo's use of their recordings to train the Genny AI model. (AC ¶ 302; Opp. at 41.) These claims fail for lack of adequate explanation in the complaint. Throughout, Plaintiffs allege only that their voices were "used to train Genny." (*See, e.g.*, *id.* ¶¶ 58-59, 109, 133, 139, 157-58, 269, 279, 282, 302.) They never, in either the operative complaint or their opposition brief, explain what training is or how it works, even at a very high level of generality. The Court therefore cannot ascertain or reasonably infer which exclusive rights Lovo allegedly infringed, or how. While the Court recognizes that it is difficult to plead details about a closed-source algorithm to which one does not have access, that difficulty does not excuse the utter lack of factual detail presented here. *Cf. Iqbal*, 556 U.S. at 678. Although Plaintiffs do not need to allege exhaustive detail about how Lovo's technology works, they have not said enough.

However, it may be possible—even straightforward—for Plaintiffs to amend their pleadings to remedy this deficit. *Cf. Andersen v. Stability AI Ltd.*, 700 F. Supp. 3d 853, 866 (N.D. Cal. 2023) (granting leave to amend so plaintiff could clarify how defendant used

copyrighted material to train its AI model).  Assuming Plaintiffs lack access to granular details

about how Lovo's technology works, *cf. id.* (involving "a program that is open source, at least in

part"), they may rely on information-and-belief pleading, *see Arista Recs.*, 604 F.3d at 120, along

with generally available information about AI algorithms, *see, e.g.*, *N.Y. Times Co. v. Microsoft

Corp.*, No. 23-CV-11195, 2025 WL 1009179, at *4 (S.D.N.Y. Apr. 4, 2025).  The Court

therefore grants Lovo's motion to dismiss Plaintiffs' training-based copyright claims with leave

to amend.[19]

### c.    AI Outputs

Lehrman and Sage also claim copyright infringement as to the output of the Genny

model—that is, to the voice clones themselves.  (AC ¶ 302; Opp. at 41.)  But such claims are

---

[19] Lovo raises two additional arguments, neither of which justifies denying leave to
amend.  Lovo asserts, in one conclusory sentence, a defense of fair use.  (Mem. at 47-48 (citing
*Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 548 (S.D.N.Y. 2019) (not about AI).)  Fair use
is an affirmative defense on which Lovo bears the burden.  *See Campbell v. Acuff-Rose Music,
Inc.*, 510 U.S. 569, 590 (1994).  Relevant factors include the purpose and character of the work,
its nature, and the effects of the allegedly infringing conduct on the relevant market.  *Id.* at 578-
590.  Lovo has addressed none of these, nor any other relevant considerations, and therefore
cannot establish fair use on the basis of its current submissions.  However, that is not to say as a
substantive matter that there is no fair use here.  *Cf. Bartz v. Anthropic PBC*, No. 24-CV-5417,
2025 WL 1741691, at *5 (N.D. Cal. June 23, 2025) ("[T]he use of the books at issue to train
Claude and its precursors was exceedingly transformative and was a fair use under Section 107
of the Copyright Act.").  Should Plaintiffs file an amended complaint alleging more detail about
Lovo's technology, Lovo is free to plead fair use in a more thorough fashion at that time.

Lovo also argues that it was licensed to use Plaintiffs' recordings to train Genny pursuant
to Fiverr's Terms of Service.  (Mem. at 43.)  The specific voice-over license allows use "for any
purpose except for commercials, radio, television and internet commercial spots."  (2019 TOS at
14; 2020 TOS at 13.)  However, as explained above, *see supra* Sections III.A, III.C.3, Plaintiffs
have plausibly alleged that the parties overrode that license in their direct chat conversations.
Those conversations limited Lovo's use of Lehrman's recordings to "academic research purposes
only" (AC ¶ 49), and the use of Sage's recordings to "test scripts for radio ads" (*id.* ¶¶ 76, 78).
Plaintiffs allege that "academic" voice research is a defined field of study and does not include
the creation of commercial AI models.  (Id. ¶ 57.)  And creating "test scripts for radio ads" self-
evidently does not entail creating commercial AI models.  Plaintiffs have thus plausibly alleged
that Lovo's use of their recordings to train Genny was not licensed.

barred by the relevant statutory language, which excludes from protection the "independent fixation of other sounds" to "imitate or simulate" those in the protected recording. 17 U.S.C. § 114(b). As the Ninth Circuit has explained, "[a] new recording that mimics the copyrighted recording is not an infringement, even if the mimicking is very well done, so long as there was no actual copying." *VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 883 (9th Cir. 2016); *cf. UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 350 n.1 (S.D.N.Y. 2000) (holding that transformation of a CD to MP3-based music files was copying, because it "create[d] a music file that is sonically as identical to the original CD as possible" and "some slight, humanly undetectable difference between the original and the copy does not qualify for exclusion from the coverage of the Act").

