**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL LEHRMAN and LINNEA SAGE, on behalf of themselves and all others similarly situated, <br><br>                 Plaintiffs, <br><br>      v. <br><br> LOVO, INC., <br><br>                 Defendant. | No. 1:24-cv-03770 <br><br> CLASS ACTION <br><br> DEMAND FOR JURY TRIAL |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Paul Lehrman and Linnea Sage (the "Voice Actor Plaintiffs"), on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), for their Complaint against Defendant Lovo, Inc. ("LOVO"), state as follows:

## NATURE OF THE ACTION

1.      Superstar Scarlett Johansson is not the only person whose voice has been used without permission. (Whether her voice was tech-cloned or imitated by an actor is not clear.) We hear about senior citizens who receive voicemails supposedly from their grandchildren who say they are in trouble and need money wired to bail them out of jail. We have read about deepfakes of businesspeople authorizing fraudulent payments; about union leaders supposedly urging members to vote against the very contracts they just negotiated; and even about the (supposed) President of the United States making

phone calls about policy proposals that were completely fake and contrary to his actual positions.[1]

2.      This case is about something even more basic but no less sinister: it is about a tech company that has illegally cloned actors' voices and sold them to unsuspecting customers.

3.      As artificial intelligence ("AI") generation proliferates content creation, so do concerns about its use.

4.      This is a class action brought on behalf of two voice actors – Plaintiffs Lehrman and Sage – and similarly situated persons whose voices and/or identities were stolen and used by LOVO to create millions of voice-over productions without permission or proper compensation. It is also on behalf of other consumers of LOVO's voice cloning and text-to-speech service who subscribed to the LOVO service thinking that they had the rights to use these voices for their projects, when in fact they did not. These actions by LOVO violate numerous state rights of privacy laws, federal copyright laws, and state consumer protection laws.

5.      LOVO is a technology company with proprietary software driven by artificial intelligence (AI) that allows LOVO's clients to create and edit voice-over narrations adapted from real actors. To be clear, the product that customers purchase from LOVO is stolen property. The voices are stolen by LOVO and marketed by LOVO

---

[1] NPR, "That panicky call from a relative? It could be a thief using a voice clone, FTC warns," Joe Hernandez (Mar. 22, 2023), https://www.npr.org/2023/03/22/1165448073/voice-clones-ai-scams-ftc; NPR, "A political consultant faces charges and fines for Biden deepfake robocalls," Shannon Bond (May 23, 2024), https://www.npr.org/2024/05/23/nx-s1-4977582/fcc-ai-deepfake-robocall-biden-new-hampshire-political-operative.

under false pretenses: LOVO represents that it has the legal right to market these voices and use them commercially, but it does not.

## THE PARTIES

6.    Plaintiff Paul Lehrman is a resident of New York and is a voice-over actor.

7.    Plaintiff Linnea Sage is a resident of New York and is a voice-over actor.

8.    Defendant Lovo, Inc. is a Delaware-incorporated corporation with a principal address of 2150 Shattuck Avenue, Berkeley, California 94704.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States; and under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

10.    This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in New York County, within the Southern District of New York.

11.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

12.    In addition, under 28 U.S.C. § 1332(d)(2), this Court shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which any

member of a class of plaintiffs is a citizen of a State different from any defendant (28 U.S.C. § 1332(d)(2)(A)).

13.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions that give rise to the claims alleged herein occurred in New York County, within the Southern District of New York, the principal injuries stemming from the violations alleged herein occurred in the State of New York, and this Court has personal jurisdiction over Defendant.

## BACKGROUND

14.    The voice-over industry is estimated to generate more than $2 billion annually in the United States, and more than $4 billion annually worldwide.

15.    Voice-overs, commonly known as narrations, are integral to various industries, spanning entertainment, advertising, marketing, education, and other corporate sectors. They serve as indispensable tools across a wide array of mediums, including film and television, commercials, animation, audiobooks, e-learning, corporate presentations, marketing presentations, educational videos, interactive voice response (IVR) systems, podcasting, video games, documentaries, virtual assistants, public announcements, dubbing, radio imaging, audio dramas, museum exhibits, phone systems, language learning, medical narration, corporate training modules, websites, sales pitches, and digital content. They are even used in venture capital funding pitches.

16.    Traditionally, actors are hired to read scripts, which may be recorded in production house studios or with the actor's own equipment. The recordings are then edited, changes or re-recordings are produced, and a final recording is laid into the show or presentation.

17.     The actors are paid a negotiated amount for the use of their voices, and typically for the time spent recording the requested audio. The negotiated amount is a function of the actor's name, brand value, where and in what medium the voice-over will be used, and for how long it will be used. Payments typically include upfront fees, royalties, residuals, or some combination of these payments. And there are other potential fees required under Screen Actors Guild – American Federation of Television and Radio Artists (SAG-AFTRA) contracts.

18.     Actors like the Voice Actor Plaintiffs get paid anywhere from $150 for a short recording for a local television tag, to $2,000 for a one-time sales presentation, to a minimum of $6,000 for a 13-week run of a TV commercial, or more depending on the project.[2] Established actors can typically make much more via residuals, and through daily fees which can exceed $1,000 per day and can involve several weeks of work.

19.     Failure to pay an actor a negotiated and agreed-upon price for their professional services – and often recognizable voice – violates multiple state and federal statutes and common law.

20.     Defendant LOVO, by its own admission, is attempting to disrupt and "revolutionize" this traditional model. LOVO sells a text-to-speech subscription service that allows its clients to generate voice-over narrations at a fraction of the cost of the traditional model. LOVO does this by allowing subscribing customers to upload a script into its AI-driven software known as "Generator" or "Genny," and generate a professional-quality voice-over based on certain criteria. For example, LOVO customers

---

[2] *See, e.g.*, Global Voice Acting Academy, GVAA Rate Guide, https://globalvoiceacademy.com/gvaa-rate-guide-2/.

can choose between – and designate their preference for – male or female voices, regional accents, and older or younger-sounding voices.

21.     LOVO has claimed that its Generator was created using "1000s of voices." Some of those voices were used by LOVO in violation of contracts between the artists – like Plaintiffs Lehrman and Sage – and LOVO. Some voices may have been used with permission; other voices may have been scraped from public domain sources on the internet; and still other voices may have been synthesized by LOVO's AI-driven software.

22.     But what is clear is that the Voice Actor Plaintiffs' voices were cloned without permission or compensation. LOVO and its senior management often bragged about their ability to clone voices. According to LOVO, "voice cloning refers to a virtual copy of a real person's voice. Rather than using machine learning to synthesize an original AI voice, voice cloning technology replicates an existing human voice."[3] Tom Lee, CEO and co-founder of LOVO, remarked on a podcast how close the voice clones are to a real voice: "I would like to say 100% but that would be lying. … We have had customers … one customer, his wife, gave it 9.5/10 … but it's a validation of how close we got to actually cloning his original voice."[4]

23.     LOVO did so in various forms of advertising to promote the sale of its subscription service: the very essence of trade. For example, on January 17, 2020, LOVO posted on its YouTube Site "LOVO: Love Your Voice," a video with the

---

[3] LOVO, "Synthetic Voice And Voice Cloning," Carol Moh (July 17, 2023), lovo.ai/post/synthetic-voice-and-voice-cloning.

[4] BBC UK, "Look who's talking - the rise of 'voice cloning,'" Elaine Moore (Oct. 11, 2021), https://www.bbc.co.uk/sounds/play/m0010ggp.

explanation: "In this video, you will hear five speakers whose voices have been cloned to near perfection. Their tone, accent, and even mannerisms are fully learned by our AI voice system." One of those voices was Plaintiff Sage's voice, which LOVO marketed with the pseudonym "Sally Coleman."

24.    According to co-founder and CEO Charlie Choi, in a little over a year, LOVO "users … created over 5 million voice content on [the] platform."[5] As of January 2023, LOVO claimed that its Generator had been used by customers to create over seven million voice-overs[6] and today LOVO claims over two million customers.[7]

25.    Mr. Lee explained, on a January 2023 podcast, how LOVO's synthetic speech platform works:

> [I]magine … you have a real human voice, and we take that, and clone that, and make it available as an option for you to turn any text that you have into that voice. So, you can make that voice say anything that you want, even if that person has never actually said that before in their life.

26.    On that podcast, Mr. Lee then stated that LOVO "only need[s] a person to read 50 sentences. … We can capture the tone, the character, the style, the phonemes, and if you have an accent, we can even capture that as well."

---

[5] TechCrunch, "AI voice, synthetic speech company LOVO gets $4.5M pre-series A funding," Kate Park (Aug. 26, 2021), https://techcrunch.com/2021/08/26/ai-voice-synthetic-speech-company-lovo-gets-4-5m-pre-series-a-funding/.

[6] *Category Visionaries*, Podcast, "Tom Lee, Co-Founder of LOVO AI: $7 Million Raised to Build the Future of AI Voiceovers," https://categoryvisionaries.podbean.com/e/tom-lee-co-founder-of-lovo-ai-7-million-raised-to-build-the-future-of-ai-voiceovers/  (Jan. 31, 2023).

[7] https://lovo.ai/.

27.     LOVO also promotes its service using barely disguised images and names of celebrities and states on its website, "Clone any voice." Only deep in its website does LOVO tell customers, "Mind you, you cannot use this cloned voice for imitation of celebrities, so only use this tool for personal entertainment purposes!"

28.     LOVO purports to compensate voice actors. That may be true in some cases. But the Voice Actor Plaintiffs and other members of the Class have received no revenue from the continued unauthorized use of their voices by LOVO and LOVO clients.

