**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PAUL LEHRMAN and LINNEA SAGE,
on behalf of themselves and all others
similarly situated

      Plaintiffs,

          v.

LOVO, INC.,

      Defendant.

Case No.: 24 Civ. 03770

Hon. J. Paul Oetken

---

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SIXTH CAUSE OF ACTION

POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................1

FACTUAL BACKGROUND..................................................................................2

    I.     Ms. Sage and Mr. Lehrman's Copyrighted Works .......................................2

    II.    LOVO's AI Voice Cloning Technology ........................................................3

    III.   LOVO's Training Process Using Plaintiffs' Copyrighted Works.................3

    IV.   LOVO's Impact on the Market for Plaintiffs' Voice Recordings .................6

ARGUMENT ........................................................................................................7

    I.     Plaintiffs have adequately alleged that LOVO infringed on their copyrights in the course of training its AI model. .......................................7

        A.    Plaintiffs have stated a claim for copyright infringement. ...............8

        B.    Plaintiffs' allegations are sufficiently particularized. ....................10

        C.    Converting copyrighted material into a different format that "duplicated every aspect of them" does not eliminate their protection under the Copyright Act.................................................11

    II.    Defendant's invocation of the affirmative defense of fair use is both premature and meritless..............................................................................14

        A.    This is not one of the rare cases where fair use can be adjudicated at the pleading stage.......................................................................14

        B.    Defendant has failed to establish that its use of the Copyrighted Works to train its AI models was fair..............................................15

            1.    Purpose-and-character ......................................................... 16

            2.    Nature of the Copyrighted Works ...................................... 18

            3.    Amount and substantiality of portion used...................... 19

            4.    Effect on the potential market for the Copyrighted Works .................................................................................. 19

CONCLUSION ...............................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Abdin v. CBS Broad., Inc.,*
971 F.3d 57 (2d Cir. 2020) ...................................................................8

*Abs Ent. v. CBS Corp.,*
908 F.3d 405 (9th Cir. 2018) ..............................................................12

*Agee v. Paramount Commc'ns, Inc.,*
59 F.3d 317 (2d Cir. 1995) ................................................................12

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
598 U.S. 508 (2023) ..............................................................15, 16, 17

*Arista Records Ltd. Liab. Co. v. Doe,*
604 F.3d 110 (2d Cir. 2010) ..............................................................11

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)......................................................................10, 11

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015) .....................................................16, 19, 20

*Bartz v. Anthropic PBC,*
No. 24-cv-05417 WHA, 2025 U.S. Dist. LEXIS 118989
(N.D. Cal. June 23, 2025) ..................................................................20

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)......................................................................10, 11

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994)...........................................................................18

*DeCarlo v. Archie Comic Publ'ns, Inc.,*
11 F. App'x 26 (2d Cir. 2001) ............................................................3

*Doe v. Columbia Univ.,*
831 F.3d 46 (2d Cir. 2016) ...............................................................10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
499 U.S. 340 (1991)............................................................................8

*Grant v. Trump,*
563 F. Supp. 3d 278 (S.D.N.Y. 2021)................................................1, 14

*Harper & Row, Publrs. v. Nation Enters.,*
471 U.S. 539 (1985)...........................................................................19

*Hayden v. Koons,*
No. 21-cv- 10249, 2022 U.S. Dist. LEXIS 127368
(S.D.N.Y. July 18, 2022) ...................................................................14

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) ...................................................................16

*Kadrey v. Meta Platforms, Inc.*,
    No. 23-cv-03417-VC, 2025 U.S. Dist. LEXIS 121064
    (N.D. Cal. June 25, 2025) ..........................................................1, 15, 20

*Lehrman v. Lovo, Inc.*,
    No. 24-CV-3770 (JPO), 2025 U.S. Dist. LEXIS 131464
    (S.D.N.Y. July 10, 2025) .................................................................passim

*TCA TV Corp. v. McCollum*,
    839 F.3d 168 (2d Cir. 2016) ...................................................................14

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*,
    765 F. Supp. 3d 382 (D. Del. 2025)........................................................18

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000)................................................12, 18

## Statutes and Rules

17 U.S.C. § 106 ...............................................................................8, 15, 17

17 U.S.C. § 107 ....................................................................................15, 16

17 U.S.C. § 114 ...............................................................................8, 12, 18

Fed. R. Civ. P. 12 ........................................................................................10

## PRELIMINARY STATEMENT

Generative AI requires lots of data to work; and lots *and lots* of data to work well. Because of that, "companies have been unable to resist the temptation to feed copyright-protected materials into their models—without getting permission from the copyright holders or paying them for the right to use their works for this purpose." *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417-VC, 2025 U.S. Dist. LEXIS 121064, at *12 (N.D. Cal. June 25, 2025) (Chhabria, J.). "[I]n most cases" this conduct is illegal. *Id.* This case is in that majority.