Plaintiffs do not contend that Lovo ever used Genny to output perfect, AI-generated reproductions of their original recordings, or that Genny is even capable of doing so.[20] Rather, they claim that Genny is able to create new recordings that mimic attributes of their voices like "pitch, loudness, tone, timbre, cadence, inflection, breathiness, roughness, strain, jitter, (variation in pitch), shimmer (variation in amplitude), spectral tilt, and overall intelligibility, and other qualities." (AC ¶ 57.) Genny then, at Lovo's direction or the direction of Lovo's customers, could and did produce new audio recordings using those mimicked voices.[21]

---

[20] While it is conceivable that an AI clone might be used to generate from scratch a perfect copy of a copyrighted sound recording, including identical words and sonic attributes, that scenario is not presented here.

[21] For example, in a CNN interview, Plaintiffs compare a snippet of audio narrated by Sage with one narrated by the AI "Sally Coleman" voice. (AC ¶ 75 n.12 (citing *AI 'stole' our voices. Actors show CNN comparison of their voices and alleged 'illegal' AI versions*, CNN (May 24, 2024), https://www.youtube.com/watch?v=_YfuSdFmPaI&t=169s (last visited June 18, 2025)). While the voices may sound similar, they are not saying the same words, and are not identical fixations of sound within the meaning of the Copyright Act.

Copyright protection does not extend to this kind of imperfect mimicry, even when accomplished using advanced technology rather than more traditional techniques like musical covers or impersonations.  What Plaintiffs are essentially asking for is copyright protection for their voices *qua* voices.  But copyright "must concern the expression of ideas, not the ideas themselves," *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 67 (2d Cir. 2010), and does not extend to something as abstract and intangible as a "voice," *see In re Jackson*, 972 F.3d 25, 47 (2d Cir. 2020) (distinguishing between "the recognizable sound of [50 Cent's] voice (which is not within the subject matter of copyright)" and "the copyrighted work in which that voice is embodied (which, of course, is within the subject matter of copyright)"). Moreover, even if copyright protection could cover voices, Plaintiffs did not attempt to register anything but ordinary sound recordings.

Plaintiffs' copyright claims based on Genny's output are therefore dismissed.

### d.    Contributory Infringement

Plaintiff's contributory infringement claims are analogous to their direct infringement claims based on Genny's outputs, and fail for the same reason:  Plaintiffs have not pleaded any facts from which the Court can infer that any Lovo consumer reproduced the original sound recordings for which Lehrman and Sage hold copyrights.  (*Cf.* AC ¶¶ 309-12 (pleading only "infringe[ment]" in conclusory terms).)  "'There can be no contributory infringement absent actual infringement' and no vicarious infringement absent direct infringement." *Williams v. A & E Television Networks*, 122 F. Supp. 3d 157, 165 (S.D.N.Y. 2015) (quoting *Faulkner v. Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 40 (2d Cir.2005)) (cleaned up).  Plaintiffs' contributory infringement claims are therefore dismissed.

D.    New York Civil Rights Law

New York Civil Rights Law ("NYCRL") Section 50 prohibits the "use[] for advertising purposes, or for the purposes of trade, the name, portrait, picture, likeness, or voice of any living person without having first obtained the written consent of such person," and Section 51 provides a private right of action to any person whose voice is so used.  "To establish such a claim, the plaintiff must demonstrate each of four elements: '(i) usage of plaintiff's name, portrait, picture, or voice, (ii) within the state of New York, (iii) for purposes of advertising or trade, (iv) without plaintiff's written consent.'"  *Wilson v. Veritas Consulting Grp. Inc.*, No. 21-CV-8318, 2022 WL 4227145, at *2 (S.D.N.Y. Sept. 13, 2022) (quoting *Molina v. Phx. Sound Inc.*, 747 N.Y.S.2d 227, 230 (1st Dep't 2002)).

"Unlike other jurisdictions, New York does not recognize a common-law right of privacy," *Barbash v. STX Fin., LLC*, No. 20-CV-123, 2020 WL 6586155, at *2 (S.D.N.Y. Nov. 10, 2020) (quotation marks omitted), a gap that the New York Legislature filled with Sections 50 and 51 of the Civil Rights Law, *Messenger v. Gruner Jahr Printing & Pub.*, 208 F.3d 122, 125 (2d Cir. 2000).  In light of this limited purpose, the Second Circuit has "underscored that the statute is to be narrowly construed and 'strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person'."  *Id.* (quoting *Finger v. Omni Pubs. Int'l, Ltd.*, 77 N.Y.2d 138, 141 (1990)).  In 2021, responding to the living-person requirement, the Legislature amended Section 50 to cover a "digital replica" of a deceased person.  *See* NYCRL § 50-f.

Defendants raise several objections to Plaintiffs' claims under these provisions, each of which the Court rejects.

### 1.    Statute of Limitations

The statute of limitations applicable to NYCRL Section 51 is one year.  N.Y. C.P.L.R.