29.     The benefit to a subscriber of using LOVO's service is financial: they do not have to pay the actor for the studio session, any residuals, royalties, or fees; they pay only a monthly subscription fee to LOVO. Subscribers also do not need to seek the consent of the actor, meaning actors lose control of how their voices are used.

30.     Implicit in LOVO's offerings to its customers is that each voice-over actor has agreed to LOVO's terms and conditions for customers to be able to access that actor's voice. But for the Voice Actor Plaintiffs and other members of the Class who have not agreed to LOVO's terms, the continued unauthorized use of their voices is theft of service and misappropriation.

31.     LOVO also implies to its customers that because the voice-over actors have agreed to the use of their voices, their voices are available at a bargain, and customers can save on professional recordings by using LOVO instead. Indeed, the LOVO website boasts that customers can "Save $$ and time on voiceovers":



32.    On its website, LOVO represents to potential clients that it "respect[s] the rights of voice actors," implying it has agreements with actors allowing LOVO to utilize those actors' voices and compensating them appropriately for that use. That may be true with respect to some actors, but it is emphatically not true with respect to the Voice Actor Plaintiffs: LOVO had no permission to use Voice Actor Plaintiffs' copyright-protected recordings, i.e., their voices, for training its AI Generator, to promote the LOVO service, or to market voices based on the Voice Actor Plaintiffs' voices. To be clear, LOVO never compensated the Voice Actor Plaintiffs for any of LOVO's unauthorized uses of their voices.

33.    Plaintiffs Lehrman and Sage are members of SAG-AFTRA.

34.    Upon information and belief, LOVO has not entered into any agreement with SAG-AFTRA pertaining to the employment of its members for voice-over services. Those agreements are designed to protect the rights of SAG-AFTRA members who are required by SAG-AFTRA's Global Rule 1 to eschew jobs that are not covered by the union's contract. By bypassing or ignoring the terms of agreements between SAG-AFTRA and producers and/or companies that are signatories to SAG-AFTRA agreements, LOVO endangers the Voice Actor Plaintiffs' livelihood. Moreover, using the Voice Actor Plaintiffs' voices without their consent, and allowing its customers to do the same, may put Plaintiffs in an involuntary breach of their union obligations and contracts, or contracts with their other clients.

35.    LOVO represents to its customers that LOVO is granting full commercial rights for all content generated using its platform to users who subscribe to any of its paid plans (Basic, Pro, Pro+, and Enterprise).[8] LOVO advertises to clients and prospective clients that when they purchase a subscription to LOVO's service, they are purchasing the "commercial rights" to use the cloned voices. As explained in LOVO's Terms of Service: "'Commercial' means include any monetized, business-related uses such as videos, audio books, advertising, promotion, web page vlogging, product integration."[9] Yet LOVO does not legally own or control the rights of Voice Actor

---

[8] LOVO.AI, "Simple Pricing Plans," https://lovo.ai/pricing; LOVO.AI Legal/Commercial Rights/Ethics, "Do I receive commercial rights for the voice overs generated on Genny?," https://help.lovo.ai/hc/en-us/articles/21885450061209-Do-I-receive-commercial-rights-for-the-voice-overs-generated-on-Genny.

[9] LOVO.AI, "Terms of Service," *last updated* June 8, 2023, https://lovo.ai/tos.

Plaintiffs' voices it is purporting to give these customers – rights which remain with the actors whose voices have been illegally cloned or otherwise misappropriated.

36.    LOVO's value proposition – that it will lower the cost of creating voice-over projects – completely depends upon the actor agreeing to participate in LOVO's scheme. But the Voice Actor Plaintiffs did not agree to LOVO's terms and did not grant LOVO any right to market their voices. In fact, Voice Actor Plaintiffs have rejected entreaties from others to participate in AI-driven voice-related software. Moreover, as detailed below, LOVO affirmatively misrepresented to Mr. Lehrman and Ms. Sage how their voices would be used. And yet, LOVO used its proprietary software to appropriate, adapt, generate, steal, and market the Voice Actor Plaintiffs' voices.

## DEFENDANT'S MISAPPROPRIATION OF THE VOICE ACTOR PLAINTIFFS' VOICES

37.    Voice Actor Plaintiffs' voices are unique, distinctive, and of professional quality, which is why LOVO sought them out to teach Genny and create AI copies or clones.

38.    Voice Actor Plaintiffs specialize in voice-over services, particularly in the fields of radio and TV commercials, explainer videos, e-learning, IVR and voicemail, and corporate narration – the same fields for which one might use LOVO's services.

39.    Voice Actor Plaintiffs' work has been sought out by large companies, including Uber, McDonald's, J.P. Morgan, American Red Cross, Disney, Starbucks, Twitter, AirBnB, and Volkswagen.

40.    Mr. Lehrman's work has included acting work on Blue Bloods, New Amsterdam, The Resident, Bull, an HBO movie, and two supporting roles in major motion pictures.

41.    Ms. Sage has done voice-over work for companies such as Febreze, Starbucks, Twitter, Audible, McDonald's, and Staples, on international TV, radio, and online, as well as in the MARVEL Avengers Academy video game and MARVEL Snap (a digital collectible card game). Plaintiff Sage is also the host of the app Slotomania, which is a mobile game played by 70 million people worldwide, as well as a series regular on the podcast Beef and Dairy Network, with 40 thousand monthly listeners.

42.    Both Voice Actor Plaintiffs have professional reputations to be protected, and thus both are consistently careful of which products, clients, and positions they support and endorse.

### PLAINTIFF LEHRMAN'S CONTRACT WITH LOVO

43.    Fiverr.com ("Fiverr") is an online marketplace that connects freelancers with clients looking for digital and creative services.

44.    In May 2020 Mr. Lehrman was contacted via the Fiverr website by someone identified as User25199087 – later identified by LOVO's counsel as a LOVO employee – who wanted Mr. Lehrman to provide voice recordings for "research purposes."

45.    Using the Fiverr platform, Mr. Lehrman communicated about the inquiry with User25199087.

46.    On multiple occasions in communications with Mr. Lehrman (via Fiverr) User25199087/LOVO represented that the audio recordings would not be used publicly. On May 10, 2020, Mr. Lehrman was assured that his recording would be "used for internal research purposes only." User25199087 repeatedly assured Mr. Lehrman that the files would be used for internal research purposes from the initial order request until Mr. Lehrman agreed to upload his voice.

47.     On May 12, 2020, before Mr. Lehrman agreed to upload the voice files requested by User25199087, he asked User25199087, "In addition can you please explain how the voiceovers will be used?"

48.     At 9:24 PM on May 12, 2020, User25199087 sent Mr. Lehrman a message: "We are researching speech synthesis with different accents and voices. Your voiceover will be used for academic research purposes only."

49.     Mr. Lehrman wrote back to User25199087, "Great. Still working through the scripts. Please guarantee that these scripts will not be used for anything other than your specific research project. My curiosity is getting the best of me. What is the goal of the research project?"

50.     On May 13, 2020, at 12:12 AM EST, User25199087 wrote back to Mr. Lehrman, "The scripts will not be used for anything else – and I can't yet tell you the goal, as it's a confidential work in process sorry haha."

51.     Mr. Lehrman responded to User25199087, "That's okay. Will my voice be repurposed and used in a different order?"

52.     To which User25199087 wrote to Mr. Lehrman, "The script and your finished file will be used for research purposes only."

53.     Only after receiving these reassurances, and after reaching this understanding with User25199087, on May 18, 2020 at 1:29 PM EST, Mr. Lehrman delivered the requested audio files of his voice – 104 recordings in total – to LOVO via Fiverr.

54.     Mr. Lehrman was paid $1,200 by LOVO for the recordings.

55.     Mr. Lehrman subsequently registered these audio files with the United States Copyright Office and received two registration numbers for these audio recordings. The first Certificate of Registration, for Registration Number SRu-1-583-006, has an effective Date of Registration of June 24, 2024 and a Registration Decision Date of August 16, 2024. The second Certificate of Registration, for Registration Number SRu-1-583-972, has an effective Date of Registration of July 25, 2024 and a Registration Decision Date of August 26, 2024.

56.     In 2020, at the time of the online communications between Mr. Lehrman and User25199087, neither Mr. Lehrman nor Ms. Sage had any idea what "speech synthesis" was. Mr. Lehrman had no reason not to believe User25199087's assurance that his voice would be used "for academic research purposes only." At no time did User25199087, i.e., LOVO, ever accurately represent that Mr. Lehrman's voice would be used for anything other than "academic research purposes." Mr. Lehrman, a professional voice actor, understood academic research purposes to mean analyzing such qualities as pitch, loudness, tone, timbre, cadence, inflection, breathiness, roughness, strain, jitter, (variation in pitch), shimmer (variation in amplitude), spectral tilt, and overall intelligibility, and other qualities that comprise voice. Such research is essential in helping people with hearing deficiencies hear better.[10]

57.     User25199087, i.e., LOVO, never told or implied to Mr. Lehrman that his voice would be used to train Genny; that it would be cloned; that it would be provided,

---

[10] National Library of Medicine, "A Comparative Study of Voice Characteristics in Children With Cochlear Implants and Typically Hearing Children: Insights From an Indian Context," Akshat Kushwaha, et al. (Oct. 31, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10687492/.

sold, or licensed to subscribers of LOVO's service; that it would be used and sold or licensed by LOVO under the name Kyle Snow; that it would be used as the default voice by LOVO; that it would be used by LOVO in advertising; that it would be used in trade; or that it would be used for commercial purposes. Had Mr. Lehrman known any of that, he would not have agreed to provide the audio files to User25199087 or to LOVO.