Defendant LOVO has infringed on Plaintiffs' copyrights several times over in the course of training its generative AI model. It has directly infringed on Plaintiffs' exclusive rights to reproduce their copyrighted works and to create derivative works. In their operative complaint, Plaintiffs have alleged with particularity how this infringement occurred. And at the motion to dismiss stage, the court must accept as true the facts alleged in Plaintiffs' complaint.

Defendant claims the doctrine of fair use protects its copying and infringement. That argument is premature, since fair use is an affirmative defense and "a fact-intensive inquiry," and, as a result, rarely found at the motion to dismiss stage. *Grant v. Trump*, 563 F. Supp. 3d 278, 284 (S.D.N.Y. 2021). But even on the merits, Defendant's fair use argument fails, since it has not shown that the "purpose and character" of its use was fundamentally different from that of the original works. That is because both the original and the copy were created with the same intention: to create commercial voice recordings. Defendant has also failed to show that the potential market for the copyrighted works would not be entirely displaced by the copy's unauthorized use.

After a ruling on Defendant's first Motion to Dismiss, Plaintiffs accepted this Court's invitation to amend their complaint to include further detail on their allegations that LOVO infringed on Plaintiffs' copyrights in the course of training its generative AI model. Defendant has now moved to dismiss that amended count of Plaintiffs' complaint. Plaintiffs respectfully urge this Court to deny that motion.

## FACTUAL BACKGROUND

A detailed account of the facts relevant to this action are laid out in Plaintiffs' operative complaint. *See generally* Plaintiffs' Second Amended Complaint, ECF No. 47 (July 31, 2025) ("SAC"). The factual background outlined here includes facts relevant to Defendant's Motion to Dismiss the Sixth Cause of Action from the Second Amended Class Action Complaint ("Defendant's Second Motion to Dismiss") which relates to Plaintiffs' claim that Defendant LOVO ("Defendant" or "LOVO") infringed on Plaintiffs' copyrights in the course of training LOVO's artificial intelligence model.

## I.    Ms. Sage and Mr. Lehrman's Copyrighted Works

Plaintiffs Linnea Sage and Paul Lehrman (together with putative class members "Plaintiffs") are voice-over actors. SAC ¶¶ 6, 7. In October 2019, Ms. Sage received a message from "tomlsg" (later identified as LOVO co-founder Tom Lee) offering her a contract to produce and record test scripts for radio ads. SAC ¶¶ 75, 81. When Ms. Sage inquired about the use of the recordings, she was assured that they were "test scripts for radio ads" that "will not be disclosed externally, and will only be consumed internally, so will not require rights of any sort." SAC ¶¶ 77–78. After this assurance, Ms. Sage delivered the audio recordings to LOVO and was paid $400. SAC ¶¶ 79–80.

In May 2020, Mr. Lehrman was contacted by a LOVO employee (identified as User25199087) who requested voice recordings for purported "research purposes."

SAC ¶¶ 44–46. The LOVO employee repeatedly assured Mr. Lehrman that the recordings would be "used for internal research purposes only" and "for academic research purposes only." SAC ¶¶ 46, 48, 52. After receiving these assurances, Mr. Lehrman delivered 104 audio recordings of his voice to LOVO on May 18, 2020, for which he was paid $1,200. SAC ¶¶ 53–54.[1]

## II.   LOVO's AI Voice Cloning Technology

LOVO operates an artificial intelligence voice cloning product called "Genny" that creates digital copies of human voices using AI and machine learning. SAC ¶ 119. According to LOVO's own description, "voice cloning refers to a virtual copy of a real person's voice. Rather than using machine learning to synthesize an original AI voice, voice cloning technology replicates an existing human voice." SAC ¶ 22.