§ 215(3); *see also Richards v. Multinex Co.*, No. 23-7690, 2024 WL 3041330, at *1 (2d Cir. June

18, 2024) (summary order).  "No court shall extend the time limited by law for the

commencement of an action."  N.Y. C.P.L.R. § 201.  Plaintiffs have identified no relevant

statutory provision or rule of law that would toll the statute of limitations here.  *Cf. Brooks ex rel.*

*Est. of Bell v. The Topps Co.*, No. 06-CV-2359, 2007 WL 4547585, at *4 (S.D.N.Y. Dec. 21,

2007) (finding "no basis to find that New York courts would adopt a discovery rule to extend the

statute of limitations for a right of publicity cause of action"); *Jewell v. Cnty. of Nassau*, 917

F.2d 738, 740 (2d Cir. 1990) ("Federal courts do have the power to toll statutes of limitations

borrowed from state law, but only where application of the statute of limitations would frustrate

the policy underlying the federal cause of action.").

"New York courts apply a single publication rule to claims under NYCRL § 51 such that

a claim accrues 'on the date the offending material is first published.'"  *Wilson v. Veritas*

*Consulting Grp. Inc.*, No. 21-CV-8318, 2022 WL 4227145, at *3 (S.D.N.Y. Sept. 13, 2022); *see*

*also Zoll v. Ruder Finn, Inc.*, No. 02-CV-3652, 2004 WL 42260, at *2 n.2 (S.D.N.Y. Jan. 7,

2004) (collecting cases).  Here, substantial offending material was publicized by Lovo well

before May 16, 2023—one year before the original complaint was filed on May 16, 2024.  (ECF

No. 1; AC ¶¶ 24, 87, 92, 201, 125.)

However, Plaintiffs are correct that "republication of the offending material refreshes the

limitations period."  *Comolli v. Huntington Learning Ctrs., Inc.*, 117 F. Supp. 3d 343, 349

(S.D.N.Y. 2015).  This "occurs upon a separate aggregate publication from the original, on a

different occasion, which is not merely 'a delayed circulation of the original edition.'"  *Firth v.*

*State*, 98 N.Y.2d 365, 371 (2002) (quoting *Rinaldi v. Viking Penguin*, 52 N.Y.2d 422, 435 (1981)).

If the republication exception is applicable anywhere, it is here. Unlike traditional Section 51 cases, the alleged misuse of Plaintiffs' voices did not involve a fixed recording, image, name, or other immutable device. *Cf. Wilson*, 2022 WL 4227145, at *1 (publication of a "name, photograph, and biography" on a website); *Zoll*, 2004 WL 42260 at *1 (footage from a single broadcast commercial originally recorded in the 1970s);[22] *Bondar*, 2012 WL 6150859, at *1 (images of a model from a single photo shoot). Here, Plaintiffs allege that the essence of their voices has been replicated, such that the Genny algorithm can and does continually produce entirely new sound clips using their voices, including well into the limitations period. (AC ¶¶ 128 (estimating that "the number of projects in which Mr. Lehrman's voice was used could easily run into the hundreds of thousands"), 130 (alleging that as late as September 2023, Lehrman's voice was available to Lovo's subscribers, who could use Lovo's software to produce new recordings in his voice).) Moreover, "[Lovo], not Plaintiff[s], bear[s] the burden of proof on the affirmative defense of the statute of limitations." *Cf. Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 182 (S.D.N.Y. 2007). Because it is plausible that Plaintiffs will be able to uncover facts supporting their invocation of the republication exception, the Court declines to dismiss Plaintiffs Section 51 claims as untimely at this juncture.

### 2. Coverage for Digital Replicas

Lovo's main argument invokes the *expressio unius* canon of interpretation to suggest that the explicit inclusion of digital replicas of deceased persons in Section 50-f means that living

---

[22] For the factual background in *Zoll*, see *Zoll v. Jordache Enters., Inc.*, No. 01-CV-1339, 2002 WL 31873461, at *1-3 (S.D.N.Y. Dec. 24, 2002).

persons are excluded from the Section 50's scope. (Mem. at 25.) However, this ignores the legislative context in which Section 50-f was enacted. Just before the amendment was proposed, New York courts held that digital replicas of living persons—at least ones with a visual component—were already covered by the law. *See Lohan v Take-Two Interactive Software, Inc.*, 31 N.Y.3d 111, 117 (2018) ("[A] computer generated image may constitute a 'portrait' within the meaning of [N.Y. Civ. Rights Law Sections 50 and 51]." ); *see also Gravano v. Take-Two Interactive Software, Inc.*, 31 N.Y.3d 988, 990 (2018). Thus, as one treatise explains, "[i]t therefore was unnecessary to amend Civil Rights Law sections 50 and 51 to address digital replicas." 3 Entertainment Law 3d: Legal Concepts and Business Practices § 24:28 n.1 (3d ed. 2024). There is no indication in the text of Sections 50 and 50-f, or in the legislative history, that the amendment was intended to overturn this precedent, nor to exclude the possibility of a similar holding with respect to audio-only voice clones.