58.     Mr. Lehrman never gave LOVO permission to use his voice or copyrighted audio recordings to train Genny.

## MR. LEHRMAN DECLINED TO PARTICIPATE IN OTHER AI PROJECTS

59.     On March 28, 2022, a Fiverr executive asked Mr. Lehrman if he would like to add an AI software option to his Fiverr profile. The told Mr. Lehrman that the AI software option would integrate with his profile and allow customers to hear what Mr. Lehrman's voice could sound like if he were to read a script.

60.     Mr. Lehrman declined the invitation to add that AI software to his Fiverr profile.

61.     Mr. Lehrman demonstrated to Fiverr that a user could easily produce commercial audio without consent or compensation as well as create violent, pornographic, or any unauthorized audio material without consent from the voice actor.

## MR. LEHRMAN AND MS. SAGE HEAR MR. LEHRMAN'S CLONED VOICE AND DISCOVER LOVO IS BEHIND IT

62.     On July 11, 2023, as Mr. Lehrman and Ms. Sage were driving in their car, they were listening to the June 20, 2023 episode of the "Deadline Strike Talk" podcast hosted by Billy Ray.

63.     Ironically, the episode was about the dangers of AI technologies. In fact, it was a conversation with "Poe," an AI bot. It became immediately clear that the voice of Poe was, in fact, Mr. Lehrman's voice.

64.     The Deadline Strike Talk podcast that used Mr. Lehrman's voice was produced in cooperation with MIT Professor Simon Johnson. The host, Billy Ray, asked questions of Professor Johnson who typed those questions into ChatGPT. When the answers came back from ChatGPT, Professor Johnson entered that text into LOVO's software, which answered the questions orally – in Plaintiff Lehrman's voice.

65.     When Plaintiffs Lehrman and Sage's counsel sent an inquiry to Professor Johnson about how the oral answers were produced, Claire Schneider of MIT's Office of General Counsel, responded on September 29, 2023: "Professor Simon's team utilized a paid subscription to LOVO as part of the creation of the project that was featured on the podcast to which you refer."

66.     The podcast was produced and first aired on June 20, 2023.[11]

67.     There is no question that the voice used on the Deadline Strike Talk podcast was identical to Mr. Lehrman's voice.

68.     Mr. Lehrman never gave permission to LOVO or to Deadline Strike Talk to use his voice on a podcast, nor was he ever compensated for that unauthorized use.

**CONFUSION WITH MR. LEHRMAN'S REAL VOICE AND BRAND**

69.     Numerous people who heard the podcast, and who were friends or professional colleagues of Mr. Lehrman or Ms. Sage, told Mr. Lehrman or Ms. Sage that

---

[11] The original complaint in this action was filed on May 16, 2024, less than a year after the use of Plaintiff Lehrman's voice on the "Deadline Strike Talk" podcast.

the Poe voice on the podcast was virtually identical to Mr. Lehrman's voice. They told Mr. Lehrman and Ms. Sage that the cloned voice would undoubtedly be mistaken for Mr. Lehrman's actual voice, causing real confusion and harming Mr. Lehrman's brand.

70.     As described below, LOVO's counsel has admitted that the "original voice recording for … Kyle Snow [was] provided to LOVO for a fee by [a] freelance voice artist[] [i.e., Mr. Lehrman] on Fiverr.com … then used … to create the fictitious characters."

71.     As described below, LOVO subsequently used Mr. Lehrman's cloned voice as its default voice for its subscription service, used it to advertise LOVO's service, and marketed it under the name Kyle Snow. These unauthorized, uncompensated uses caused confusion and harm to Mr. Lehrman and his brand in the marketplace.

72.     It is not Mr. Lehrman alone who believes that the Deadline Strike Talk podcast "Poe" is identical to his voice, or that LOVO's Kyle Snow character is using Mr. Lehrman's cloned voice.

73.     As the attached unsworn declarations attest, casting agents, producers, professional television and radio journalists, and other actors say so, too. These are people who have experience discerning and conveying small differences in voice tone, quality, timbre, and delivery, and they state that LOVO's cloned voice is a replica of Mr. Lehrman's real voice.

74.     When CNN Correspondent Claire Duffy listened to the side-by-side comparison of Mr. Lehrman's real voice and the LOVO cloned voice she reported,

"Obviously this does sound a lot like you."[12] When ABC Australia Radio reporter Juliann Morrow listened to the side-by-side comparison of Mr. Lehrman's real voice and the LOVO cloned voice, he reported, "Paul, I've listened to the comparison of what does very much sound like your voice."[13]

## PLAINTIFF SAGE'S CONTRACT WITH LOVO

75. On October 29, 2019, Plaintiff Sage received a message on the Fiverr platform from "tomlsg" offering her a contract to produce and record test scripts for radio ads.

76. Before accepting the job offer, Ms. Sage asked what the voice recording would be used for.

77. The response (on the Fiverr platform) from "tomlsg" was, "These are test scripts for radio ads. They will not be disclosed externally, and will only be consumed internally, so will not require rights of any sort."

78. Ms. Sage accepted the job. Before providing the audio files, however, Ms. Sage confirmed that if the user were to "place th[e] order, and later down the line use them in broadcast, I hope that you will come back and order the appropriate licensing." She was assured by user tomlsg that, "These are test scripts for radio ads. They will not be disclosed externally, and will only be consumed internally, so will not require rights of any sort."

---

[12] CNN, "AI 'stole' our voices. Actors show CNN comparison of their voices and alleged 'illegal' AI versions" (May 24, 2024), https://www.youtube.com/watch?v=_YfuSdFmPaI&t=169s.

[13] ABC Radio National, "They cloned and sold our voices!" (Sept. 14, 2024), https://www.abc.net.au/listen/programs/sundayextra/ai-cloned-and-stole-my-voice/104347522.

79.     Only after this reassurance and reaching this understanding, Ms. Sage delivered the audio recordings to LOVO.

80.     Ms. Sage was paid $400 for the job by LOVO.

81.     The Fiverr user "tomlsg" was LOVO co-founder, Tom Lee.

82.     Ms. Sage subsequently registered the audio file she delivered to LOVO with the United States Copyright Office and received a registration number for 10 audio tracks. The Certificate of Registration, Registration Number SRu-1-580-410, has an effective Date of Registration of June 18, 2024 and a Registration Decision Date of July 15, 2024 (together with Mr. Lehrman's copyrights described above, the "Copyrighted Works").

83.     Defendant wrote a glowing review of Ms. Sage's voice on Fiverr, and stated regarding Ms. Sage's voice that, "Stellar is an understatement. We would recommend her to anyone."

84.     Some years later, in July of 2023, after hearing Mr. Lehrman's voice on the Deadline Strike Talk podcast, Ms. Sage discovered that LOVO had been using, manipulating, and editing her voice in multiple promotional and commercial ways, for many years, without her permission or compensation.

85.     Ms. Sage learned that in 2020, LOVO used both a recording of her actual voice – the copyrighted audio sample she provided to LOVO in the October 2019 – and a cloned version of her voice with the identical content that she recorded for LOVO, to raise money from investors and to promote the service to potential customers.

86.    LOVO used this side-by-side presentation at the Berkeley SkyDeck Demo Day Spring 2020 event and, upon information and belief, on subsequent dates, to raise money from investors. LOVO also posted the presentation publicly to YouTube.

87.    This side-by-side comparison of Ms. Sage's voice – the recording she made for LOVO in November 2019 and the Genny-generated script of the identical content – utilized Ms. Sage's copyrighted recording. LOVO used the copyright recording not only without permission but in direct contravention to LOVO's previous assurances that Ms. Sage's voice would not be used public.

88.    The SkyDeck Demo Day event and the subsequent usage were uses in trade and were advertising/commercial uses that were instrumental in helping raise money for LOVO.[14]

---

[14] The examples of Ms. Sage's actual voice and the LOVO-generated voice used by LOVO can be heard starting at approximately 2:13 of the presentation. It can be accessed at
https://www.pollockcohen.com/media/SoundFiles/Lovo2020PitchatSkyDeck.mp4.



89.    LOVO used the side-by-side demonstration of Ms. Sage's voice on YouTube as advertising and on LOVO's website to attract customers.

90.    Indeed, a side-by-side voice comparison with Plaintiff Sage's voice is *still* available on LOVO's YouTube site.[15]

91.    Charlie Choi also played Ms. Sage's recordings at the 2020 CES Tech Conference.[16]

92.    LOVO made a cloned version of Ms. Sage's voice available to LOVO subscribers under the name "Sally Coleman."

---

[15] "Side-by-Side Voice Comparison | LOVO Studio," at 0:23, https://www.youtube.com/watch?v=ZQ1V5kyRJSA.

[16] PLUGHITZ Live, "LOVO makes computer voices sound natural and emotional @ CES 2020," at 3:45 (Feb. 20, 2020), https://www.youtube.com/watch?v=30iMuQEpkFU.

93.    As LOVO's co-founder and CEO explained: "If you are doing a voice-over for one project you can't be doing narration for something else at the same time. But with LOVO, an actor could have his voice reproduced and used in multiple projects and it is ***practically indistinguishable*** from the 'real' voice … This makes the human voice truly scalable."[17]

94.    Indeed – even though it is obvious – LOVO has admitted that Plaintiff Sage's voice was a clone. On a video posted on January 17, 2020, and still available on May 21, 2021, LOVO wrote: "In this video, you will hear 5 speakers whose voices have been ***cloned to near perfection***. Their tone, accent, and even mannerisms are fully learned by our AI voice system." (emphasis added).