LOVO's CEO Tom Lee explained the technology's capabilities, stating that they "only need a person to read 50 sentences" to "capture the tone, the character, the style, the phonemes, and if you have an accent, we can even capture that as well." SAC ¶ 26. Lee further described how the system works: "imagine ... you have a real human voice, and we take that, and clone that, and make it available as an option for you to turn any text that you have into that voice. So, you can make that voice say anything that you want, even if that person has never actually said that before in their life." SAC ¶ 25.

## III.   LOVO's Training Process Using Plaintiffs' Copyrighted Works

As Plaintiffs allege in their operative Complaint, Genny – or an earlier iteration

---

[1]    "Under the Copyright Act of 1976, copyright protection attaches once the work is fixed in some tangible form, regardless of whether the copyright is registered or the work is published." *DeCarlo v. Archie Comic Publ'ns, Inc.,* 11 F. App'x 26, 28 (2d Cir. 2001). Both Ms. Sage and Mr. Lehrman registered the audio files they delivered to LOVO with the United States Copyright Office. SAC ¶¶ 55, 82.

of LOVO's foundational model – was pretrained on sound recordings including the Copyrighted Works to recognize certain patterns and characteristics of the human voice. SAC ¶ 120. LOVO processed this dataset of sound recordings into spectrogram representations like mel-spectrograms, which are visual representations of audio that show how the energy of different frequencies changes over time mapped to a particular scale designed to match how humans perceive sound. SAC ¶ 121. LOVO then used a neural network architecture like Tacotron to train Genny to learn the mapping between text input and vocal characteristics. SAC ¶ 121. LOVO used the Copyrighted Works to train clones of Plaintiffs' voices, which were sold and marketed as Sally Coleman (Ms. Sage) and Kyle Snow (Mr. Lehrman). SAC ¶¶ 71, 23. LOVO trained the Kyle Snow and Sally Coleman voices by converting the Copyrighted Works into spectrogram representations that duplicated every aspect of the actual copyrighted recordings. SAC ¶ 122. LOVO then used either a generative adversarial network (GAN) or likelihood training process to train Genny, Kyle Snow, and Sally Coleman to sound like human voices. SAC ¶ 123. Regardless of which process was used, LOVO's training involved the repeated duplication, rearranging, recapturing, and remixing of the copyrighted sound recordings. SAC ¶ 123.

A GAN is comprised of two models: one that attempts to generate audio that sounds human, and another that guesses which audio is human versus computer-generated. SAC ¶ 124. The model "learns" by registering and incorporating features when it successfully fools the other model, repeating this comparison cycle hundreds of thousands or even millions of times. SAC ¶ 124.

Likelihood training, on the other hand, operates by feeding the model

spectrograms and training it to maximize the probability that it would generate the exact audio sequences found in the training data, adjusting its parameters to make the spectrograms and audio waveforms as statistically probable as possible. SAC ¶ 125.

Both training methods involve constant engagement with the sound recordings of the voice being emulated, duplicating those sound recordings hundreds of thousands or millions of times. SAC ¶ 126. The training process yields a neural network that incorporates all the phonemes of the human voice recordings it was trained on—including pitch, pacing, accent, tone, and expressive choices—and replicates them when prompted. SAC ¶ 127.

LOVO used all of the Copyrighted Works submitted by Ms. Sage and Mr. Lehrman in the course of training Genny and in the creation of the Sally Coleman and Kyle Snow voices. SAC ¶ 132. In addition, LOVO created a separate neural network for both voices from the copyrighted recordings delivered to it. SAC ¶ 130.

The training process necessarily involved the duplication, rearranging, recapturing, and remixing of the copyrighted sound recordings since the only way to program a computerized system to replicate a human voice is by giving that system examples of the human voice to be emulated. SAC ¶ 133. Every time LOVO made updates to the Genny model or the Sally Coleman and Kyle Snow voices, it would do so by reprocessing the original copyrighted sound recordings and repeating a version of the learning-comparing-learning process. SAC ¶ 134.