In addition, while *Lohan* dealt with only the "portrait question" in the context of visual images or avatars, *see* 31 N.Y.3d at 122 (capitalization altered), its logic applies equally to voice clones. Prior to *Lohan*, the Court of Appeals had already held that "picture" and "portrait" in this context include "any representation of [a] person," and are not limited to photographs. *Id.* (parenthetically quoting *Binns v Vitagraph Co. of Am.*, 210 N.Y. 51, 57 (1913) and citing *Cohen v. Herbal Concepts, Inc.*, 63 N.Y.2d 379, 384 (1984)). Even highly figurative representations, like "a composite photograph and drawing" or a "cartoon" "may trigger the protections of Civil Rights Law article 5," as long as they are recognizable. *Id.* (citing *Ali v Playgirl, Inc.*, 447 F. Supp. 723, 726 (S.D.N.Y. 1978) and *Allen*, 610 F. Supp. at 622). Indeed, "any recognizable likeness . . . may qualify as a 'portrait or picture.'" *Id.* (quoting *Burck v Mars, Inc.*, 571 F. Supp. 2d 446, 451 (S.D.N.Y. 2008)). The rationale underlying this longstanding interpretation is that

"[t]he statute is designed to protect a person's identity, not merely a property interest in his or her 'name', 'portrait' or 'picture.'" *Cohen*, 63 N.Y.2d at 384.[23]  What matters is not whether, for example, a face is seen in a particular picture, but rather "the quality and quantity of the identifiable characteristics displayed," and whether they suffice to permit recognition of the plaintiff's identity.  *Id.* at 384.  In light of this, Lovo identifies no principled basis for interpreting "voice" more narrowly than "picture" or "portrait" so as to exclude digital replicas.  If anything, the Court views "voice" as having a broader scope than a term like "picture," because it cannot plausibly be read to refer to any particular form of media or representative device.

Finally, when confronted with new technologies, "[t]he appropriate course . . .  is to employ the theory of statutory construction that general terms encompass future developments and technological advancements."  *Lohan*, 31 N.Y.3d at 121.  Here, as in the visual context, construing the Civil Rights Law to exclude digital clones would frustrate the statutory purpose, and, for all practical purposes, enable commercial entities to appropriate individuals' identities without restraint.  In fact, allowing such appropriation by means of AI might be even more pernicious, because, allegedly, a functioning voice clone capable of saying anything, forever, can be created using a small snippet of original audio.  While Section 51 "is to be narrowly read" in light of its legislative history, it is nonetheless "not to be obeyed grudgingly by construing it narrowly and treating it as though it did not exist for any purpose other than that embraced within the strict construction of its words."  *Davis v. High Soc'y Mag., Inc.*, 457 N.Y.S.2d 308, 313 (2d Dep't 1982) (quotation marks omitted).  To cabin Section 51 as Lovo requests would be to treat the law as "an alien intruder in the house of the common law" rather than "a guest to be

---

[23] This also explains why Sections 50 and 51 are not preempted by the Copyright Act, as Lovo suggests in passing in its memorandum of law.  (*Cf.* Mem. at 35.)

welcomed as a new and powerful aid in the accomplishment of its appointed task of accommodating the law to social needs." *Id.* (cleaned up).

### 3. Factual Allegations

Defendant next disputes whether Plaintiffs have alleged sufficient facts concerning recognizability, conduct within New York, and use in advertising or trade.

First, Plaintiffs have easily cleared the bar for pleading recognizability. Not only do they attach numerous declarations from professionals in the industry claiming that the voice clones are recognizable as Plaintiffs (*see* ECF No. 22-1), but Lovo itself allegedly represented that its creations are "practically indistinguishable from the 'real' voice" (AC ¶ 94 (emphasis omitted)). At the pleadings stage, such allegations are sufficient. While it is true that "New York courts have consistently dismissed Section 51 claims based on the use of a fictitious name, even if the depiction at issue evokes some characteristics of the person or the person is identifiable by reference to external sources," *Greene v. Paramount Pictures Corp.,* 138 F. Supp. 3d 226, 233 (E.D.N.Y. 2015), those cases all involve a fictional character sharing certain discrete attributes or traits with a Section 51 plaintiff, not the use of the plaintiff's portrait or voice. Of course, a voice might be understood as an amalgam of the lower-level traits that it comprises. But Section 50 specifically chose "voice" as the relevant level of generality, and Plaintiffs have plausibly alleged that Lovo copied their voices whole cloth, rather than merely lifting certain attributes of their voices, like tone or pitch. Lovo cannot escape liability merely because it appended fictitious names to those appropriated voices. To hold otherwise would carve out a massive, judicially created loophole in the statute with no textual or doctrinal basis.

Second, Plaintiffs have adequately alleged use in New York. The operative complaint alleges that Plaintiffs' voice clones were included in Lovo's subscription package and that "[m]any of the consumers of Lovo's services . . . are located in New York." (AC ¶ 175.)