95.    Ms. Sage never authorized LOVO to market her cloned voice under the name Sally Coleman.

96.    LOVO has raised millions of dollars in venture capital using Ms. Sage's copyrighted audio recordings (*i.e.*, her voice) in unauthorized and uncompensated presentations that showcase the LOVO technology.

97.    LOVO used Plaintiff Sage's copyrighted audio recording without permission to advertise and promote their service.

98.    LOVO used Ms. Sage's voice for advertising and trade without her written or oral consent.

---

[17] Biometric Update, "Lovo launches AI 'voice-over' platform that creates realistic human voices," Anthony Kimery (Apr. 21, 2020), https://www.biometricupdate.com/202004/lovo-launches-ai-voice-over-platform-that-creates-realistic-human-voices.

**CONFUSION WITH MS. SAGE'S REAL VOICE AND BRAND**

99.    It is not Ms. Sage alone who believes that LOVO's Sally Coleman character is using her cloned voice. As described below, LOVO's counsel has admitted that the "original voice recording for … Sally Coleman [was] provided to LOVO for a fee by [a] freelance voice artist[] [i.e., Ms. Sage] on Fiverr.com … then used … to create the fictitious characters."

100.    Regular people on the street are also fooled by the cloned voice. As stated in a comment on the CBS News YouTube channel by user @nm3547: "Wow. The recording and speech with the woman sound exactly the same. Yes, rules are needed asap. Like Yesterday!"[18] User @TechnoEsoterica commented: "They sound exactly the same."

101.    When CBS News Correspondent Jo Ling Kent listened to the side-by-side comparisons of Ms. Sage's real voice and the LOVO cloned voice, she reported on CBS Mornings, "It feels exactly the same."[19]

102.    As the attached unsworn declarations attest, casting agents, producers, professional television and radio journalists, and other actors agree. These are people who have experience discerning and conveying small differences in voice tone, quality, timbre, and delivery; and they state that LOVO's cloned voice is a replica of Ms. Sage's real voice.

---

[18] CBS News, "Voice actors sue AI company, say they cloned their voices" (June 25, 2024), https://www.youtube.com/watch?v=aG86nTlDz7E.

[19] *Id.* at 3:04.

**DEFENDANT'S IMPROPER USE OF PLAINTIFF LEHRMAN'S VOICE**

103.    In July of 2023, Mr. Lehrman began investigating whether his voice had been used by LOVO or anyone else.

104.    Mr. Lehrman learned that LOVO had used his voice in multiple ways, including advertising and trade, without his consent and without compensation for that use.

105.    LOVO used Mr. Lehrman's voice to promote and advertise its Genny service without Mr. Lehrman's permission and without compensating him. The ads LOVO put on its website and YouTube used Mr. Lehrman's cloned voice, and are *still* available.

106.    Mr. Lehrman never gave LOVO permission to use his voice to advertise and market the capabilities of the LOVO software.

107.    Mr. Lehrman learned that LOVO had been marketing his misappropriated voice as part of its subscription service under the stage name "Kyle Snow." The Kyle Snow voice was, unquestionably, Mr. Lehrman's voice.

108.    LOVO cloned, sold, and licensed Mr. Lehrman's voice under the moniker "Kyle Snow" without Mr. Lehrman's consent and without compensating him, and used Mr. Lehrman's voice to train its Genny generator without Mr. Lehrman's consent and without compensating him.[20]

---

[20] This use of Plaintiff Lehrman's voice as Kyle Snow can be heard at https://www.pollockcohen.com/media/SoundFiles/GennyAdvertismentUsingPaulsVoice.mp4.



**MR. LEHRMAN AND MS. SAGE SENT A CEASE-AND-DESIST DEMAND TO LOVO**

109.    On August 18, 2023 prior counsel for Mr. Lehrman and Ms. Sage sent a letter to LOVO. In that letter, counsel demanded that LOVO cease and desist from using or marketing Mr. Lehrman's and Ms. Sage's voices, including marketing their voices under the names Kyle Snow and Sally Coleman.

110.    On August 30, 2023, in response to a cease-and-desist letter sent to LOVO's counsel on August 18, 2023, LOVO's counsel admitted that:

> The original voice recording for Kyle Snow and Sally Coleman were provided to LOVO for a fee by freelance voice artists on Fiverr.com in 2020 and 2019, respectively. LOVO then used these voice recordings to create the fictitious characters.
>
> LOVO obtained the original voice recordings for Kyle Snow and Sally Coleman from a male and female freelancer on Fiverr. The freelancer that provided audio file for Kyle Snow

used the handle Paulskye and the freelancer that provided the data file for Sally Coleman used the handle Linneas8.[21]

111. LOVO's counsel stated:

> The voice recordings used by LOVO are not unauthorized recordings of your clients' voice recordings. The voice recordings provided to LOVO were created and authorized by these freelancers using their own voices specifically for LOVO. LOVO provided an original script for the freelancers to read. Each freelancer then read the script and provided an original audio file to LOVO. As such, the voice recording used by LOVO to create Kyle Snow and Sally Coleman were fully permissioned and provided by the individual whose voice appears in the audio file.

112. At the time LOVO procured their voices on Fiverr, LOVO had obscured the fact that it was an AI voice generation company that was ordering from Lehrman and Sage.

113. LOVO's counsel also admitted: "The original voice recording for Kyle Snow and Sally Coleman were provided to LOVO for a fee by freelance voice artists on Fiverr.com in 2020 and 2019, respectively. LOVO then used these voice recordings to create the fictitious characters."

114. Paulskye is the Fiverr identity for Mr. Lehrman and Linneas88 is the Fiverr identity for Ms. Sage.

115. LOVO's counsel further stated, "As such, the original voice recordings [provided by Lehrman and Sage to LOVO via the Fiverr site] that became Kyle Snow

---

[21] On September 27, 2023, Plaintiffs responded to LOVO's counsel. As of October 2, 2023, Plaintiff Lehrman's voice was still available as the voice of Kyle Snow on the LOVO website. On October 11, 2023, LOVO's counsel responded that LOVO had taken down other uses of Kyle Snow and Sally Coleman voices. Yet, even as of November 28, 2023, Plaintiff Lehrman's voice was available as the voice of Kyle Snow.

and Sally Coleman on the LOVO site were fully permissioned, authorized and compensated."

116.    That is not so: LOVO assured both Lehrman and Sage that the recordings would not be used externally.

117.    LOVO's counsel added, "Nevertheless, Kyle Snow or Sally Coleman are not popular and sales are negligible. To avoid any further misunderstanding, LOVO unilaterally removed the characters."

118.    Counsel for Plaintiffs Lehrman and Sage instructed LOVO to preserve all documents and communications. It appears that has not happened. LOVO deleted messages that were part of the Fiverr correspondence between Ms. Sage and the LOVO representative.

## LOVO INFRINGED ON MR. LEHRMAN AND MS. SAGE'S COPYRIGHTS IN TRAINING ITS VOICE CLONING MODEL

119.    Genny is LOVO's artificial intelligence voice cloning product that creates a digital copy of a human voice using AI and machine learning.

120.    On information and belief, Genny or an earlier iteration of LOVO's foundational model was pretrained on sound recordings including the Copyrighted Works to recognize certain patterns and characteristics of the human voice.

121.    On information and belief, LOVO processed this dataset of sound recordings into spectrogram representations like mel-spectrograms, which are visual representations of audio that show how the energy of different frequencies changes over time mapped to a particular scale designed to match how humans perceive sound. *See* Carol Moh, *AI Voice Cloning: What It Is and How It Works*, LOVO Blog (Aug. 4, 2023), https://perma.cc/R7JS-9BW2 (according to a blog post on LOVO's website, the model

processes its dataset by breaking down the data "into individual soundwaves so the AI can understand it," then "labels these sound waves and their corresponding phoneme, the smallest unit of a sound in language"). Then, LOVO used a neural network architecture like Tacotron to train Genny or an earlier iteration of LOVO's foundational model to learn the mapping between text input and vocal characteristics.

122.    On information and belief, LOVO trained the Kyle Snow and Sally Coleman voices by converting the Copyrighted Works into spectrogram representations that duplicated every aspect of them.

123.    On information and belief, LOVO then used one of two processes to train Genny, Kyle Snow, and Sally Coleman to sound like human voices. It either used a a generative adversarial network (GAN) or a process known as likelihood training. Regardless of which process it used, LOVO's training involved the repeated duplication, rearranging, recapturing, and remixing of the copyrighted sound recordings.

124.    A GAN is a machine learning process comprising two models: one model attempts to generate audio that sounds human and the other guesses which piece of audio is human and which is computer-generated. *See* Carol Moh, *Generative AI: Everything You Need to Know*, LOVO Blog (Sep. 29 2023), https://perma.cc/5WPV-Q9GL (characterizing AI voice generation as something that GANs can do and describing LOVO AI as one of the big players in generative AI, specializing in AI voice generation). The model "learns" how to generate human-sounding content by what fools the model: when the model selects the computer over the human-generated content, the model registers those features and incorporates them into itself. The GAN repeats this comparison cycle hundreds of thousands or even millions of times.

125.    Likelihood training operates similarly but does not learn by computer-generated example. Instead, the model is trained by reference to the voice it is attempting to mimic in spectrogram form. The model is fed those spectrograms and trained to maximize the probability (likelihood) that it would generate the exact audio sequences found in the training data. The model learns by adjusting its parameters to make the spectrograms and audio waveforms in the sound recordings of the voice it is attempting to copy as statistically probable as possible.