LOVO has claimed substantial commercial success from its voice cloning technology. As of January 2023, LOVO claimed that Genny had been used by customers to create over seven million voice-overs, and as of January 2023, LOVO claimed to have

over two million customers. SAC ¶ 24. LOVO used Ms. Sage's copyrighted recordings to raise millions of dollars in venture capital through investor presentations that showcased the technology's capabilities. SAC ¶ 96. Mr. Lehrman's cloned voice, marketed under the pseudonym "Kyle Snow," served as LOVO's default voice from 2021 to September 2023. SAC ¶ 140. LOVO promoted Kyle Snow as the fourth-best voice on its platform, describing it as having "the perfect voice for conveying enthusiasm and youthfulness." SAC ¶¶ 139, 143.

The Sally Coleman and Kyle Snow voices fuse the knowledge that the Genny model learned in both the pretraining and training phases with the particular aspects of Ms. Sage and Mr. Lehrman's voices exhibited in the Copyrighted Works. SAC ¶ 131.

## IV.    LOVO's Impact on the Market for Plaintiffs' Voice Recordings

LOVO's voice cloning technology—and its clones of Mr. Lehrman and Ms. Sage's voices in particular—has diminished the potential market for and value of Plaintiffs' voice-over work. LOVO's value proposition to customers is simple: buy professional-sounding voice-overs that are essentially identical to those prepared by real-life professional voice actors without paying professional voice actors for each word their voices speak. SAC ¶ 36. This proposition is entirely dependent upon voice actors' participation in LOVO's scheme which here occurred without Plaintiffs' knowledge or consent. SAC ¶ 36. The benefit to LOVO subscribers is financial: they do not have to pay actors for studio sessions, residuals, royalties, or fees, but instead pay only a monthly subscription fee to LOVO. SAC ¶ 29.

This directly diverts work from voice actors including Plaintiffs, as LOVO's service enables customers to use Plaintiffs' cloned voices instead of hiring them for new projects. SAC ¶¶ 29, 196. By offering their voice clones at a bargain price, LOVO has

reduced the market for Plaintiffs' professional voice-over services. SAC ¶ 220.

LOVO's activities have also deprived Plaintiffs of control over their own brands and voices, causing them to lose the ability to selectively accept or decline work based on the nature of the project or client. SAC ¶ 221. By making cloned versions of their voices available through a subscription service, LOVO has fundamentally undermined the traditional market in which voice actors negotiate compensation based on factors including "the actor's name, brand value, where and in what medium the voice-over will be used, and for how long it will be used." SAC ¶ 17. Plaintiffs' voices have been used in projects they never authorized and would never have approved, exposing them to potential loss of business relationships and other reputational harm. *See* SAC ¶ 206.

## **ARGUMENT**

### I.    **Plaintiffs have adequately alleged that LOVO infringed on their copyrights in the course of training its AI model.**

Regardless of the technique used, training an AI model to clone a voice necessarily involves copying versions of that voice hundreds of thousands of times. *See* SAC ¶¶ 123–33. Plaintiffs have adequately alleged that LOVO did just that, training its generative AI model to copy all aspects of their voices using the Copyrighted Works LOVO obtained under false pretenses. Plaintiffs have alleged these facts with the particularity required at the pleading stage, including specific details about the technological mechanisms LOVO used to infringe their copyrights. Finally, converting the copyrighted recordings into spectrogram format did not strip them of copyright protection, just as converting analog recordings to a digital format does not eliminate their protected status.

A.  **Plaintiffs have stated a claim for copyright infringement.**

Plaintiffs' operative complaint alleges both direct infringement and infringement on Plaintiffs' exclusive rights to create derivatives with particularity. SAC ¶¶ 119–34, 249–62. Under the Copyright Act of 1976, as codified at 17 U.S.C. § 106, the owner of a copyright in a sound recording possesses the exclusive rights to reproduce the copyrighted work in copies or phonorecords and to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership. *See* 17 U.S.C. 106(1), (3). The owner also possesses the right to prepare derivative works "in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality." 17 U.S.C. § 106(2); 17 U.S.C. § 114(b).