Plaintiffs also allege that Lovo did not exclude New York from its online advertising and marketing (*id.* ¶ 176), and that Lovo posted marketing materials using their cloned voices to its website and third-party platforms (*see e.g.*, *id.* ¶¶ 87-93, 123-24). Taken together, this clears the plausibility threshold with respect to use in commerce and advertising in New York. The cases Defendant identifies are consistent with this conclusion. In *Bendit v. Canva, Inc.*, the Plaintiff failed to allege any use in advertisements or commerce at all, nor any of the other required elements of her Civil Rights Law claim. *See* No. 23-CV-473, 2023 WL 5391413, at *8 (S.D.N.Y. Aug. 22, 2023). The complaint in that case did not even mention New York, instead alleging use "in numerous advertisements and websites throughout the world." *Id.* (quotation marks omitted). And *Pearce v. Manhattan Ensemble Theater, Inc.* involved the "creation" in New York of "deal memos and promotional materials" that were "only intended for and distributed to an audience outside of New York." No. 06-CV-1535, 2009 WL 3152127, at *9 (S.D.N.Y. Sept. 30, 2009). Defendant has identified no case excluding online advertisements clearly intended for a nationwide audience, including numerous customers located in New York. *Cf. Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 430-31, 446 (S.D.N.Y. 2021) (declining to dismiss Section 51 claims brought by New York residents based solely on online publication of photos).

Third, Plaintiffs have adequately alleged use in both advertising and trade. While "[t]he statute does not define trade or advertising purposes," *Stephano v. News Grp. Publ'ns, Inc.*, 64 N.Y.2d 174, 184 (1984), New York courts give those terms their ordinary meanings. "Advertising purposes has been defined as use in, or as part of, an advertisement or solicitation for patronage of a particular product or service, and trade purposes involves use which would draw trade to the firm." *Mason v. Jews for Jesus*, No. 06-CV-6433, 2006 WL 3230279, at *3

(S.D.N.Y. Nov. 8, 2006) (cleaned up); *Sweigert v. Goodman*, No. 18-CV-8653, 2021 WL 2678621, at *6 (S.D.N.Y. June 30, 2021) (same); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 130 (2d Cir. 1984) (similar); *accord Kane v. Orange Cnty. Publ'ns*, 649 N.Y.S.2d 23, 25 (2d Dep't 1996); *Davis*, 457 N.Y.S.2d at 313. That said, the statute was drafted so as not to conflict with the First Amendment, and therefore does not reach newsworthy uses or matters of public interest. *Sweigert*, 2021 WL 2678621, at *7.

Here, Plaintiffs adequately allege use in both advertising and trade, and Lovo does not raise a First Amendment, newsworthiness, or public interest defense. Whether or not the solicitation of investors itself counts as an "advertisement," the function of the "investor presentation, which was later posted publicly online, is plausibly understood as promoting Lovo's underlying product. (*Cf.* AC ¶¶ 89-90, 98-99.) The same goes for the use of Lehrman's voice in tutorials and promotional articles posted online. (*See id.* ¶¶ 123, 124, 132.) Moreover, even if the voices were not used in formal advertisements or solicitations, they were clearly used for commercial purposes, and to draw trade to the firm. It is plausible to infer that, by illustrating the value of the product and helping show prospective customers how to use it, Lovo used its publicly posted tutorials to increase the appeal of its software, acquire subscribers, and retain subscribers it already had. (*Cf. id.* ¶ 132.) Plaintiffs allege even that Lehrman's cloned voice was Lovo's default product and one of its self-described "best" voices. (*See id.* ¶ 128.)

The Court therefore declines to dismiss Plaintiffs' claims pursuant to Sections 50 and 51 of the New York Civil Rights Law.

### E.    New York Consumer Protection Law

Plaintiffs next assert claims under New York's consumer protection laws—Sections 349 and 350 of the General Business Law ("GBL"). Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

N.Y. Gen. Bus. L. § 349(a).  Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." *Id.* § 350.  "To successfully assert a claim under either section, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'"  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941, (2012)); *see also Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002) ("The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349.").  "The standards under [GBL 349 and 350] are substantially the same as those applied to claims brought under Section 43(a) of the Lanham Act."  *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 518 (S.D.N.Y. 2012); *see also Weight Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 381 (S.D.N.Y. 2019) ("While the elements for alleging false advertising and infringement under the General Business Law are otherwise similar to Lanham Act claims, the section 349 threshold is actually higher, as there must be specific and substantial injury to the public interest over and above the ordinary trademark infringement." (cleaned up)).

For the most part, Plaintiffs have failed to identify material misrepresentations for the same reasons that they have failed to plead false statements under the Lanham Act.  *See supra* Section III.B.2.  And Plaintiffs cannot rely on misrepresentations that Lovo made to them in the course of their contract negotiations, as Plaintiffs were not acting as consumers in those transactions, and Sections 349 and 350 do not reach such "narrow, private dispute[s]."  *Beth Isr. Med. Ctr. v. Verizon Bus. Network Servs., Inc.*, No. 11-CV-4509, 2013 WL 1385210, at *7 (S.D.N.Y. Mar. 18, 2013).

Plaintiffs have, however, adequately alleged that Lovo misrepresented the scope of the "commercial rights" that it promised to provide to its subscribers, thereby making its offerings appear more attractive.  (AC ¶¶ 36, 215.)  Lovo's consumers thus "purchased . . . [but] did not receive a product with the full value with unlimited usage rights, which would have been a product with legitimately acquired and/or created voices."  (Opp. at 25.)  While the Lanham Act's requirement that false advertising pertain to a product's "nature, characteristics, qualities, or geographic origin" excludes such a claim, *see supra* Section III.B.2, Sections 349 and 350 have no comparable limitation.  Rather, a claim is "materially misleading" for state-law purposes if it is objectively "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 178 (2021); *accord Noriega v. Abbott Labs.*, 714 F. Supp. 3d 453, 458 (S.D.N.Y. 2024).