126.    Both a GAN and likelihood training involve constant engagement with the sound recordings of the voice that the model is learning to emulate. The process involves duplicating those sound recordings tens or hundreds of thousands of times.

127.    This training yields a neural network based on the human voice the cloning system has prompted it to emulate. That neural network incorporates all the phenomes of the recordings of the human voice it was trained on—its pitch, pacing, accent, tone, and expressive choices—and replicates them when prompted.

128.    The model is fully "trained" when it can create sound recordings from text in the cloned voice by "reproduc[ing] any sound" in the original human recordings "that the text later demands." Moh, *AI Voice Cloning: What It Is and How It Works*.

129.    On information and belief, LOVO trained Genny, Kyle Snow, and Sally Coleman either by comparing the Copyrighted Works to the nascent clones of Mr. Lehrman's and Ms. Sage's voices using a GAN, or learning to predict patterns by reference to the voice it is attempting to mimic in spectrogram form using the likelihood method.

130.    On information and belief, LOVO created a separate neural network for both Mr. Lehrman and Ms. Sage from the copyrighted recordings sent to them.

131.    On information and belief, the Kyle Snow and Sally Coleman voices fuse the knowledge that the Genny model learned in both the pretraining and training phases with the particular aspects of Mr. Lehrman and Ms. Sage's voices exhibited in the Copyrighted Works.

132.    On information and belief, LOVO used all of the Copyrighted Works submitted by Mr. Lehrman and Ms. Sage in the course of training Genny and in the creation of the Kyle Snow and Sally Coleman voices.

133.    Regardless of the machine learning technology that LOVO used to train Genny and the Kyle Snow and Sally Coleman voices, the training process necessarily involved the duplication, rearranging, recapturing, and remixing of the copyrighted sound recordings since the only way to program a computerized system to replicate a human voice is by giving that system examples of the human voice to be emulated.

134.    Every time LOVO made updates to the Genny model or the Kyle Snow and Sally Coleman voices, it would do so by reprocessing the original copyrighted sound recordings and repeating a version of the learning-comparing-learning process described above.

## MR. LEHRMAN'S AND MS. SAGE'S VOICES WERE INSTRUMENTAL IN LOVO'S FUNDRAISING AND COMMERCIAL SUCCESS

135.    Contrary to the LOVO's counsel's assertion, Mr. Lehrman's Kyle Snow character was, according to LOVO, the fourth best voice on the LOVO site and the default voice that LOVO provided to subscribers. LOVO used Ms. Sage's voice to raise millions of dollars of venture capital.

136.    LOVO used, marketed, and advertised Mr. Lehrman's voice under an identity LOVO created called "Kyle Snow," for purposes of trade, and without permission or compensation.

137.    LOVO used, marketed, and advertised Ms. Sage's voice under an identity LOVO created called "Sally Coleman," for purposes of trade, and without permission or compensation.

138.    On July 10, 2023, LOVO published an article promoting LOVO's services on its website titled "5 Best Practices For Perfect Audio Advertising," that featured Mr. Lehrman voice, and attributing that voice to "Kyle."[22]



139.    On June 21, 2023, LOVO also promoted Mr. Lehrman's voice as Kyle Snow and said it was one of "The 5 Best Male Voices For Text To Speech." The LOVO promotional piece continued:

> With his upbeat tone and slightly faster talking speed, Kyle
> Snow has the perfect voice for conveying enthusiasm and

---

[22] https://www.pollockcohen.com/docs/5-Best-Practices-For-Perfect-Audio-Advertising-_-LOVO-AI.pdf

youthfulness. This makes him an ideal male voice generator text-to-speech option for all kinds of content, from audiobooks and narrations to commercials and social media.

His upbeat tone becomes even more enthusiastic and compelling if you speed up his voice while his tone remains cheerful and enthusiastic but takes on a clearer and more pronounced quality when slowed down. This makes Kyle's decelerated voice an excellent choice for explainers and e-learning.



140.    Mr. Lehrman later learned that from 2021 to September 2023, his voice was the default voice for the software.[23] In other words, when somebody started to use Genny, it was automatically set to Kyle Snow, i.e., Mr. Lehrman's voice.

141.    It is unknown how many of the 7 million voice-over projects LOVO claims were made with Genny using Kyle Snow or default voices.

142.    LOVO boasts that it offers "500+" voice options.

143.    LOVO stated that Mr. Lehrman's "Kyle Snow" voice was listed fourth on LOVO's "best" voices on the platform (as well as the default voice). If Mr. Lehrman's voice was used in 1/500 of the 7 million projects LOVO claims were created, that would mean Mr. Lehrman's voice was used in some 14,000 projects. If Mr. Lehrman's voice — as the number-four-best voice, the default voice, and the voice used by LOVO in its own advertisements — was used proportionately more often, the number of projects in which Mr. Lehrman's voice was used could easily run into the hundreds of thousands.

144.    LOVO's counsel stated on August 30, 2023 that, "To avoid any further misunderstanding, LOVO unilaterally removed the characters."

145.    That was not true. LOVO either failed to remove or subsequently re-published both the Kyle Snow and Sally Coleman voices on its website, advertised them on its YouTube channel, and continued to make them available to customers who had previously created projects with their voices. For example, the Kyle Snow voice was still available as of September 23, 2023:

---

[23] *See* LOVO AI, "One Take Tutorials Ep3: Genny can draw now?," 0:41 (Apr. 28, 2023), https://www.youtube.com/watch?v=QDt-_IA-Eqg (LOVO co-founder Charlie Choi demonstrating LOVO features and featuring "Kyle Snow," i.e. the voice of Mr. Lehrman, as the default voice).



146.    Just as the use of the LOVO software on the Deadline Strike Talk podcast was within one year of Plaintiffs filing this action, these new publications were also within one year of the filing date.

147.    Further, Mr. Lehrman's voice was used on multiple LOVO tutorials:







To select a video from our library, click on "Pixabay™" and select a video. Here you can search and browse through videos. Once you have made your selection, click "Add to Project", and it will appear on your editor timeline.



148.    Mr. Lehrman never authorized LOVO to use, clone, manipulate, or repurpose his voice for LOVO's service or any other use. He did not authorize his copyrighted voice to be used to train Genny; he did not authorize LOVO to use his voice in an API; nor did Mr. Lehrman authorize LOVO to connect his voice to the stage name "Kyle Snow," sell it to LOVO's subscribers, or use it in advertising. Mr. Lehrman was never made aware of, nor compensated for, Defendant's unauthorized usage of his voice.

149.    LOVO's scheme not only unlawfully appropriated, used, sold, and marketed Mr. Lehrman's voice, but it interfered with his ability to earn a living. LOVO knew that its scheme could threaten Mr. Lehrman's relationship with producers, casting agents, SAG-AFTRA and those producers/signatories.

**DEFENDANT'S IMPROPER USE OF PLAINTIFF SAGE'S VOICE**

150.    Plaintiff Sage subsequently learned that her voice was marketed by LOVO as part of its subscription business. LOVO promoted the availability of Ms. Sage's voice under the name "Sally Coleman."

151.    LOVO also used Ms. Sage's voice on its website to demonstrate the software capabilities, and to advertise and promote its business. Ms. Sage never gave LOVO permission to use her voice to advertise and market the capabilities of the LOVO software.

152.    Ms. Sage never gave LOVO permission to clone or use her voice as part of its subscription business.

153.    Ms. Sage never gave LOVO permission to use her voice or her copyrighted audio recordings for marketing purposes.

154.    Ms. Sage never gave LOVO permission to use her voice or her copyrighted recordings to train Genny.

155.    Ms. Sage was never compensated for LOVO's improper use of her voice.

**DEFENDANT'S UNAUTHORIZED USE OF LEHRMAN'S and SAGE'S VOICES CONTINUES**

156.    Significantly, despite assurances of LOVO's counsel that Plaintiff Lehrman's voice, denoted as the voice of Kyle Snow had been removed; and LOVO's informing users that the Kyle Snow voice had been retired, Mr. Lehrman's cloned voice is *still* live on LOVO's YouTube page as an advertisement for Genny[24] and under "Community Originals."[25]

157.    Despite assurances that the characters would be removed, as of August 2024, Ms. Sage's voice was still available as "Sally Coleman" on LOVO's Application Programming Interface, or "API." APIs are published online and shared freely; they are application programming interfaces that are publicly available to software developers. LOVO explains what an API is this way:

> An API, or Application Programming Interface, is like a digital waiter that helps different software programs communicate and share information with each other. In the context of LOVO and Genny API, here's how it works in simple terms: LOVO and Genny are text-to-speech services that can turn written text into spoken audio. Their APIs act as intermediaries, allowing your application to request voice generation without you having to understand all the complex processes happening behind the scenes.

---

[24] LOVO AI, "Genny by LOVO" (Jan. 20, 2023), https://www.youtube.com/watch?v=F439h9P__zE.

[25] "Motivation | LOVO Fandub," https://www.youtube.com/watch?v=cdNbKbxqIOc; "You Are Now a Professor at Supervillain University. What course do you teach? | r/AskReddit Fandub," https://www.youtube.com/watch?v=Xgy_bCZg51I; "What is something that you find terrifying that everyone finds normal? | r/AskReddit Fandub," https://www.youtube.com/watch?v=Eifcs4PSImA.

| Item | Qty. | Duration | Price |
|------|------|----------|-------|
| **record any female voice over, today**<br>Sure! If you do place this order, and later down the line decide to use them in broadcast, I hope that you will come back and order the appropriate licensing.<br>Split Files up to 5 files | 1 | 1 day | $400 |

**(After you submit this page, please double check that your script is attached IN FULL! Fiverr has been known to cut off scripts or delete attachments!)**
These are test scripts for radio ads. They will not be disclosed externally, and will only be consumed internally, so will not require rights of any sort.