To establish a *prima facie* case of copyright infringement of a sound recording, a plaintiff must demonstrate: (1) "ownership of a valid copyright" in the sound recording, and (2) "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A plaintiff can establish the second element by pleading that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work." *Abdin v. CBS Broad., Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (internal quotation marks and emphasis omitted). Here, there is no dispute that Plaintiffs own valid copyrights to the sound recordings that they submitted to LOVO. (That Plaintiffs provided LOVO with these recordings under false pretenses is not relevant to the copyright claim, but colors LOVO's arguments.)  As to the second element, Plaintiffs alleged in their operative complaint that LOVO "actually copied" the copyrighted works "hundreds of thousands of times," SAC ¶¶ 124, 126. (Because of the number of times LOVO copied Plaintiffs' copyrighted

works in the course of training its model to clone their voices and because, as Plaintiffs have alleged, LOVO created separate neural networks for each plaintiff from the Copyrighted Works, LOVO's infringement was not "de minimis" as Defendant has argued. *See* Def. Second Mot. to Dismiss at 19–22.) In addition, Plaintiffs have alleged that those copies were exact duplicates of the Copyrighted Works, unquestionably satisfying the "substantial similarity" requirement. SAC ¶¶ 122–23.

In particular, Plaintiffs alleged that LOVO trained its model using one of two technological mechanisms, a GAN or likelihood training. Either of these mechanisms necessarily involved the repeated infringement on Plaintiffs' copyrights. SAC ¶ 123. If LOVO used a GAN to train its model, it would have infringed on Plaintiffs' copyright in the course of running the comparison cycle that teaches the GAN. SAC ¶ 123. That cycle involves the comparison between human-generated audio (here, the Copyrighted Works) and computer-generated audio. SAC ¶ 124. The GAN model "learns" when it is fooled into thinking that the computer-generated audio is the human-generated audio, and this learning process is repeated hundreds of thousands or even millions of times. SAC ¶ 124. If LOVO used likelihood training to train its model, it would have infringed on Plaintiffs' copyrights by training its model to generate the exact audio sequences found in the Copyrighted Works which constitute derivatives or duplicates of those works. SAC ¶¶ 125, 254.

Regardless of which of these two methods LOVO used to create its model (either involved repeated infringement on Plaintiffs' copyrights), LOVO also infringed on Plaintiffs' copyrights when creating a neural network architecture to learn the mapping between text input and vocal characteristics. That network "incorporates ***all*** the

phenomes of the recordings of the human voice it was trained on—its pitch, pacing, accent, tone, and expressive choices—and replicates them when prompted." SAC ¶ 127 (emphasis added).

In sum, regardless of the machine learning technology that LOVO used to train Genny and the Kyle Snow and Sally Coleman voices, the training process inevitably involved repeated infringement on Plaintiffs' copyrights since "***the only way*** to program a computerized system to replicate a human voice is by giving that system examples of the human voice to be emulated." SAC ¶ 133 (emphasis added).

### B.    <u>Plaintiffs' allegations are sufficiently particularized.</u>

Plaintiffs have alleged with sufficient particularity that LOVO trained its model on their Copyrighted Works, and that training infringed on Plaintiffs' copyrights. In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff must plead factual allegations "to state a claim to relief that is plausible on its face." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, ***accepted as true***, to state a claim to relief that is plausible on its face." *Id.* (emphasis added). "If the complaint is found to be sufficient to state a legal claim, the opposing party will then have ample opportunity to contest the truth of the plaintiff's allegations and to offer its own version." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016). "The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief

where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records Ltd. Liab. Co. v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010).

Plaintiffs' complaint includes specific allegations about how LOVO trained its model based on "information and belief pleading" and "generally available information about AI algorithms," following this Court's instruction. *Lehrman v. Lovo, Inc.*, No. 24-CV-3770 (JPO), 2025 U.S. Dist. LEXIS 131464, at \*55 (S.D.N.Y. July 10, 2025). Plaintiffs' allegations are not just "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Instead, Plaintiffs' operative complaint explains with the requisite degree of particularity *how* LOVO infringed on their copyrights, even alleging which technological mechanisms LOVO used to train its generative AI model. *See* SAC ¶¶ 119–34 (alleging LOVO used a neural network like Tacotron and a GAN or likelihood training to create Genny and its clones of Plaintiffs' voices and referencing LOVO's own blog that sheds light on how its model was trained). Plaintiffs are under no obligation to demonstrate the truth of those allegations at the motion to dismiss stage, particularly where, as here, the relevant "facts are peculiarly within the possession and control of the defendant." *Arista*, 604 F.3d at 120; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

### C.    Converting copyrighted material into a different format that "duplicated every aspect of them" does not eliminate their protection under the Copyright Act.