Lovo's allegedly false claims about commercial rights constitute such misleading conduct.  Lovo promised its subscribers that they could use Lovo's voice clones without legal restrictions.  While Lovo was correct with respect to federal copyright and trademark law, *see supra* Sections III.B and III.C,[24] it was incorrect with respect to New York law, *see supra* Section III.D.  Lovo's consumers could, like Lovo itself, be liable under Sections 50 and 51 of the NYCRL.  *Id*.  That Plaintiffs have not brought such claims against Lovo's subscribers in this suit is irrelevant, as Lovo's subscribers still bear the risk of legal liability due to Lovo's

---

[24] It is also worth noting that Plaintiffs could not bring a similar GBL claim based on alleged misrepresentations about a copyright license, as such a claim would be preempted by the Copyright Act.  *See We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.)*, 221 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) (holding GBL claims to be preempted where "[t]he right being challenged through this claim is the very right protected by the Copyright Act—the right to restrict the performance and distribution of a copyrighted work"); *Aaberg v. Francesca's Collections, Inc.*, No. 17-CV-115, 2018 WL 1583037, at *9 (S.D.N.Y. Mar. 27, 2018) (same).

misrepresentations.  Put differently, Lovo's subscribers received a product that was worth less

than Lovo promised, because New York law prohibits certain uses of that product without

Plaintiffs' written consent.[25]

The other elements required for a GBL violation are likewise satisfied.  Lovo's conduct

with respect to its subscribers was "consumer oriented" in that it was "directed to consumers"

and had "a broader impact on consumers at large."  *Oswego Laborers' Loc. 214 Pension Fund v.*

*Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995) (cleaned up).  Plaintiffs' allegations thus

do not pertain to a "[p]rivate contract dispute[], unique to the parties," *id.*, nor a "'single shot

transaction' involving complex arrangements, knowledgeable and experienced parties and large

sums of money," such as the purchase of a sports stadium, *cf. Genesco Ent., Div. of Lymutt*

*Indus., Inc. v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984).  Lovo offered a product to the

public at large, and did so on misleading terms.  That is the quintessential consumer-oriented

harm that Sections 349 and 350 are designed to prevent.

What Lovo did here is distinct from cases in which defendants have misappropriated and

themselves used plaintiffs' likenesses.  For example, in *Electra*, 987 F.3d at 259, the Second

Circuit dismissed GBL claims where "[t]he gravamen of Appellants' complaint is that Appellees

used their modeling images without their consent, a private dispute over a private injury visited

on the individuals portrayed in the photographs."  The court held that the mere unauthorized use

of the plaintiffs' images was "not 'consumer-oriented in the sense that it potentially affects

similarly situated consumers."  *Id.* (quoting *Oswego Laborers*, 85 N.Y.2d at 27) (brackets

---

[25] Plaintiffs do not need to "identify specific consumers who suffered pecuniary harm," nor allege "specific quantifiable harm to the public at large." *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 103 (2012).  Rather, they need only plead an "'impact' on consumers." *Id.* at 102–03 (quoting *Oswego Laborers*, 85 N.Y.2d at 25).  They have done so here.

omitted).  Here, however, Lovo did more than take Plaintiffs' voices for Lovo's own use; rather, Lovo resold Plaintiffs' voices to third-party consumers for downstream use by those consumers. Thus, unlike in *Electra*, the alleged misconduct here does affect similarly situated consumers in similar ways, and is not unique to the parties.  *See also N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 101-02 (2012) (collecting cases and reaching a similar conclusion).

Finally, with respect to direct injury, Plaintiffs have adequately alleged that they suffered injury from Lovo's misrepresentations in the form of diverted customers and lost sales.  (AC ¶¶ 206, 209, 237.)  While it is true that Lovo offered its voice clones at lower prices than the services of traditional voice actors (*id.* ¶ 32), Lovo was able to poach Plaintiffs' customers only because it purported to offer products that its subscribers could legally use—that is, because it engaged in misrepresentations made unlawful by Sections 349 and 350.  Therefore, because Plaintiffs have adequately alleged "harm to the public at large" stemming from these misrepresentations, Plaintiffs have standing to sue under Sections 349 and 350 based on the economic harm they suffered as Lovo's competitors.  *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *see also Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 207 (2004) (same); *N. State Autobahn*, 953 N.Y.S.2d at 105-07 (same); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 376 (E.D.N.Y. 2012) (same). Lovo argues that Plaintiffs cannot bring these claims because they are not themselves consumers, nor were they themselves misled.  (Mem. at 29-30.)  But Lovo's arguments attempt to "graft an additional requirement onto the statute so as to deprive [Plaintiffs] of standing based solely on their role in the consumer transaction."  *N. State Autobahn*, 953 N.Y.S.2d at 107.  It is now well settled that the GBL "confer[s] on an injured business competitor standing to challenge deceptive

conduct practiced on the consumers in its market," and that it may do so based on allegations that "the unlawful conduct diverted customers to competing businesses resulting in . . . lost business." *Id.* at 106-07.