**Three**, that Tom from Lovo left this review:

**TOMLSG**'S REVIEW

T    **tomlsg**'s message ★★★★★5
Stellar is an understatement. We would recommend her to anyone!

| Communication With Seller | ★★★★★5 |
|---|---|
| Service as Described | ★★★★★5 |
| Buy Again or Recommend | ★★★★★5 |

158.    Ms. Sage's and Mr. Lehrman's voices were still available to new customers through the end of September 2023.

159.    In September 2023, approximately ten days after Plaintiffs' cease-and-desist letter was sent to Defendant, LOVO sent an August newsletter to customers. LOVO announced to its users that it would take down the Voice Actor Plaintiffs' voices, i.e., the Kyle Snow and Sally Coleman voices. But LOVO misrepresented the reasons it was doing so. LOVO said that the voices of Kyle Snow

and Sally Coleman (and eleven others) were being "retired" "as their licenses [were] expiring." LOVO acknowledged that this "might be disappointing news to hear[.]"

160.    To be clear: LOVO never had a license with Mr. Lehrman or Ms. Sage; there was no license to expire.

161.    Contrary to LOVO's assertion that the Kyle Snow and Sally Coleman voices were being retired, those voices remained available on the LOVO website and Genny for almost a month. Indeed, even after LOVO stated that Plaintiffs' voices had been taken down, Plaintiff Lehrman's voice was still available as the default voice on the LOVO website. On January 20, 2023, LOVO put Plaintiff Lehrman's voice in an advertisement. That advertisement is still available on LOVO's YouTube page.[26] And, as seen on a tutorial video uploaded as of July 19, 2023, Plaintiff Lehrman's voice was available as the default voice on Genny.[27]

**DEFENDANT RECOGNIZES THE IMPROPER USAGE OF PLAINTIFFS' VOICES**

162.    Ironically, LOVO's CEO Tom Lee recognized the threat of improper usage of AI-generated voices. In 2019, co-founder Lee wrote in an article for *Medium*:

> Some people are alarmed by the possibility of their voices being used unbeknownst to them, or in malicious, illegal ways. Others are concerned they are going to take away the jobs. ***While they are right to be concerned***, it shouldn't be a divisive confrontation. Just like how we must be wary of our images, names, affiliations, and identities are used by ourselves or others, we must ensure that our laws and ethics

---

[26] "Genny by LOVO," LOVO AI YouTube Channel, https://www.youtube.com/watch?v=F439h9P__zE.

[27] "3 Best AI Voice Generator For YouTube Videos In 2023," Channel Profits YouTube Channel, https://youtu.be/9m8aNcop8cU.

develop in step with the technology to create a safe environment.[28]

163.    The founders of LOVO even created another company, VoiceVerse, which sold voice NFTs (non-fungible tokens). The founders stated on a pitch website about their "[v]ision":

> A person's voice is uniquely linked to their identity. Once you hear that person's voice, it immediately reminds you of them, and memories you had with them. Voice is personal. Voice brings out emotion. Voice is unique. Voice is a powerful aspect of one's identity.[29]

## DEFENDANT'S IMPROPER USE OF CELEBRITY NAMES AND LIKENESSES AND OTHER VOICES

164.    Defendant not only improperly appropriates the voices of the Voice Actor Plaintiffs who are "working actors" but not "celebrities"; Defendant also misappropriated the name and likeness of some of the nation's most well-known celebrities, including Scarlett Johansson (represented as "Samantha OS"), Barack Obama (crudely represented as "Barack Yo Mama"), Conan O'Brien ("Cocoon O'Brien"), and Elton John ("Elton John Cena"), to promote its services and show the capabilities of the LOVO product.

---

[28] *Medium*, "Voice Conversion: Definition, Technology, Usage & Concerns," Orbis AI Inc. (Sept. 13, 2019), https://medium.com/@tom_44446/voice-conversion-definition-technology-usage-concerns-8b8f103a343b (emphasis added).

[29] VoiceVerse Docs, "Vision," docs.voiceverse.com/whitepaper/english/vision. Separately, VoiceVerse has already been found to have stolen technology from another company. *See* Ule Lopez, WCCF Tech, "Voiceverse NFT Service Reportedly Uses Stolen Technology from 15ai," (Jan. 16, 2022), https://wccftech.com/voiceverse-nft-service-uses-stolen-technology-from-15ai/.



165.    Defendant boasts that its Genny tool allows users to "[c]lone any voice and create high-quality custom voice content," and illustrates that capability with the barely disguised names and images above.

166.    LOVO even used celebrity-cloned voices in its pitch to potential investors: it used Elton John's voice and image in the same SkyDeck investor pitch deck that improperly used Ms. Sage's voice.[30]

---

[30] The Elton John clone begins at approximately 2:27, https://www.pollockcohen.com/media/SoundFiles/Lovo2020PitchatSkyDeck.mp4.



## CLASS ACTION ALLEGATIONS

167.    This action is brought by the Plaintiffs individually and on behalf of a

class of similarly situated individuals pursuant to Rules 23(a) and 23(b)(2) and (3) of

the Federal Rules of Civil Procedure.

168.    Plaintiffs seek certification of the following Class and Subclasses:

> All persons whose voices were used by LOVO without
> permission or proper compensation for the purpose of creating
> or refining its AI text-to-speech generator; or whose AI-
> replicated voice was used, licensed, or sold without
> authorization or appropriate compensation; or whose name or
> stage name was used by LOVO to market its services without
> authorization or proper compensation.

169.    Excluded from the proposed classes are Defendant and its employees,

officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates,

and the judicial officers and their immediate family members and associated court staff

assigned to this case, as well as all persons who make a timely election to be excluded from the proposed classes.

170.    Plaintiffs reserve the right to amend or modify the class definition, including as to subclasses and particular issue classes.

171.    **Numerosity.** Fed. R. Civ. P. 23(a)(1). The Class consists of many hundreds of actors whose voices were used by LOVO without authorization or proper compensation. LOVO has bragged that its proprietary algorithm and machine-learning software, which it refers to as "Generator" or "Genny," was trained using data from thousands of voices and thousands of hours of recordings. Those actors were not appropriately compensated for the use of their voices for training an AI program.

172.    **Typicality.** Fed. R. Civ. P. 23(a)(3). The claims asserted by the Plaintiffs are typical of the claims of the Class. At all relevant times, Defendant acquired voices for Genny either by appropriating actors' voices without their knowledge, or by deceiving actors as to the true nature of the "academic research" project they were signing up for when they agreed to provide voice recordings. Class members' voices were used either to train the AI program, or as unaltered options for LOVO customers to use.

173.    **Adequacy of representation.** Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of other Class members. Plaintiffs have retained counsel competent and experienced in class actions and consumer protection litigation, who are competent to serve as Class Counsel. Plaintiffs and their counsel will fairly and adequately protect the interest of the class members.

174.    **Ascertainability.** The identities of Class members can be readily ascertained from business records maintained by Defendant and/or self-authentication. The precise number of class members can be ascertained from Defendant's records. Plaintiffs anticipate providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

175.    **Commonality and predominance.** Fed. R. Civ. P. 23(a)(2); 23(b)(3). This action is appropriate as a class action because common questions of law and fact affecting the Classes predominate over those questions affecting only individual members. Those common questions include but are not limited to, the following:

a)  Whether Defendant appropriated Plaintiffs' voices for use in its AI Generator without the express permission of the Plaintiffs in violation of New York Civil Rights Law § 51.

b)  Whether Defendant appropriated Plaintiffs' professional identities to promote its Genny subscription service without the express permission of Plaintiffs in violation of New York Civil Rights Law § 51.

c)  Whether Defendant violated New York General Business Law ("GBL") §§ 349 and/or 350 by promoting Plaintiffs' voices and/or likenesses which they did not have the lawful right to promote.

d)  Whether Defendant violated New York GBL §§ 349 and/or 350 by advertising and selling a service to consumers and representing to those customers that Defendant had the rights to commercial usage of Plaintiffs' voices and that customers thereby had the rights to use Plaintiffs' voices for commercial use or any other purpose.

176.    **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)  given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class member, few, if any, Class members could afford to seek

legal redress individually for the wrongs that Defendant has committed against them;

b) the prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for Defendant and burden the courts;

c) when Defendant's liability has been adjudicated, the Court can determine claims of all Class members;

d) this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense;

e) without a class action, many Class members would continue to suffer injury while Defendant retains the substantial proceeds of its wrongful conduct; and

f) this action does not present any undue difficulties that would impede its management by the Court as a class action.

177.    Plaintiffs request that the Court afford members of the Classes with notice and the right to opt out of any class certified in this action.

## FIRST CAUSE OF ACTION

### Violation of New York Civil Rights Law Sections 50, 51
### On Behalf of Mr. Lehrman, Ms. Sage, and the Class

178.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

179.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the New York Civil Rights Law Sections 50, 51.

180.    Section 50 states:

A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait, picture, likeness, or *voice of any living person* without having first obtained the written consent of such person, or if

a minor of such minor's parent or guardian, is guilty of a misdemeanor.[31]

181. Section 51 states:

Any person whose name, portrait, picture, likeness or *voice* is used within this state *for advertising purposes or for the purposes of trade without the written consent* first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using such person's name, portrait, picture, likeness or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait, picture, likeness or voice in such manner as is forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages.