Plaintiffs allege that, in the course of training its algorithm, LOVO converted the Copyrighted Works into spectrogram representations "that duplicated every aspect of

them." SAC ¶ 122. This means that if LOVO converted the spectrogram representations

of the Copyrighted Works back to their original file format, a human listening to them

would hear no difference. Defendant misunderstands (or misrepresents) the extent of

information that a spectrogram representation of an audio recording contains.

Defendant argues that the conversion somehow stripped the Copyrighted Works of any

protection under the Copyright Act, since "there can be no allegation that anything

protectible was copied in the conversion." Def.'s Second Mot. to Dismiss at 20. This is

incorrect and contrary to the allegations in Plaintiffs' complaint, which makes clear

that the spectrogram conversion process captures the "actual sounds fixed in the

recording," 17 U.S.C. § 114(b); *see also* SAC ¶ 254, and not just attributes like "pitch,

loudness, [and] tone," that this Court has already determined are unprotectable,

*Lehrman*, 2025 U.S. Dist. LEXIS 131464, at *20.

Instead, the process operates in a manner analogous to digitization of analog

sound recordings, which does not automatically erase copyright protection of the analog

work. *See Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 324 (2d Cir. 1995) (the "mere

transfer" of a copyrighted recording into another medium is still infringing); *UMG

Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000)

(unauthorized copying of CDs into MP3 files constituted "a presumptive case of

infringement under the Copyright Act of 1976"); *see also Abs Ent. v. CBS Corp.*, 908

F.3d 405, 418 (9th Cir. 2018) ("the mere translation of a work from an analog to a

digital medium to take advantage of technological improvements does not itself

transform the essential character and identity of the underlying work").

Defendant's argument—that a change to the file format of a sound recording

operates to entirely deprive that sound recording of protection under the Copyright Act—would create an end-run around all copyright protection for sound recordings. Podcasts, educational videos, oral histories, or professionally narrated performances could be copied by transferring a WAV file to an MP3 without recourse. Converting an audio file into a spectrogram format (or compressing an audio file to make it smaller) allows a computer to ingest vast quantities of sound, but it does not meaningfully alter the "actual sounds fixed" to the copyrighted recording. *See* 17 U.S.C. § 114(b).

LOVO argues that Plaintiffs are actually just challenging the AI model's outputs through their allegations that the training process infringed on their copyrights, since the training process and all of its steps ultimately serve the purpose of crafting an AI model that generates outputs. *See* Def.'s Second Mot. to Dismiss at 17–19. This argument contains several flaws: first and most obviously, Plaintiffs' allegations on training have nothing to do with the outputs generated in response to prompts by the end-users of LOVO's model. Second, although Defendant is correct that the training process is designed to craft an AI model that generates outputs, that does not mean the steps of the training process are all outputs. For instance, a spectrogram representation of one of the Copyrighted Works which captures "every aspect" of the copyrighted work is not an "output" in any meaningful way. *See* SAC ¶ 122. In any event, even if the training process *did* generate intermediate outputs, Plaintiffs are not barred by the Court's July 10 ruling from alleging that *those* outputs infringed on their copyrights, since the Court's ruling just applied "to the voice clones themselves." *Lehrman*, 2025 U.S. Dist. LEXIS 131464, at *56.

## II.    **Defendant's invocation of the affirmative defense of fair use is both premature and meritless.**

Defendant argues that even if Plaintiffs have adequately alleged infringement, their sixth cause of action must still be dismissed since using the Copyrighted Works for training "is clearly a fair use." Def.'s Second Mot. to Dismiss at 22. This argument is premature, and it is also wrong on the merits.

### A.    **This is not one of the rare cases where fair use can be adjudicated at the pleading stage.**

Because it is an affirmative defense, "fair use is susceptible to the general rule that 'a plaintiff ordinarily need neither anticipate, nor plead facts to avoid, a defendant's affirmative defenses at the pleadings stage.'" *Hayden v. Koons*, No. 21-cv-10249, 2022 U.S. Dist. LEXIS 127368, at *11 (S.D.N.Y. July 18, 2022) (quoting *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021)). "Because fair use is a fact-intensive inquiry, it is rarely appropriate for a court to make a determination of fair use at the motion to dismiss stage." *Grant*, 563 F. Supp. 3d at 284. Although the Second Circuit "has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim," that is the exception, not the rule. *TCA TV Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016).