Finally, Lovo argues that Plaintiffs' GBL claims are untimely and lack the requisite connection to New York.  (Mem. at 30-31.)  Lovo's timeliness arguments incorrectly assume that the only relevant misrepresentations are those that Lovo made directly to Plaintiffs.  (*Id.* at 31.)  But the relevant misrepresentations for this claim are the ones that Lovo made to its subscribers—namely, that subscribers were able to purchase full commercial rights to clones of Plaintiffs' voices.  Plaintiffs allege that those misrepresentations continued through the filing of the complaint.  (AC ¶ 36.)  And Plaintiffs have adequately alleged conduct within New York for the same reasons as explained above.  *See supra* Section III.D.3.

The Court therefore declines to dismiss Plaintiffs' GBL claims.

### F.    Fraud

Plaintiffs' fraud claims fail for two reasons.  First, Plaintiffs do not adequately plead compensable damages, alleging only that they "have not been fully compensated for the use of their voices by LOVO," "have suffered from the degradation of their services," and "would not have given permission for their voices to be used had they known the truth."  (AC ¶ 272.)  But Plaintiffs *were* compensated pursuant to their contracts with Lovo, and the allegation that Lovo later breached those contracts does not transform Plaintiffs' contract claims into fraud claims. While Plaintiffs do allege that Lovo "divert[ed] legitimate customers away from them" (*id.* ¶ 206) and "depreciate[ed] their brands" (*id.* ¶ 209), Plaintiffs do not attempt to quantify the true value of the recordings they sold to Lovo, as opposed to what Lovo paid.

The problem is that New York follows the "out-of-pocket rule" for fraud damages, which limits recovery to "the actual pecuniary loss sustained as the direct result of the wrong."

*Connaughton v. Chipotle Mexican Grill, Inc.*, 23 N.Y.S.3d 216, 218 (1st Dep't 2016), *aff'd*, 29 N.Y.3d 137 (2017) (quotation marks omitted).  "In other words, damages are calculated to compensate plaintiffs for what they lost because of the fraud, not for what they might have gained in the absence of fraud."  *Id.* at 218-19 (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).  Plaintiffs therefore may not recover in a fraud action for reputational harm that risks future losses, *id.* at 219, lost profits, *Delcor Labs., Inc. v. Cosmair, Inc.*, 564 N.Y.S.2d 771, 772 (1991), or emotional distress stemming from misuse of their voices, *Juman v. Louise Wise Servs.*, 770 N.Y.S.2d 305, 306 (1st Dep't 2004).  The operative complaint identifies no other, valid theory of damages.

Furthermore, "a fraud claim should be dismissed as redundant when it merely restates a breach of contract claim, *i.e.*, when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract."  *First Bank of Ams. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 20-21 (1st Dep't 1999); *see also Wyle Inc. v. ITT Corp.*, 13 N.Y.S.3d 375, 376 (1st Dep't 2015) ("In the context of a contract case, the pleadings must allege misrepresentations of present fact, not merely misrepresentations of future intent to perform under the contract, in order to present a viable claim that is not duplicative of a breach of contract claim.").  Here, Plaintiffs allege that Lovo agreed not to use their recordings except for "academic research" and as "test scripts for radio ads."  (AC ¶¶ 45-54, 76-79).  Lovo's alleged misrepresentation, then, is that it never intended to abide by these restrictions.  Such false promises are not actionable as fraud, as they "directly relate[] to a specific provision of the contract."  *Iken v. Bohemian Brethren Presbyterian Church*, 80 N.Y.S.3d 246, 248 (1st Dep't 2018); *see also Cronos Grp. Ltd. v. XComIP, LLC*, 64 N.Y.S.3d 180, 191 (1st Dep't 2017) ("[A] false promise is actionable as fraud only if the promised performance is outside the terms of any

contract between the parties."). Plaintiffs do not allege that Lovo misrepresented any other "present fact," such as whether it had already made or planned to make specific investments at the time of contracting. *Cf. Int'l Bus. Machs. Corp. v. GlobalFoundries U.S. Inc.*, 167 N.Y.S.3d 13, 14-15 (1st Dep't 2022); *Laduzinski v. Alvarez & Marsal Taxand LLC*, 16 N.Y.S.3d 229, 232 (2015) (misstatements about "companies' financial health" were actionable present facts not "nonactionable future statements").[26]

Plaintiffs' claims for common-law fraud are therefore dismissed.

### G.    Other Common-Law Claims

Plaintiffs assert unjust enrichment and conversion claims pursuant to New York common law. (AC ¶¶ 252-73, 313-18.) However, "[t]he New York Civil Rights law preempts all common law claims based on unauthorized use of name, image, or personality, including unjust enrichment claims." *Zoll*, 2004 WL 42260, at *4; *see also Wilson*, 2022 WL 4227145, at *2; *Frost & Miller, LLP v. Heaven's Way Inv. Tr.*, 2024 WL 4648015, at *4 (S.D.N.Y. Oct. 31, 2024) (conversion claims preempted).[27] Those claims are therefore dismissed.