182. This protection includes a living person's voice, whether digital or analogue.

183. Voice Actor Plaintiffs and members of the Class are persons under the law.

184. Defendant's actions as set forth herein used Voice Actor Plaintiffs' and Class's voices without their consent in violation of New York Civil Rights Law Sections 50 and 51, both in advertising and for the purposes of trade, in the state of New York.

185. Although LOVO, and co-founder and CEO Lee, have represented that they get strict permission from actors to create voice clones, and have partnerships with

---

[31] Notably, Sections 50 and 51 apply to the rights of living persons, particularly their voices. A new statute, Section 50-F, applies to the rights of deceased persons, but is not relevant here.

certain actors, Plaintiffs Lehrman and Sage never provided such permission for the use of their voices, nor were they offered such a partnership.[32]

186.    The use of the Voice Actor Plaintiffs and Class's voices was for the purposes of trade within New York. As detailed above, LOVO used both Mr. Lehrman's voice and Ms. Sage's voice to advertise, promote, and sell the LOVO subscription service to individuals and small businesses. LOVO also offered, promoted, licensed, and sold their cloned voices as voice options for clients to use for the clients' business projects. Those uses of Plaintiffs' cloned voices are trade.

187.    Plaintiffs Sage and Lehrman are residents of New York, and the agreement with LOVO to provide voice recordings to LOVO was conducted in New York.

188.    In addition, many voice-over actors are residents of New York.

189.    Many of the consumers of LOVO's services – including the voices of the Voice Actor Plaintiffs – are located in New York. New York is one of the most popular states for content creation and for individuals and small businesses that need voice-over work.

190.    LOVO did not exclude New York from its advertising.

191.    Defendant licensed its Genny service to MIT, which used LOVO's default voice – the Kyle Snow voice which was Plaintiff Lehrman's cloned voice – for the June 2023 Deadline Strike Talk podcast, within one year of Plaintiffs filing this action.

---

[32] *See* https://www.youtube.com/watch?v=7chAXq9_cQ0&t=610s.

192.    Defendant has used, and *continues to use*, Plaintiff Lehrman's voice to advertise its product,[33] within one year of Plaintiffs filing this action.

193.    Plaintiff Lehrman's cloned voice was used in multiple blog posts and tutorials posted by LOVO for advertising and trade purposes within one year of Plaintiffs filing this action; and continues to be used today.

194.    Defendant used both Plaintiffs Lehrman and Sage's voices for the purposes of trade, because their voice recordings were used to create AI clones of their voices that were sold or licensed on LOVO's website.

195.    Upon information and belief, Defendant used, sold, and/or licensed other New York actors' voices for the purpose of advertising or trade, without those actors' permission.

196.    The Voice Actor Plaintiffs and Class have been injured by Defendant's misappropriation in that they did not receive appropriate compensation for the use of their voices; their brands were harmed by Defendant's Genny text-to-speech tool, which was licensed to and used by consumers to create voice-over projects instead of hiring voice actors; their voices were used without permission on projects for which they did not give permissions thereby degrading their individual brands; and their voices were used for advertising LOVO itself without permission or compensation.

---

[33] Kyle Snow, i.e. Plaintiff Lehrman's, voice is still used to advertise LOVO's service on LOVO's YouTube account. *See* https://www.youtube.com/watch?v=Xgy_bCZg51I at 0:29 (crediting the voice of Kyle Snow); https://www.youtube.com/watch?v=Eifcs4PSImA at 1:20 (crediting the voice of Kyle Snow); https://www.youtube.com/watch?v=cdNbKbxqIOc (although the voice is that of Kyle Snow, credit is given only to LOVO). Sally Coleman's voice was available as of January 30, 2023. *See* https://www.youtube.com/watch?v=58xKrH1-IaY, at 14:53.

## SECOND CAUSE OF ACTION

**Deceptive Acts and Practices in Violation of the
New York Deceptive Practices Act, N.Y. GBL § 349
on Behalf of Plaintiffs Lehrman, Sage, and the Class**

197.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

198.    Plaintiffs bring this claim individually and on behalf of Plaintiffs Lehrman, Sage, and the members of the proposed Class against Defendant for violations of the New York Deceptive Practices Act, N.Y. GBL § 349 with respect to commercial rights as set forth in the Court's Order on Defendant's Motion to Dismiss. ECF No. 45.

199.    N.Y. GBL § 349 imposes liability on anyone who engages in "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York.

200.    Plaintiffs are "persons" under N.Y. GBL § 349(h).

201.    Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under N.Y. GBL § 349(a).

202.    Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs. Defendant misrepresented to the Voice Actor Plaintiffs and Class the purposes for which their voices would be used. LOVO told the Voice Actor Plaintiffs and members of the Class that their voices would be used only for academic research purposes and/or not for public use. LOVO then used their voices in ways that were not agreed to or permitted, and for which Plaintiffs were not compensated.

203.    In the course of business, Defendant made deceptive affirmative misrepresentations and omissions to consumers by publishing and disseminating

misleading information that the Voice Actor Plaintiffs – or their recognizable voices – were affiliated with LOVO and had given their consent to be included in LOVO's product offerings.

204.    These misrepresentations and omissions alleged herein were materially misleading.

205.    The acts and practices alleged herein are deceptive acts and practices covered under N.Y. GBL § 349 and have caused the Voice Actor Plaintiffs and members of the Class significant ascertainable monetary and non-monetary injuries, including damages to Plaintiffs' brands.

206.    The acts and practices alleged herein are deceptive acts and practices covered under N.Y. GBL § 349 and have caused the Voice Actor Plaintiffs and members of the Class damage by deceiving them as to the purpose of their work; then using their cloned voices without permission and without compensation; permitting and causing others to use their voices for purposes that they would never have approved; and exposing them to loss of business relationships and legal action by clients.

207.    Defendant willfully and knowingly violated N.Y. GBL § 349. It knew that Plaintiffs and members of the Class would not have given their consent for the use of their voices.

## THIRD CAUSE OF ACTION

### False Advertising in Violation of the
### New York False Advertising Act, N.Y. GBL § 350
### on Behalf of Plaintiffs Lehrman, Sage, and Members of the Class

208.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

209.    Plaintiffs bring this claim individually and on behalf of Plaintiffs Lehrman, Sage, and the members of the proposed Class against Defendant for violations of the New York False Advertising Act, N.Y. GBL § 350 with respect to commercial rights as set forth in the Court's Order on Defendant's Motion to Dismiss. ECF No. 45.

210.    N.Y. GBL § 350 imposes liability on anyone who uses false advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in New York. "False" includes "advertising, including labeling of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity[.]" N.Y. GBL § 350(a).

211.    Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under N.Y. GBL § 350.

212.    Defendant engaged in false advertising in multiple media: on its website, its YouTube channel, its newsletter, and podcast appearances and interviews.

213.    A website is a fundamental form of advertising. That is why both the New York State Bar Association and the ABA rules require law firms to label their websites "Attorney Advertising."

214.    Newsletters – whether delivered on paper or digitally – are traditional advertising vehicles.

215.    YouTube is an advertising vehicle no different from NBC, Fox News, or Hulu. Defendant has placed promotional videos on YouTube – including videos featuring Mr. Lehrman's voice, as of January 20, 2023, and Ms. Sage's voice, as of

January 17, 2020. LOVO used its YouTube channel – with Plaintiff Lehrman's voice – to misrepresent the rights that consumers would receive by subscribing to the LOVO service. This is deceptive advertising, and the use of Mr. Lehrman's voice to deliver these false and fraudulent messages harmed his brand. The association of Mr. Lehrman's voice with LOVO's deceptive messages and deceptive business practices harms his brand.

216.    Members of the Class were similarly harmed by these misrepresentations in that their affiliation with false and fraudulent statements by LOVO harmed their brands.

217.    LOVO's statement in its newsletter that it was retiring the voices of Kyle Snow, Sally Coleman, and eleven others, because their licenses were expiring was false advertising. That misstatement harmed Mr. Lehrman, Ms. Sage, and other members of the Class by falsely affiliating them with LOVO and thus harming their brands.

218.    This deceptive advertising caused monetary and reputational harm to members of the Class because clients use the recognizable voices for projects for which the actors do not get compensated; may be in violation of contracts where members of the Class are precluded from appearing because of category-exclusivity clauses; and may be in violation of SAG-AFTRA rules.

219.    Defendant has engaged in consumer-oriented conduct that has misled its consumers and harmed the Voice Actor Plaintiffs and Class. The actions and practices alleged herein were directed at consumers who wished to utilize the services of established voice-over actors – or purely AI-generated voices – and thought they were getting those services in an authorized and affordable way.

220.    This false and deceptive advertising further harmed the Voice Actor
Plaintiffs and Class by diverting legitimate customers away from them by falsely telling
customers the Plaintiffs' professional services were available at a bargain price.

221.    This false and deceptive advertising further harmed Plaintiffs by
misappropriating their voices, by violating their right to publicity and failing to
appropriately compensate Plaintiffs, and by depriving them of control of their own
brands.

222.    The false advertising alleged herein was materially misleading.

223.    The acts and practices alleged herein constitute false advertising covered
under N.Y. GBL § 350 and have caused millions of dollars in significant monetary
damages to members of the Class by diverting legitimate work from them and
depreciating their brands.