Defendant's fair use defense implicates many factual questions that are *not* "clearly established by [the] complaint." *See id*. Indeed, as this Court has pointed out, the allegations about how LOVO trained its model depend on facts related to "a closed source algorithm to which [Plaintiffs] do[] not have access." *Lehrman*, 2025 U.S. Dist. LEXIS 131464, at *55. With the Court's permission, Plaintiffs amended their complaint to include additional factual detail relying on "information-and-belief pleading" and "generally available information about AI algorithms" to allege the way LOVO

infringed on Plaintiffs' copyright throughout the training process. *See id*; *see also* SAC ¶¶ 119–34. This Court cannot determine that LOVO's use of Plaintiffs' recordings was fair without access to details about how LOVO trained its model and how it used Plaintiffs' recordings in that process.

**B.**     <u>**Defendant has failed to establish that its use of the Copyrighted Works to train its AI models was fair.**</u>

In addition to being premature, Defendant's fair use defense also fails on the merits, since it has not demonstrated that its use of the Copyrighted Works had a "transformative purpose," and because LOVO copied the Copyrighted Works in their entirety hundreds of thousands of times to train its model. Even if this Court *were* to determine that LOVO's use of the Copyrighted Works was transformative "beyond that required to qualify as a derivative," *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 529 (2023), the effect on the potential market for Plaintiffs' voice recordings alone suffices to defeat Defendant's arguments that its use was fair, *Kadrey*, 2025 U.S. Dist. LEXIS 121064, at *76 (in cases involving wholesale copying of large swaths of copyrighted material, "plaintiffs will often win" where they can show "the market effects of the defendant's use").

As described above, the Copyright Act gives copyright owners the exclusive rights to authorize the use, distribution, reproduction, and preparation of derivative works based on the copyrighted work. 17 U.S.C. § 106. Notwithstanding this, the "fair use" of copyrighted works "for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The Copyright Act lists four factors to be considered when evaluating whether a given use is fair:

**(1)** the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

**(2)** the nature of the copyrighted work;

**(3)** the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

**(4)** the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Since fair use is an affirmative defense to a claim of copyright infringement, the burden of proof is on its proponent. *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998).

### 1.    **Purpose-and-character**

Two central considerations guide a court's analysis when considering the "purpose and character" of a challenged use: (1) whether the use is "commercial as opposed to nonprofit"; and (2) whether the purpose of the use is "distinct from," as opposed to similar to, the purpose of the original copyrighted work. *Andy Warhol Found.*, 598 U.S. at 531. In general, "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Id.* at 532–33; *see also Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (Leval, J.) ("The more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives, shrinking the protected market opportunities of

the copyrighted work.").

Because LOVO used the Copyrighted Works for a commercial purpose that was fundamentally the same as Plaintiffs' purpose in creating them (to make money selling professional-quality voice recordings), the "purpose and character" factor weighs against fair use. The Copyrighted Works were created for a commercial purpose, since Plaintiffs sold them for profit. LOVO then used the Copyrighted Works to train its commercial AI model. Defendant's argument that the Copyrighted Works were not created for commercial purposes since LOVO falsely told Plaintiffs the recordings would be used for "academic research" and as "test scripts for radio ads" is absurd. Def.'s Second Mot. to Dismiss at 24. LOVO paid for the recordings under false pretenses and based on the understanding that "Lovo would be able to use Plaintiffs' voice recordings only in narrowly circumscribed ways." *Lehrman*, 2025 U.S. Dist. LEXIS 131464, at *51. Defendant cannot escape the commercial nature of its use of the recordings *or* Plaintiffs' purpose in preparing them by reference to its own lies.

The Supreme Court has cautioned that "an overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works." *Andy Warhol Found.*, 598 U.S. at 529, 571. "To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id.* at 529. The owner of sound recording copyrights possesses the right to prepare derivative works "in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality." 17 U.S.C. § 106(2); 17 U.S.C. § 114(b).

LOVO's infringement of Plaintiffs' copyrights during the course of training its model, described above, "add[ed] no new new aesthetics, new insights and understandings to the original [sound] recordings it copie[d]." *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000). At most, LOVO converted the Copyrighted Works into spectrogram form, which "simply repackage[d] those recordings to facilitate their transmission through another medium." *Id.* While the training process LOVO used "may [have] be[en] innovative, [it was] not transformative." *Id.*; *see also Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 765 F. Supp. 3d 382, 399 (D. Del. 2025) (copying Westlaw headnotes to "develop a competing legal research tool" using AI was not transformative), *appeal docketed*, No. 25-8018 (3d Cir. Apr. 14, 2025).