Although Lovo does not argue that Plaintiffs' unfair competition claim is similarly preempted, the Court can discern no reason why it is not. As articulated here, the unfair competition claim is effectively a common-law publicity claim, which does not exist in New York. *See Myskina v. Conde Nast Publ'ns, Inc.*, 386 F. Supp. 2d 409, 420 (S.D.N.Y. 2005)

---

[26] Whether this requirement is characterized as singular—that the misrepresentation concern a present fact—or dual—that it also be "collateral" to the relevant contract—is somewhat of an open question. *See Xeriant, Inc. v. XTI Aircraft Co.*, 762 F. Supp. 3d 345, 355-57 (S.D.N.Y. 2025). Here, the distinction is immaterial, as Plaintiffs allege no misrepresentations about present facts, and the alleged misrepresentations directly relate to the putative contracts between the parties.

[27] *But see Ippolito v. Ono-Lennon*, 526 N.Y.S.2d 877, 883 (N.Y. Sup. Ct. N.Y. Cnty. 1988) (allowing Section 51 and fraud claims to proceed together).

("There is no independent common law cause of action in the right to privacy or publicity.").  In any event, "[t]he elements of an unfair competition claim under New York law are identical to the elements of an unfair competition claim under the Lanham Act (which in turn mirror the elements of a false endorsement claim)," except that the test for showing confusion is slightly different and Plaintiffs must also show "bad faith."  *Bondar*, 2012 WL 6150859, at *5. [28]

Accordingly, for the reasons explained above in Section III.B.1, Plaintiffs fail to state a common-law unfair competition claim.

**IV.    Conclusion**

For the foregoing reasons, Lovo's motion to dismiss is GRANTED IN PART and DENIED IN PART.  The motion is denied as to Sage's copyright claims based on the use of her original voice recording, and as to Plaintiffs' contract claims, New York Civil Rights Law claims, and New York General Business Law claims.  The motion is granted with leave to amend as to Plaintiffs' copyright claims based on the use of their recordings to train the Genny AI model.  The motion is otherwise granted. [29]  Because Lovo has not separately moved to dismiss

---

[28] The bad faith element "considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between its and the senior user's product."  *Bondar*, 2012 WL 6150859, at *5 (cleaned up).  Beyond conclusory allegations that "Defendant's conduct was knowing, characterized by malicious intent, and explicitly designed to deceive the general public" (*see, e.g.*, AC ¶ 242), the operative complaint does not allege facts supporting an inference that Lovo acted with the intent of generating confusion or coopting Plaintiffs' reputations (as opposed to the desirable characteristics of their voices).

[29] In a brief footnote, Plaintiffs request "leave to replead . . . to remedy any insufficiency" in the operative complaint.  (Opp. at 44 n.6.)  While Plaintiffs are correct that courts "should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), whether to grant such leave "is within the sound discretion of the district court."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Courts need not grant leave to amend when amendment would be futile.  *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).  Here, Plaintiffs have already amended once, and the operative complaint includes copious detail.  Furthermore, the bases for dismissal here are predominantly legal in nature: that the Copyright Act covers only discrete expressions, not voices as such; that Lanham Act false association applies only to source

Plaintiffs' putative class claims, those claims also survive to the extent that Plaintiffs' individual claims survive, and are otherwise dismissed.[30]

Plaintiffs shall file a letter within 14 days of the publication of this opinion indicating whether they intend to amend the complaint with respect to their training-based copyright claims. If Plaintiffs do not elect to amend, Defendants shall file an answer to the surviving claims within 14 days of Plaintiffs' letter. If Plaintiffs do elect to amend, Defendants shall file any motion to dismiss the amended claims within 21 days of Plaintiffs' amended complaint. Defendants' answer to the other remaining claims shall not be due until 14 days after the Court resolves any such motion to dismiss.

The Clerk of Court is directed to close the motion at Docket Number 27.

SO ORDERED.

Dated: July 10, 2025
       New York, New York

_____
            J. PAUL OETKEN
         United States District Judge

---

identifiers; and that most of Plaintiffs' state common-law claims are preempted by the New York Civil Rights Law. To the extent that dismissal is based on factual gaps in the operative complaint, such as Plaintiffs' failure to plead any falsehoods actionable under the Lanham Act, it is unclear what additional detail a second amended complaint might add. So too with Plaintiffs' failure to establish secondary meaning in their voices. Unlike Plaintiffs' claims about AI training, the problem is not a paucity of information in the operative complaint, but rather that the extensive information provided fails to state particular claims. In such a situation, the Court is "well within its discretion in denying . . . leave to amend. *See Arnold v. KPMG LLP*, 334 F. App'x 349, 352–53 (2d Cir. 2009) (summary order) ("Plaintiff failed to identify those facts that would save his complaint, should he be granted leave to amend, with sufficient specificity."); *see also Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."). Leave to amend is therefore denied except with respect to Plaintiffs' copyright claims about AI training.

[30] Plaintiffs "concede that 'John Doe' does not exist, and so Causes of Action Four, Five, and Nine, should be dismissed." (Opp. at 44 n.6.)