224.    Defendant willfully and knowingly violated N.Y. GBL § 350.

### FOURTH CAUSE OF ACTION

**Breach of Contract**
**On Behalf of Plaintiffs Lehrman and Sage**

225.    Plaintiffs incorporate by reference all allegations in this Complaint and
restate them as if fully set forth herein.

226.    Plaintiffs Lehrman and Sage each had a contract with Defendant by
virtue of their agreements to supply audio recordings to Defendant LOVO. LOVO's
counsel has confirmed that the voice recordings used to create Kyle Snow and Sally
Coleman were provided by Plaintiffs Lehrman and Sage, respectively.

227.    Plaintiff Lehrman agreed to provide his recordings to Defendant LOVO in May 2020, with the understanding that, as LOVO stated: "The script and [his] finished file will be used for research purposes only."

228.    After receiving these assurances and reaching this understanding, after five days, Mr. Lehrman delivered the requested voice files via Fiverr in May 2020 and was paid $1,200 for the use of those recordings for "internal research purposes only."

229.    Defendant LOVO agreed to pay for those recordings, and not to use them for any commercial purposes, *i.e.*, research purposes only. Mr. Lehrman relied on those assurances in providing his recording.

230.    LOVO breached the contract with Plaintiff Lehrman by using the recordings in ways contrary to its express promises and outside the defined agreement. These breaches included using Lehrman's copyrighted recordings to train the Generator; using Lehrman's voice to promote, advertise and sell the LOVO service; and offering Lehrman's voice as a voice option of the LOVO service, including as its default voice.

231.    Plaintiff Sage delivered her recordings to Defendant LOVO in 2019, and Defendant LOVO paid her $400 for the recordings. Plaintiff Sage agreed to provide her recordings to Defendant LOVO, with the understanding that, "If [LOVO was to] place this order, and later down the line decide to use them in broadcast, [LOVO would] come back and order the appropriate licensing."

232.    Defendant LOVO purchased the recording with that understanding and represented that the recordings were "test scripts for radio ads. They will not be

disclosed externally, and will only be consumed internally, so will not require rights of any sort." Ms. Sage relied on that statement in providing her recordings.

233.    LOVO breached the contract with Plaintiff Sage by using the copyrighted recordings in ways contrary to its express promises and outside the defined agreement. These breaches included using Ms. Sage's copyrighted recording and her Genny-generated voice as a key part of LOVO's fundraising efforts (including but not limited to the Berkeley SkyDeck presentation); using her copyrighted voice to train the Generator; using Ms. Sage's voice to promote, advertise, and sell the LOVO service; and offering Ms. Sage's voice as a voice option for the LOVO service.

234.    Had they known that their voice recordings would be used to create AI voices, Plaintiffs would not have allowed such uses of their voices or would have sought greater compensation.

235.    Because of Defendant's extra-contractual uses of their audio recordings, Plaintiffs have incurred damages.

### FIFTH CAUSE OF ACTION

### Copyright Infringement
### On Behalf of Plaintiff Sage

236.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

237.    Plaintiff Sage's Copyrighted Works – the recordings made by Ms. Sage and delivered to LOVO in 2019– are original voice recordings containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq.

238.    Plaintiff Sage is the exclusive owner of rights under copyright to the Copyrighted Works.

239.    Plaintiff Sage owns valid copyright registrations for the Copyrighted Works as detailed above.

240.    Defendant infringed Ms. Sage's copyright by using her exact recording in the 2020 SkyDeck investor presentation, in pitch meetings with potential investors, and at the 2020 CES Tech Conference.[34]

241.    Defendant further infringed Ms. Sage's copyright by posting on LOVO's YouTube channel a video of that SkyDeck presentation. That presentation continues to be available on LOVO's YouTube channel.

242.    Defendant still further infringed Ms. Sage's copyright by posting on its YouTube site the January 17, 2020 video "LOVO: Love Your Voice." That video stated "In this video, you will hear 5 speakers whose voices have been cloned to near perfection. Their tone, accent, and even mannerisms are fully learned by our AI voice system."  One of those five speakers was Ms. Sage, and her copyrighted recording.

243.    Through Defendant's conduct alleged herein, including Defendant's reproduction, distribution, public display, and sale of the entirety and portions of the Copyrighted Works without Plaintiff Sage's permission, Defendant has directly infringed her exclusive rights in the Copyrighted Works in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

---

[34] PLUGHITZ Live, "LOVO makes computer voices sound natural and emotional @ CES 2020," at 3:45 (Feb. 20, 2020), youtube.com/watch?v=30iMuQEpkFU.

244.    Defendant's infringing conduct alleged herein was willful and with full knowledge of Plaintiff Sage's rights in the Copyrighted Works, and has enabled Defendant to illegally obtain profit therefrom.

245.    As a direct and proximate result of Defendant's infringing conduct alleged herein, Plaintiff Sage has been harmed and is entitled to damages in an amount to be proven at trial. Pursuant to 17 U.S.C. § 504(b), Plaintiff Sage is also entitled to recovery of Defendant's profits attributable to Defendant's infringing conduct alleged herein, including from any and all sales of the Copyrighted Work and products incorporating or embodying the Copyrighted Work, and an accounting of and a constructive trust with respect to such profits.

246.    Alternatively, Plaintiff Sage is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c), for Defendant's willful infringing conduct for each of Plaintiff Sage's works that Defendant has infringed, and for such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

247.    Plaintiff Sage is further entitled to her attorneys' fees and costs pursuant to 17 U.S.C. § 505.

248.    As a direct and proximate result of Defendant's infringing conduct alleged herein, Plaintiff Sage has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendant's infringing conduct is enjoined by this Court, Defendant will continue to infringe the Copyrighted Work. Plaintiff Sage is therefore entitled to preliminary and permanent injunctive relief restraining and enjoining Defendant's ongoing infringing conduct.

## SIXTH CAUSE OF ACTION

### Copyright Infringement – Training
### On Behalf of Plaintiffs Lehrman and Sage

249.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

250.    Plaintiffs Lehrman and Sage's Copyrighted Works – the recordings made by Plaintiffs Lehrman and Sage and delivered to LOVO in 2019 and 2020 – are original voice recordings containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq.

251.    Plaintiffs Lehrman and Sage are the exclusive owners of rights under copyright in and to the Copyrighted Works.

252.    Plaintiffs own valid copyright registrations for the Copyrighted Works as detailed above.

253.    Defendant infringed Plaintiffs' copyrights by training Genny and creating Kyle Snow and Sally Coleman using Plaintiffs' Copyrighted Works.

254.    In particular, Defendant infringed on Plaintiffs' copyrights in the Copyrighted Works by processing those Works, since that processing involved the repeated duplication of the actual sounds fixed in the Copyrighted Works.

255.    Defendant's creation of a neural network for each plaintiff based on the copyrighted sound recordings submitted to LOVO also infringed on Plaintiffs' copyrights since network contains rearranged, remixed, and repurposed versions of the sounds fixed to the Copyrighted Works.

256.    Defendant infringed on Plaintiffs' copyrights every time it made updates to Genny or the Kyle Snow and Sally Coleman voices, since updating that technology

required Defendant to re-copy and re-process the Copyrighted Works and re-train those recordings.

257.    Through Defendant's conduct alleged herein, including Defendant's reproduction, distribution, public display, and sale of the entirety and portions of the Copyrighted Works without Plaintiffs' permission, Defendant has directly infringed Plaintiffs' exclusive rights in the Copyrighted Works in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

258.    Defendant's infringing conduct alleged herein was willful and with full knowledge of Plaintiffs' rights in the Copyrighted Works, and has enabled Defendant illegally to obtain profit therefrom.

259.    As a direct and proximate result of Defendant's infringing conduct alleged herein, Plaintiffs have been harmed and are entitled to damages in an amount to be proven at trial. Pursuant to 17 U.S.C. § 504(b), Plaintiffs Lehrman and Sage are also entitled to recovery of Defendant's profits attributable to Defendant's infringing conduct alleged herein, including from any and all sales of the Copyrighted Work and products incorporating or embodying the Copyrighted Work, and an accounting of and a constructive trust with respect to such profits.

260.    Alternatively, Plaintiffs are entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c), for Defendant's willful infringing conduct for each of Plaintiffs' works that Defendant has infringed, and for such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

261.    Plaintiffs further are entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

262.    As a direct and proximate result of Defendant's infringing conduct alleged herein, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendant's infringing conduct is enjoined by this Court, Defendant will continue to infringe the Copyrighted Work. Plaintiffs therefore are entitled to preliminary and permanent injunctive relief restraining and enjoining Defendant's ongoing infringing conduct.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, request relief and judgment against Defendant as follows:

A.    certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Classes, and designating Plaintiffs' counsel as Class Counsel;

B.    awarding Plaintiffs and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C.    awarding Plaintiffs and the Classes appropriate relief, including actual and statutory damages;

D.    awarding Plaintiffs and the Classes punitive damages;

E.    awarding Plaintiffs and the Classes civil penalties;

F.    granting Plaintiffs and the Classes declaratory and equitable relief, including restitution and disgorgement;

G.    enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

H.    awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

I.    awarding Plaintiffs and the Classes reasonable attorneys' fees and costs as allowable by law;

J.    awarding pre-judgment and post-judgment interest; and

K.      granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: New York, New York
   July 31, 2025

        Respectfully submitted,

        By: _/s/ Steve Cohen_
        Steve Cohen
        Anna Menkova
        **POLLOCK COHEN LLP**
        111 Broadway, Suite 1804
        New York, NY 10006
        Tel: (212) 337-5361
        SCohen@pollockcohen.com

        *Attorneys for Plaintiffs and*
        *the Proposed Classes*