Defendant's claim that its use was motivated by the purpose of "generat[ing] new sounds," and thus is "quintessentially transformative," fails, Def.'s Second Mot. to Dismiss at 24. Contrary to Defendant's wishful thinking, Plaintiffs' allegations have nothing to do with the now-dismissed claim that the "new sounds" generated by the outputs of LOVO's model violated their copyrights. Instead, Plaintiffs allege that LOVO repeatedly copied the Copyrighted Works in the course of *training* its model. *See* SAC ¶¶ 119–34, 249–62.

## 2.    Nature of the Copyrighted Works

The second factor—which considers the nature of the Copyrighted Works—"calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). Because it also focuses on the purpose of the copyrighted work, this analysis overlaps considerably with the question of the work's "transformative purpose." *See Authors*

*Guild*, 804 F.3d at 220 (the "transformative purpose" analysis "inevitably involves the second factor as well"). As a result, "the second factor has rarely played a significant role in the determination of a fair use dispute." *Id.*

As discussed above, the purpose and nature of the copying was fundamentally the same as Plaintiffs' purpose in creating the copyrighted works: to sell professional sounding voice recordings to consumers. The second factor accordingly cuts against a finding of fair use.

### 3. Amount and substantiality of portion used

The third factor relates to the scale of the copyrighted material used likewise militates against fair use. The Second Circuit has held that "a finding of fair use is more likely when small amounts, or less important passages, are copied than when the copying is extensive, or encompasses the most important parts of the original." *Authors Guild*, 804 F.3d at 221. The rationale is that copying larger portions of an original increases the "likelihood that the secondary work might serve as an effectively competing substitute for the original, and might therefore diminish the original rights holder's sales and profits." *Id.* This factor plainly favors Plaintiffs since LOVO copied *all* of the Copyrighted Works "hundreds of thousands of times." SAC ¶¶ 124, 126, 130.

### 4. Effect on the potential market for the Copyrighted Works

The fourth factor, which the Supreme Court has called "undoubtedly the single most important element of fair use," *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 566 (1985), considers the impact of the copying on the market for the copyrighted materials. Courts have held that, in general, "when the secondary use is transformative, 'market substitution is at least less certain, and market harm may not be so readily inferred.'" *Authors Guild*, 804 F.3d at 214 (quoting *Campbell v. Acuff-Rose*

*Music, Inc.*, 510 U.S. 569, 591 (1994)). But this proposition does not hold true when the secondary use involves "develop[ing] a tool to make billions or trillions of dollars while enabling the creation of a potentially endless stream of competing works that could significantly harm the market for those [copyrighted works]." *Kadrey*, 2025 U.S. Dist. LEXIS 121064, at *76.

One court to address this factor adopted a contrary approach in the context of training LLMs on copyrighted books determined that the copying there did not displace the market for the books since it was "no different than . . . training schoolchildren to write well would result in an explosion of competing works." *Bartz v. Anthropic PBC*, No. 24-cv-05417 WHA, 2025 U.S. Dist. LEXIS 118989, at *49-50 (N.D. Cal. June 23, 2025). Although there are strong arguments that an LLM trained on the writing in the copyrighted books of the plaintiff authors in that case *would* be meaningfully different than a new generation of writers entering the book-writing marketplace, the circumstances here are nonetheless distinguishable.

The relevant "potential market" in this case is not just the market for voice recordings by professional voice actors (though LOVO has no doubt had an impact on that market too). Here, the "potential market" is the market for voice recordings *by Plaintiffs* whose voices were cloned by LOVO. LOVO trained its model to replicate the voices of these particular voice actor Plaintiffs, which has had a direct and clear impact on the market for their voices. Because LOVO sold synthetic versions of their voices at a sharp discount, the market for their human voices suffered and this consideration counsels against finding LOVO's use was fair.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Second Motion to Dismiss should be denied.

Dated: October 6, 2025

Respectfully Submitted,

POLLOCK COHEN LLP

By:  /s/ *DRAFT*
Steve Cohen
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Steve@PollockCohen.com

*Counsel for Plaintiffs*

- 21 -